**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MICHAEL E. LIPSCOMB,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **C.A. No. 1:07CV00103 (JDB)** |
| | ) | |
| **DONALD C. WINTER,** | ) | |
| **Secretary of the Navy,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

Pursuant to Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure, defendant respectfully moves to dismiss the complaint in this case.  Alternatively, defendant moves for summary judgment pursuant to Fed. R. Civ. P. 56.  As set forth in the Memorandum of Points and Authorities in support of this motion, plaintiff has failed to state a claim upon which relief can be granted.  Alternatively, there are no material facts in genuine dispute and defendant is entitled to judgment as a matter of law.  Wherefore, plaintiff respectfully requests that plaintiff's complaint be dismissed with prejudice or summary judgment entered in defendant's behalf.

Respectfully submitted,

_____/s/_____
JEFFREY A. TAYLOR , D.C. Bar # 498610
United States Attorney

_____/s/_____
RUDOLPH CONTRERAS, Bar # 434122
Assistant United States Attorney

_____/s/_____
CLAIRE WHITAKER, D.C. Bar # 354530
Assistant United States Attorney
United States Attorneys Office
Civil Division
555 4th Street, N.W., Room E-4204
Washington, D.C. 20530
(202) 514-7137

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MICHAEL E. LIPSCOMB,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **C.A. No. 1:07CV00103 (JDB)** |
| | ) | |
| **DONALD C. WINTER,** | ) | |
| **Secretary of the Navy,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

<u>**MEMORANDUM IN SUPPORT OF MOTION FOR DISMISSAL AND SUMMARY**</u>
<u>**JUDGMENT ON BEHALF OF DONALD C. WINTER, SECRETARY OF THE NAVY**</u>

       Pursuant to Rule 12(b) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."),

Defendant Donald C. Winter, Secretary of the Navy, moves to dismiss Plaintiff's complaint

based on exhaustion grounds and failure to state a claim for relief.  Alternatively, Defendant

moves for summary judgment pursuant to Fed. R. Civ. P. 56.

### I.  Preliminary Statement

       The Plaintiff, Michael Lipscomb, an African-American male, is employed by the

Department of the Navy (DON) as a GS-1173-09 Housing Management Specialist at Naval

Support Activity-Washington (NSA-W) at the Washington Navy Yard ("Navy Yard").  During

the relevant time in this case (March 1999 to June 1999), he was assigned to Flag Housing

Division (which housing services to Flag officers such as Admirals). In his Complaint, Plaintiff

claims that the DON discriminated against him and harassed him, in violation of Title VII (42

U.S.C. § 2000 et. seq.), based on his sex and race when (R. 1 ("Complaint") at Exhibit 1):

      1.  He was subjected to continuous and on-going harassment by management officials
          beginning March 4, 1999, which included being accused of abusing his telephone

privileges, having his supervisor label him inadequate in the performance of his duties & having the Agency investigate him regarding possible sexual harassment; and

2. On or about April 21, 1999, he was denied a promotion to Housing Manager, GS-1173-11.

R. 1, Exhibit A (12/31/99 EEOC Decision, citing Agency Acceptance Letter), p. 1.  Thus, there are only two 1999 claims that were accepted and investigated by the Agency.  To the extent that Plaintiff avers in his complaint that there are other nonpromotion claims in 1997, 1998 or after 2000, Defendant moves to dismiss those claims because he failed to exhaust them pursuant to 29 C.F.R. § 1614.105(a)(1).

With regard to the "Accepted Claims" (R. 1, Exhibit A), they are also subject to dismissal.  Plaintiff admitted at his deposition that he did not seek a promotion on April 21, 1999, or within 45 days of when he first sought EEO counseling in this case.  Thus, this claim is also subject to dismissal on exhaustion grounds. Id.; see Attachment 2, hereto, Deposition of Michael Lipscomb (Lipscomb Dep.) at pp, 112, lines 3-5; p. 113, lines 8-10.

With regard to Plaintiff's claims of harassment commencing on March 4, 1999, they are also subject to dismissal because they do not support Plaintiff's claim of hostile work environment based on race or sex.  There were three claims: (1) accusations in March 1999, regarding unauthorized use of the telephones; (2) being labeled as inadequate in his performance on March 5, 1999, when he discussed his performance evaluation with his supervisor, and (3) being the subject of an investigation emanating from a March 5, 1999, report of sexual harassment by Plaintiff of an Admiral's assistant. The events were based on independent third party reports from the administrative office (telephone usage) and from Flag Officers and or families that Plaintiff served.  They occurred in about March through April 1999.  Plaintiff filed

2

his Formal Complaint of Discrimination on June 23, 1999. These claims were not racially or sexually motivated or pervasive.  Indeed, Plaintiff admitted that he used the phones for personal use.  <u>Id</u>. at pp. 93-94; pp. 133-135. Plaintiff was aware of complaints from Flag Officers (Admirals) or their wives, concerning his performance.  These complaints could not be ignored by his supervisors and obviously had bearing on his evaluation. <u>See</u> Attachment 2 (Lipscomb Dep.) at p. 42, lines 7-19; p. 71, lines 12-15; p. 154, lines 18-21; Attachment 3 (Formal Complaint) at 3-5; <u>see</u> <u>also</u> Attachment 11 (Affidavit of Glenda Brown), pp. 1-4.  The charge of sexual harassment lodged against Plaintiff in March 1999, was reported by an Admiral and also could not be ignored by Plaintiff's supervisors. Attachment 2 at p. 71, lines 12-15; p. 100, lines 21-22; p. 101, lines 1-11.

Thus, the circumstances leading to Plaintiff's perceived harassment claim were not racially or sexually motivated; were based on complaints from independent sources and involved discrete events.  Although they may have caused Plaintiff stress and he believed that he was isolated, they were not pervasively hostile under the law of hostile work environment. <u>See</u> <u>infra</u>. at IV. Argument.

## II.    Factual Background

Plaintiff's claims (i.e., nonpromotion on 4/21/99, and harassment commencing on March 4, 1999) before this Court were brought to an EEO counselor's attention on March 31, 1999, and April 21, 1999.  Attachment 1 (Counselor's Report) at 1.   These are the claims before the Court.

The factual background of these claims is as follows:  Plaintiff began working for Defendant in 1992 as a Housing Management Specialist (GS-1173-07) in the Housing Office at the Bethesda National Naval Medical Center. Attachment 2 (Lipscomb Dep., p. 14, lines 18-22). In 1995, he was transferred to the Navy Yard as a Housing Management Specialist. <u>Id</u>. at p. 15,

3

lines 21-22; p. 16, lines 1-4.  When Plaintiff transferred to the Navy Yard, he worked for the

Housing Office, Flag Housing Division, which was responsible for maintenance, upkeep and

repair for the homes within the Washington Navy Yard occupied by the top Navy and Marine

Corps brass (i.e. Admirals and Generals), known as the "Flag Officers."  In this capacity,

Plaintiff was the Housing Office's point of contact for these Flag Officers and their families for

any issues related to their housing. Id. at p. 18, lines 13-19.

In June 1996, Plaintiff was non-competitively promoted from the GS-07 level to the GS-

09 level on the recommendations of his first level supervisor (Barbara Beeler) and his second

level supervisor (LCDR Jim M. Wink).[1] See Attachment 8 (SF-50 form) and Attachment 9

(LCDR Wink Memo).  The next year, Plaintiff was rated as "Level 5/Outstanding" (on a five-tier

rating scale, for which a rating of five was the highest possible) and recommended for promotion

to the GS-11 level by his first level supervisor, LT Brett Blanton (who had taken over from Ms.

Beeler). Attachment 10 (Performance Appraisal for period 3/2/97 – 10/17/97).  Plaintiff was not

promoted to the GS-11 level because LCDR Wink, his second level supervisor, did not feel that

Plaintiff was qualified to perform at the GS-11 level at that time and because one of the Flag

Officers, Rear Admiral (RADM) Mobley, had complained about Plaintiff. Attachment 2

(Lipscomb Dep.), pp. 42-44; Attachment 3 at p. 5.  Plaintiff did not seek EEO counseling for the

nonpromotion and raised it for the first time in 1999. Id.; see also Attachment 2 (Lipscomb Dep.)

at p. 45, lines 20-22; p. 46, lines 1-4.

---

[1]Plaintiff's position as a Housing Management Specialist is a "career ladder" position, which allows for non-competitive promotion between GS grades 7, 9 and 11, subject to satisfactory performance. See HROWASHDC INSTRUCTION 12335.1F, Merit Promotion Procedures Manual (1993), Attachment 7.

4

In December 1997, Glenda Brown (the alleged discriminating official) replaced LT Blanton as Plaintiff's first level supervisor. Attachment 11 (Affidavit of Glenda Brown) at p. 1. Shortly after she began supervising Plaintiff, Ms. Brown submitted paperwork to promote him to the GS-11 level. Id. Ms. Brown was informed that RADM Ellis, Commandant of the Washington Navy Yard (where the flag housing was located), would not approve the Plaintiff's promotion, as RADM Ellis had personally barred Plaintiff from his own quarters due to Plaintiff's incompetence. Id.

In March 1998, Plaintiff received his first performance evaluation under Ms. Brown and his new second level supervisor, LCDR Andrew Trotta, which rated Plaintiff as "Level 4: Exceeds Fully Successful." Attachment 12 (Performance Appraisal for period 10/18/97 – 2/28/98). Ms. Brown also resubmitted her request to promote Plaintiff to the GS-11 level but he was not promoted. Attachment 11 at p. 2; Attachment 2 (Lipscomb Dep.), p. 66, lines 20-22. There is no record that Plaintiff sought counseling for this nonpromotion in 1998 or before his Formal Complaint in this case which is dated June 23, 1999. Attachment 3.

In 1998, Plaintiff's performance began to deteriorate. See Attachment 13. (Employee Performance Journal – progress reports). He began failing to complete tasks on time [id. at p. 2], slept during training [id.] and was the subject of complaints, e.g., a Flag Housing resident reported that Plaintiff had entered his home without permission, which Plaintiff acknowledged he had done. Id. at p. 3.

In his performance evaluation for the 1998-1999 rating cycle, received on March 5, 1999, Plaintiff was rated as "Acceptable" (under a new two tier appraisal system - "Acceptable" or "Unacceptable"). Attachment 14 (Performance Appraisal for period 4/1/98 – 2/28/99). In the comments section on the performance appraisal, Ms. Brown noted that Plaintiff had been

distracted and struggling during the rating cycle, he was failing to complete simple tasks and that his performance was "at the bare minimum level for acceptance." Id. at 4. Ms. Brown scheduled Plaintiff for additional formal training and noted that his performance would be closely monitored for the next 60 days and then re-evaluated. Id. Ms. Brown also raised the possibility of re-assigning Plaintiff out of Flag Housing into another Housing Manager position. Attachment 11 at p. 2.  Nevertheless, plaintiff's performance continued to lag. Attachment 13 at p. 3. Plaintiff sought EEO counseling, not for the acceptable rating, but, instead, based on a claim of harassment by his supervisor. Attachment 1 at 1.

In February 1999, several people in the Housing Office, including Plaintiff, were notified that an independent audit had been conducted on government telephone usage (cellular and landline) during the months of October - December, 1998, and they were required to repay the Government for unauthorized calls. See Attachment 11 (Brown Affidavit), at p. 2.  Neither Plaintiff nor any other employees were disciplined for their excessive phone usage, although some, including Plaintiff, were counseled, and a memo discussing phone usage policy was disseminated to the entire Family Housing Staff. Memo to Family Housing Staff. Attachment 15. Plaintiff sought EEO counseling on March 31, 1999, not because he was wrongfully charged with unauthorized use of the telephones, but instead for alleged harassment by Ms. Brown in counseling him for said unauthorized use. Attachment 1 at 1; Attachment 2 (Lipscomb Dep.) at p. 93, lines 15-22; p. 94, lines 1-9.

On or around March 4, 1999, a female mess steward, MS2 Denise Arthur, accused Plaintiff of sexually harassing her in ADM Nelson's residence. Attachment 16 (Denise Arthur's Statement).  ADM Nelson's wife became aware of the incident and ADM Nelson contacted Plaintiff's chain of command, which initiated an investigation. Attachment 11 at p. 3. During the

course of the investigation, Plaintiff continued working in Flag Housing, but was assigned to a desk job and restricted from interacting with customers. Id. Plaintiff's Command, specifically LCDR Trotta, conducted an investigation into the sexual harassment allegation, which included interviewing MS2 Arthur and obtaining a signed sworn statement from her (See Attachment 16) and interviewing Plaintiff, who also provided a statement. Requests for Statement and Statement. Attachment 17. The investigation did not reach any formal conclusions, and Plaintiff was not disciplined for the alleged misconduct. Attachment 11 at p. 4. Following this incident, however, Plaintiff was laterally transferred within the Family Housing Office from the Flag Housing to Customer Referrals. See Attachment 13 at p. 3. Plaintiff did not seek EEO counseling when he was transferred to the Customer Referral Office. Attachment 2 (Lipscomb Dep.) at p. 81, lines 1-8; p. 160, lines 7-15.

Because of the complaints concerning Plaintiff, management had contemplated transferring Plaintiff into a position where he did not have direct contact with Flag Officers and their families, due to the complaints they had been receiving, for a significant period of time (See, i.e. e-mail dated 1/19/1999 at Attachment 18). After the alleged sexual harassment, Plaintiff's chain of command felt that Plaintiff's relationship with the customers he was charged with serving in Flag Housing had deteriorated to the point at which he was no longer effective in his position, and was negatively impacting the Housing Office's mission. See Attachment 13 at p. 4; Attachment 19 at p. 2. Plaintiff's performance appraisal for the period between March 1, 1999, and April 19, 1999, rated him as "Acceptable" overall, (Performance Appraisal for period 3/1/99 – 4/19/99 at Attachment 19), but as "Unacceptable" in the "Customer Service/Working Relations" element. Attachment 19 at p. 4. Plaintiff did not seek EEO counseling for the rating, but did seek counseling for the alleged harassing associated with the rating. Attachment 1 at p. 3.

7

On March 31, 1999, Plaintiff contacted EEO Counselor Loretta Johnson. Attachment 1 at p. 1. In a letter to Ms. Johnson dated April 21, 1999, which he later used as the basis for the allegations in his formal complaint, Plaintiff alleged that he had been discriminated against when Defendant did not promote him despite a supervisor's recommendation to do so in October 1997, accused him of abusing his telephone privileges, labeled him as inadequate for his job and investigated him for alleged sexual harassment. Attachment 3 (Formal Complaint) at pp. 3-6. With regard to the 1997 claim, Plaintiff acknowledged at his deposition that he first raised this claim to an EEO counselor in March of 1999. Attachment 2 (Lipscomb Dep.) at p. 45, lines 20-22; p. 46, lines 1-4.

On November 7, 1999, Ms. Brown temporarily promoted Plaintiff to the GS-1173-11 position for 90 days. Attachment 8. Plaintiff failed to perform adequately at the GS-11 level; he frequently failed to complete assignments, failed to brief his supervisor on his work status or problems, and was extremely unorganized, despite close supervision and "micro-management" by his supervisor, Pamela Curry. Attachment 6 at pp. 4-5. He was rated as "Unacceptable" for his performance period at the GS-11 level, and was returned to the GS-9 level after 90 days. Attachment 6. These events occurred after Plaintiff filed his Formal Complaint of discrimination/harassment in June 28, 1999. Attachment 3. There is no record of any amendments to this complaint. Plaintiff never spoke to an EEO counselor about the unacceptable performance rating while he was temporarily promoted. Attachment 2 at p. 66, lines 4-13. It did not become part of the accepted claims in this case. See R. 1 at Exhibit A and Attachment 20.

II.  Standard of Review.

A.  Fed. R. Civ. P. 12(b)(1).

Fed. R. Civ. P. 12(b)(1) provides that a party may move to dismiss when the Court lacks

jurisdiction over the subject matter of the lawsuit.  The requirement that subject matter

jurisdiction must exist in every case can neither be waived by the parties nor achieved by their

consent. When a claim does not fall within the jurisdiction conferred upon district courts, the

proper practice is to dismiss for lack of jurisdiction. Williams v. United States, 50 F.3d 299, 304

(4th Cir. 1995).

Plaintiff bears the burden of proving that subject matter jurisdiction exists, "because the

party suing the United States must demonstrate an unequivocal waiver of sovereign immunity."

Williams, 50 F.3d at 304.

B.  Fed. R. Civ. P. 12(b)(6).

Fed. R. Civ. P. 12(b)(6) provides for dismissal of a lawsuit when plaintiff's fails to state a

claim upon which relief can be granted. "[A] complaint should not be dismissed for failure to

state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support

of his claim which would entitle him to relief." Thomas v. City Lights School, Inc., et al., 124

F.Supp.2d 707, 708 (D.D.C. 2000) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957));

Hishon v. King and Spaulding, 467 U.S. 69, 73, (1984).  Plaintiff's factual allegations must be

accepted as true when reviewing the adequacy of the complaint pursuant to Fed. R. Civ. P.

12(b)(6). Hill v. City of New York, 45 F.3d 653, 657 (2d Cir. 1995).  However, factual

allegations "must be enough to raise a right to relief above the speculative level," and that a

plaintiff must make "a 'showing,' rather than a blanket assertion, of entitlement to relief.'" Bell

Atlantic Corp. v. Twombly, --- U.S. --- , 127 S. Ct. 1955, 1964-65 (2007).

9

A Rule 12(b)(6) motion may be converted into a summary judgment motion pursuant to Fed. R. Civ. P. 56 when matters outside the pleadings are considered.  While the plaintiff need not plead the elements of a prima facie case in the pleadings, the plaintiff carries the burden of alleging a set of facts upon which relief can be granted.  Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002).

C.  The Standard for Summary Judgment

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Diamond v. Atwood, 43 F.3d 1538, 1540 (D.C. Cir. 1995); Molerio v. FBI, 749 F.2d 815, 823 (D.C. Cir. 1984).  Where no genuine dispute exists as to any material fact, summary judgment is required.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A genuine issue of material fact is one that could change the outcome of the litigation. Id. at 247.  The party moving for summary judgment need not prove the absence of an essential element of the nonmoving party's case.  Celotex, 477 U.S. at 325.  "The burden on the moving party may be discharged by "'informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.."  Kilby-Robb v. Spellings, __ F.Supp.2d __, 2007 WL 4142750 (D.D.C. Nov. 23, 2007) (citing Celotex, 477 U.S. at 323).  Once the moving party has met its burden, the non-movant may not rest on mere allegations, but must proffer specific facts showing that a genuine issue exists for trial.  See Matsushita Elec. Indus. Co. v. Zenith

10

Radio Corp., 475 U.S. 574, 586 (1986).  Fed. R. Civ. P. 56(e) requires the party opposing

summary judgment to go beyond the pleadings, and by affidavits, depositions, answers to

interrogatories or admissions set forth "specific facts showing that there is a genuine issue for

trial." Celotex, 477 U.S. at 324; Banks v. C & P Tel. Co., 802 F.2d 1416 (D.C. Cir. 1986). The

court must regard the non-movant's statements as true and accept all evidence and make all

inferences in the non-movant's favor. Kilby-Robb v. Spellings, 2007 WL 4142750 *4 (citing

Anderson., 477 U.S. at 255.   "'If the evidence is merely colorable, or is not significantly

probative, summary judgment may be granted.'" Id. (citing Anderson, 477 U.S. at 249-50.

In *Fogg v. Gonzales*, 492 F.3d 447 (D.C. Cir. 2007), the D.C. Circuit held, *inter

alia*, that the 1991 amendments to Title VII codified two alternative ways of establishing

liability for intentional discrimination: (1) a single motive theory requiring that the

plaintiff establish that discrimination was the "sole" or "but for" reason for the challenged

employment action; and (2) a "mixed-motive" theory requiring only that the plaintiff

demonstrate that discrimination played a "motivating part" or was a "substantial factor"

in the employment decision.  Id. at 451.  Under either theory, plaintiff must demonstrate

discrimination by a preponderance of the evidence[2] and may rely on direct or

circumstantial evidence to meet that burden.  Desert Palace, Inc. v. Costa, 539 U.S. 90,

92-102 (2003).

---

[2] "Preponderance of the evidence" means such evidence as, when weighed against that
opposing it, has the more convincing force that something is so.  Hopkins v. Price Waterhouse,
737 F. Supp. 1202 (D.D.C. 1990), *aff'd* 920 F.2d 967 (D.C. Cir. 1990);  Metropolitan Stevedore
Company v. Rambo, 521 U.S. 121, 137 n.9 (1997).  "[W]hen the evidence is evenly balanced,
the [party with the burden of persuasion] must lose." Id.

In the absence of direct evidence, Plaintiff may attempt to establish that he was the victim of intentional discrimination on the basis of his race by relying on circumstantial evidence analyzed using the scheme first set forth in McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973).[3] Under that scheme, the plaintiff must first, by a preponderance of the evidence, establish a prima facie case of discrimination. See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993). If the employee succeeds, the employer then must introduce evidence of a legitimate, nondiscriminatory reason for its action. See McDonnell Douglas, 411 U.S. at 802. Once it is established that both parties have met their respective burdens of production (i.e., plaintiff by presenting a prima facie case and defendant by producing a non-discriminatory reason for its actions), the burden shifting scheme becomes irrelevant. Hicks, 509 U.S. at 510. Then, the plaintiff must establish, by a preponderance of the evidence, that "race, color, religion, sex, or national origin was a motivating factor for any employment practice." Desert Palace, Inc. v. Costa, 539 U.S. 90, 101 (2003) (citing 42 U.S.C. § 2000e-2(m)).

Alternatively, plaintiff can meet the ultimate burden by demonstrating that the defendant's legitimate, non-discriminatory reason is a pretext and that discrimination is the "but for" reason for the challenged employment action. St. Mary's Honor Center, 509 U.S. at 515-518. This a more difficult standard than the requirement under Section 2000e-2(m) to show that discrimination was a motivating factor. In the single motive

_____

[3] Reliance on the McDonnell Douglas scheme for testing the viability of plaintiff's circumstantial evidence is not limited to the "single-motive" theory of liability. See Fogg v. Gonzales, 492 F.3d 447, 451 n.*

case, in <u>Reeves v. Sanderson Plumbing Products, Inc</u>., 530 U.S. 133, 148 (2000), Justice

O'Connor recognized occasions where summary judgment would be appropriate:

> Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

Which ever standard is employed, plaintiff fails to meet his burden of coming

forward with evidence to create a triable issue. As demonstrated below, the undisputed

facts illustrate that plaintiff cannot demonstrate that discrimination was a motivating

factor, much less that it was the sole motivating factor in the challenged decision.

D. <u>Prima Facie Case of Race or Sex Discrimination.</u>

The Supreme Court established the shifting burdens of production in a Title VII case in

<u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). The plaintiff has the initial burden of

establishing that there is some substance to their discriminatory allegation. In order to meet this

burden, the plaintiff must establish a <u>prima facie</u> case of discrimination. <u>See</u> <u>Furnco Construction

Co. v. Waters</u>, 438 U.S. 567 (1978). The plaintiff must present a body of evidence that, if not

rebutted, could lead the trier of fact to conclude that unlawful discrimination occurred.

"Demonstrating a <u>prima facie</u> case is not onerous; it requires only that the plaintiff establish facts

adequate to permit an inference of discrimination." <u>Williams v. Ford Motor Co</u>., 14 F.3d 1305,

13

1308 (8th Cir.1994). See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253-54,

101 S. Ct. 1089, 1093-94, 67 L. Ed. 2d 207 (1981).

Under McDonnell Douglas, a plaintiff establishes a prima facie case of race or sex

discrimination under Title VII by showing: (1) he belongs to a protected group; (2) he was

subjected to adverse job action; and (3) his employer treated similarly-situated employees

outside his classification more favorably. 411 U.S. at 802. The plaintiff may satisfy the third

prong of this test by demonstrating that he was treated differently from similarly-situated

employees who are not part of the protected class. Holbrook v. Reno, 196 F.3d 255, 261 (D.C.

Cir. 1999).

E.  Standard for Hostile Work Environment Claim.

The Supreme Court held in National Railroad Passenger Corp. v. Morgan, 536 U.S.

101, 116 (2002) that hostile work environment claims based on racial harassment are reviewed

under the same standard as those based on sexual harassment. Id. at 116 (citing Faragher v. Boca

Raton, 524 U.S. 775, 786-787 and n. 1 (1998); Meritor Savings Bank, FSB v. Vinson, 477 U.S.

57, 66-67 (1986).

As this Court discussed in Edwards v. United States EPA, 456 F. Supp. 2d 72, 84

(D.D.C. 2006), dismissed by Edwards v. EPA, 2007 U.S. App. LEXIS 4681 (D.C. Cir., Feb. 6,

2007), a different standard applies to plaintiff's claim that he was subjected to a hostile work

environment as opposed to a disparate treatment claim:

> The workplace is 'hostile' for purposes of Title VII only when the offensive conduct
> 'permeates [the workplace] with discriminatory intimidation, ridicule, and insult, that
> is sufficiently severe or pervasive to alter the conditions of the victim's employment
> and create an abusive working environment.'" Bell v. Gonzales, 398 F. Supp. 2d 78,
> 91 (D.D.C. 2005) (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75,
> 78, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998) (in turn quoting Harris v. Forklift Sys.,
> Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993))). In deciding

14

whether the plaintiff has met this threshold requirement, the Court must examine all of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." George v. Leavitt, 366 U.S. App. D.C. 11, 407 F.3d 405, 416 (D.C. Cir. 2005) (quoting Harris, 510 U.S. at 23 (internal quotation marks omitted)). Edwards 456 F. Supp. 2d at 84.

A single act of harassment may not be actionable on its own. See Morgan, 536 U.S. at 114.   A claim of hostile work environment, by its very nature "involves repeated conduct." Id. at 113-114.

    F.  Failure to Exhaust Administrative Remedies.

Title VII of the Civil Rights Act of 1964 requires a plaintiff to exhaust his administrative remedies prior to bringing a Title VII claim against a federal agency in court. Gilmore v. Reno, 33 F. Supp. 2d 20, 24 (D.D.C. 1998) citing United Air Lines v. Evans, 431 U.S. 553, 555, 52 L. Ed. 2d 571, 97 S. Ct. 1885 (1977); see also Williamson v. Shalala, 992 F. Supp. 454, 457 (D.D.C. 1998), cert denied 525 U.S. 915; 119 S. Ct. 263 (1998) ("non-compliance with administrative deadlines will bar a plaintiff from litigating his claims in court"). It is plaintiff's burden to establish this Court's subject matter jurisdiction by a preponderance of the evidence. See, e.g., District of Columbia Retirement Bd. v. United States, 657 F.Supp. 428, 431 (D.D.C. 1987). "Because subject-matter jurisdiction focuses on the court's power to hear the plaintiff's claim, a Rule 12(b)(1) motion imposes on the court an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001) (citing 5A Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. 2d, § 1350).

Section 2000e-16(c) allows an employee of the federal government to file a civil suit based upon alleged discriminatory practices. 42 U.S.C. § 2000e-16(c). The statute contemplates

15

that a complainant must initially seek redress through the agency, prior to appealing to the courts. "Indeed, it is well-settled that federal employees must, absent equitable considerations, exhaust their administrative remedies prior to bringing suit under Title VII." Bayer v. United States Dep't of Treasury, 956 F.2d 330, 332 (D.C. Cir. 1992) ("Prior to instituting a court action under Title VII, a plaintiff alleging discrimination in federal employment must proceed before the agency charged with discrimination."). Failure to exhaust their administrative remedies deprives a district court of subject-matter jurisdiction. See Artis v. Greenspan, 158 F.3d 1301, 1303 (D.C. Cir. 1998).

The administrative requirements a plaintiff must meet in order to proceed in Federal Court under Title VII are set out in the Code of Federal Regulations. Under 29 C.F.R. § 1614, a federal employee with a discrimination complaint must, among other things: 1) consult a Counselor within 45 days of the alleged discriminatory act to try to informally resolve the matter," 29 C.F.R. § 1614.105(a)(1); 2) file a complaint "with the agency that allegedly discriminated against the complainant," 29 C.F.R. § 1614.106(a); and 3) "produce such documentary and testimonial evidence as the [independent and impartial] investigator deems necessary." 29 C.F.R. § 1614.108(c)(1). These regulations explicitly require an aggrieved party to participate in the investigation of a complaint. Id.; see also Barnes v. Levitt, 118 F.3d 404, 409 (5th Cir. 1997) (district court lacked jurisdiction in employment discrimination suit where plaintiff failed to participate in agency investigation); Crawford v. Babbitt, 186 F.3d 1322, 1326-27 (11th Cir. 1999) (plaintiff's failure to provide agency with requested information constituted failure to exhaust administrative remedies); Briley v. Carlin, 172 F.3d 567, 571 (8th Cir. 1999) ("In order to exhaust administrative remedies, the claimant is required to demonstrate good faith participation in the administrative process, which includes making

16

specific charges and providing information necessary to the investigation."). The mandatory nature of an employee's participation in the investigation of his EEO complaint could be undercut by later court acceptance of a lawsuit when he has, without reason, failed to cooperate in that investigation. Jeffers v. Chao, 2004 U.S. Dist. LEXIS 27541, *23 (D.D.C. 2004), recons denied 2005 U.S. Dist. LEXIS 12330 (D.D.C., June 14, 2005).

Compliance with these procedures and time limits is mandatory. Vickers v. Powell, 2005 U.S. Dist. LEXIS 35260, 92-94 (D.D.C. 2005); Saltz v. Lehman, 672 F.2d 207, 208 (D.C. Cir. 1982) (per curium); Wilkins v. Daley, 49 F. Supp. 2d 1, 2 (D.D.C. 1999).

### III. ARGUMENT

#### A. Plaintiff's Nonpromotion Claim(s) are Untimely.

In the present case, Plaintiff contacted an EEO Counselor on March 31, 1999, and filed his Formal Complaint on June 23, 1999, alleging two claims, a nonpromotion on April 21, 1999, and harassment commencing on March 4, 1999. R. 1 (Complaint) at Exhibit 1 and Attachment 3.[4]  No new claims were made after June 23, 1999, except that Plaintiff alleged nonpromotion claims in 1997 and 1998.  Attachment 3. Any claims of nonpromotion would be outside of the 45-day period for seeking counseling in this case and there is no evidence in the record that plaintiff sought counseling earlier on these stale claims.   In any event, they were

---

[4]Plaintiff was explicitly informed that: "The scope of the investigation will be limited to the issues accepted above and the EEO investigator is not authorized to inquire in any other matters. If you have other matters you wish to complain about, you must see an EEO Counselor immediately." Attachment 20 (Acceptance Letter) at 1. Plaintiff was also notified, and initialed, that "Only the matter(s) raised during informal counseling (or issues like or related to issues raised during informal counseling) may be alleged in a subsequent complaint filed with the activity."  Attachment 21 (Notice of Rights and Responsibilities).

not accepted claims and he can not raise them here. <u>See</u> Attachment 20 (Acceptance of Claims Letter).

With respect to his April 21, 1999, nonpromotion claim, Plaintiff testified that he **did not** seek a promotion on April 21, 1999, or before. Attachment 2 (Lipscomb Dep.), p. 113, lines 8-19. If this date was incorrect and he sought a promotion within the 45 days of EEO counseling, he did not plead it in his complaint or present any evidence that he did. Indeed, it is unlikely that Plaintiff did anything before the agency as he refused to participate in the process. <u>Id</u>. at pp. 85-88. It is apparent, therefore, that the Acceptance letter misidentified the non-promotion claim as taken place within the applicable time frame for investigation, while in reality, Plaintiff had not raised the promotion at all with an EEO Counselor. Accordingly, the non-promotion claims he may be alleging should be dismissed as untimely in accordance with 29 C.F.R. § 1614.105.

To the extent that Plaintiff may attempt to claim that he was continuously requesting a promotion, this argument is without merit and contrary to the law. First, there is no evidence in the record to substantiate that this argument was ever made below. Second and equally important is that settled law holds otherwise. Because Plaintiff's allegation of nonpromotion is a discrete act of discrimination, the "continuing violations theory" does not apply. <u>See</u> <u>National Railroad Passenger Corp. v. Morgan</u>, <u>supra</u>. <u>Morgan</u>, 536 U.S. at 113. A discrete act is an act that is severe enough to be actionable on its own. <u>See,</u> <u>Morgan</u>, 536 U.S. at 114. Because discrete acts are, by their nature, not continuing, the continuing violations theory cannot apply to them. <u>Id</u>. at 113. Accordingly, Plaintiff's claims of nonpromotion in 1997, 1998, or after 2000 are untimely.

18

Moreover, in Taylor v. Small, 350 F.3d 1286 (D.C. Cir. 2003) this Circuit found that the traditional McDonnell Douglas test "does not fit" Title VII discrimination claims involving non-competitive promotion, and held that in order to make out a prima facie case of discriminatory refusal to promote in a case where plaintiff is only claiming entitlement to an increase in pay or grade based on current responsibilities rather than promotion to a vacant position, "the plaintiff must show that she sought and was denied a promotion for which she was qualified, and that 'other employees of similar qualifications . . . were indeed promoted at the time the plaintiff's request for promotion was denied.'" Id. at 1294 (quoting Bundy v. Jackson, 205 U.S. App. D.C. 444, 641 F.2d 934, 951 (D.C. Cir. 1981)). As the Plaintiff can neither show that he requested a promotion on a specific date, nor that any other individual was promoted at the time Plaintiff's request was denied, he cannot establish a prima facie case.

In addition, this Court (Judge Urbina) has also ruled that additional claims which arise during the complaint process would merit an administrative complaint, and therefore can not be assumed included in an EEO complaint based on a past claim. Childers v. Slater, 44 F. Supp. 2d 8, 16 (D.D.C. 1999), modified on reconsideration, 197 F.R.D. 185 (D.D.C. 2000). In Childers, plaintiff's discriminatory non-promotion claims for each of the three years following the year she raised in her EEO Complaint were dismissed because she had not filed any new complaints following her initial complaint. 44 F.Supp.2d at 16-17. The Court determined that: "A court cannot allow liberal interpretation of an administrative charge to permit a litigant to bypass the Title VII administrative process." Id., citing Park, 71 F.3d at 907. Although the decision in this case was modified, the principle holding was not affected by the modification.

Defendant urges this Court to follow this Circuit's precedent and not permit Plaintiff to make such an unmeritorious argument. As plaintiff failed to request a promotion within the

19

45-day period before or after he sought counseling, his nonpromotion claim should be dismissed. <u>See</u> 29 C.F.R. § 1614.105(a); 29 C.F.R. § 1614.105(a)(1).

     B.     **Defendant Has Failed to Establish a Prima Facie Case of Sex or Race Discrimination and Defendant had Legitimate Nondiscriminatory Reasons <u>for the Actions Taken that were Not Pretext for Discrimination</u>.**

Even if the Court were to determine that Plaintiff was timely, Plaintiff can point to no similarly-situated individuals not in his protected groups that was treated differently. In addition, there were legitimate nondiscriminatory reasons for Defendant's actions that were not pretext for discrimination based on sex and race.

     1.   <u>There are No Similarly-Situated Employees Who Were Treated Differently.</u>

As noted above, Plaintiff can neither show that he requested a promotion on a specific date, nor that any other individual was promoted **at the time** Plaintiff's request was denied. Accordingly, this fact is fatal to his <u>prima</u> <u>facie</u> case of race or sex discrimination. <u>See</u> <u>Taylor</u> <u>supra</u>, 350 F.3d at 1294.

Although Plaintiff has argued to this Court that Defendant has failed to adequately respond to Plaintiff's discovery responses, Defendant has provided Plaintiff with all of the promotions to a GS-11 in his series in the Housing Office from 1997. Attachment 24 (Note: there were none in 1999. <u>See</u> <u>id.</u>). These records clearly show that there were no promotions of any employees in his grade or series in his office on April 21, 1999, when he allegedly was denied a promotion (the Accepted Claim of nonpromotion. <u>see</u> R. 1 at Ex. A). Indeed, there were no promotions in his grade or series in his office in 1999 at all.

At his deposition, Plaintiff attempted to establish that his co-worker Teasha (Floramae) Thompson was promoted to a GS-11 position, instead of him within the Flag Housing Division (Attachment 2 at p. 147, line 19-21). However, Plaintiff admitted that at the time of the alleged

denial of his promotion, i.e., April 21, 1999, Ms. Thompson was not even in Flag Housing.  See

Attachment 2 at pp. 185-187; p. 188, lines 3-18.   Moreover, Defendant's promotion records

and Ms. Thompson's Official Personnel File (offered to Plaintiff for review) contradict

Plaintiff's claim.  Ms. Thompson was temporarily promoted to GS-1173-11 for three months in

June 2000, more than a year after Plaintiff's alleged claim of nonpromotion. Ms. Thompson

subsequently competed for and was selected for a permanent GS-1173-11 position on July 16,

2000.  Attachment 22 (Merit Promotion Certificate CAP/00E/002/CJ dated May 25, 2000).

Since Ms. Thompson's promotion was effected over a year after Plaintiff sought EEO

counseling, and was a position for which she competed, not a non-competitive career ladder

promotion (which is what Plaintiff sought), the holding of Taylor dictates dismissal of this case

for failure to establish a prima facie case of race or sex discrimination.

        This Court in Kilby-Robb v. Spellings, 2007 WL 4142750 *5, in analyzing a similar

claim for nonpromotion recognized the modified McDonnell Douglas test found in Marshall v.

Shalala, 16 F.Supp.2d 16, 19 (D.D.C. 1998).  In that case, the test required that plaintiff show

"(1) he belongs to a protected group; (2) he was qualified for and applied for a promotion; (3)

he was considered for and denied the promotion; and (4) other employees who were not

members of the protected group were indeed promoted at the time plaintiff's request for a

promotion was denied." Kilby-Robb v. Spellings, 2007 WL 4142750, *11.  In Kilby-Robb, the

plaintiff could not satisfy the second and fourth elements of this test.  In the instant case,

Plaintiff cannot satisfy the second, third and fourth elements.  He has denied specifically

seeking a promotion on April 21, 1999 (Element 2). See Attachment 2 at pp. 111-112, 113,

lines 8-10; p. 146, lines 2-4; Attachment 3 at p. 5.  He has presented no evidence that he was

considered for and denied the promotion.  Finally, there were no other employees in his grade

21

and series that were was promoted at that time. Attachment 25, Defendant's Supplemental Interrogatory Responses at #1.

Accordingly, he has failed to establish a prima facie case of discrimination.

2.  There Were Legitimate Nondiscriminatory Reasons for Plaintiff's Nonpromotion.

Even if Plaintiff could establish that his nonpromotion claim was timely, and that there were others in the office that were promoted at the same time he was not, Plaintiff cannot establish discriminatory intent by his supervisors based on either race or sex.

As the records before the Court show, his previous supervisor (and the alleged discriminatory official) recommended him in 1997 and 1998 for a promotion. See, i.e. Attachment 11 at 1.  His supervisor at the time of the complaint, Ms. Brown, stated in a sworn affidavit that she attempted to promote Plaintiff soon after she began supervising him. Attachment 11 at 1-2. The promotion was denied by RAM Ellis, the NDW Commandant, who stated that he would not approve the promotion because he had personally barred Plaintiff from his own quarters due to the Plaintiff's incompetence. Id. at 1. Despite counseling, training, and a temporary promotion, Plaintiff was unable to demonstrate to his superiors that he was qualified for performance at the GS-11 level.  Rather, he has acknowledged a number of performance deficiencies, including admissions that: complaints about his performance were lodged with his supervisors by Admirals and their families (See, i.e., Attachment 2 (Lipscomb Dep.), p. 96, line. 22; pg. 97, line 1-12), his supervisor had to bring complaints about him from clients to his attention (See, i.e., id. at p.. 98, lines 20-22, p. 99, lines 1-4) and that there were complaints about missed deadlines and appointments. See, i.e., id. p. 139, lines. 3-4. Therefore, the Plaintiff can not prove a prima facie case for discriminatory nonselection, since he can not establish the requirement that he was qualified for the position.

22

In a career ladder position, the incumbent must be qualified for the next grade of the position in order to be promoted. The Agency has no obligation to promote the individual. See, Attachment 7 (HROWASHDC INSTRUCTION 12335.1F, Merit Promotion Procedures Manual (1993)). Under Section III: Exceptions to Competitive Merit Promotions it states:

> 3. The promotion of an employee occupying a designated career ladder position including a cooperative education student converted noncompetitively. **Employees are not entitled to promotion at any time and no promise of promotion is implied by selection to a career ladder position**. [emphasis added].

Id. at 6.

This Court (Judge Sullivan) noted the existence of a similar provision in Bolden v. Ashcroft, et al., 515 F.Supp.2d 127, 132 (D.D.C. 2007), that was relied on by the U.S. Marshal's Service when refusing to promote a poorly performing plaintiff in that case. After noting that an "acceptable" performance rating "seems to contradict the defendants' contention that plaintiff was not meeting performance requirements."[Id.], Judge Sullivan concluded that this factual dispute was "not fatal to defendants' motion for summary judgment "because the plaintiff could not "satisfy the second half of the prima facie test laid out in Taylor.[350 F.3d at 1294]" Id. That prong requires that there be a similarly-situated employee--a comparator in all relevant regards to plaintiff--who was promoted "to a higher salary grade when plaintiff was denied a promotion, . . " 515 F.Supp.2d at 132. As Plaintiff cannot identify a comparator, summary judgment is also warranted in this case.

3. Plaintiff Cannot Establish a Claim of Racial or Sexual Harassment:

Plaintiff alleges that he was the victim of harassment when he was accused of the unauthorized use of the telephones; criticized for his performance, and investigated for an allegation of sexual harassment. All of these events occurred in or about March 1999.

23

a. <u>Investigation into Charge Against Plaintiff for Sexual Harassment.</u>

Plaintiff does not deny that an allegation of sexual harassment was made against him, but rather he argues that investigating him in connection with the complaint was a form of harassment. Despite this assertion, he admits that the Agency has an affirmative duty to investigate these types of allegations. Attachment 2 at p. 71, lines 12-15; p. 100, lines 21-22; p. 101, lines 1-11; <u>see also</u> <u>McDonnell</u>, 84 F.3d at 261 (The employer who fails to investigate a charge of sexual misconduct will be liable under Title VII, should the charge turn out to be meritorious, for having failed to exercise due care to prevent sexual harassment.).

Even if  Plaintiff's allegations that the investigation was pursuant to the claims of an uncooperative accuser (…even though the accuser [i] refused to provide an affidavit of the accusation, [ii] refused to give a sworn letter or statement about the accusation, and[iii] refused to clearly testify, under oath, concerning the alleged sexual harassment." Compl. ¶ 14), are accepted as true, it does not alter the Agency's affirmative duty to investigate.  In <u>Flanagan v. Ashcroft</u>, 316 F.3d 728 (7th Cir. 2003), the Court held that:

> An investigation of sexual harassment that exceeds the proper limits is not itself a form of actionable sexual harassment. Permitting discrimination claims based on such investigations, we explained, would "place[] employers on a razor's edge": ignore complaints of sexual harassment and face Title VII liability if the complaints are meritorious, or investigate them thoroughly and face discrimination claims from the targeted employees. <u>See also</u>, <u>e.g.</u>, <u>Malik v. Carrier Corp.</u>, 202 F.3d 97 (2d Cir. 2000)(relying on similar reasoning to hold that claim for negligent infliction of emotional distress may not be premised on an employer's sexual harassment investigation). [internal citations omitted] 316 F. 3d at 703.

The Supreme Court, in <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775 (1998), stated that Title VII's primary objective is not to provide redress but to avoid harm. <u>Id</u>. at 806. Therefore, the Court explained, the EEOC adopted regulations advising employers to "take all steps necessary to prevent sexual harassment from occurring, such as . . . informing employees of

24

their right to raise and how to raise the issue of harassment." 29 CFR § 1604.11(f) (1997). Id. It is clear law and policy that employers are encouraged to, and indeed must, investigate sexual harassment claims, and thus there is no cause of action under Title VII which stems from an employer's investigation into a sexual harassment claim.

Furthermore, Plaintiff does not believe that Defendant discriminated by investigating him, only that he felt that his superiors didn't believe him:

> 20    Q.  So, is it just the fact that commander --
> 21   Lt. Comdr. Trotta confronted you about this
> 22   accusation that you think was discriminatory?
>  1    A.  Yes, it is just how he came at me.  He
>  2   came -- as my line of supervisor, I would think you
>  3   would at least try to hear me out, because I have
>  4   been working for him and doing good work for him, and
>  5   he didn't even give me the opportunity -- I spoke to
>  6   him, but he was like, I hear what you are saying.  I
>  7   don't believe you.

Attachment 2 at p. 104, lines 20-22, p. 105, lines 1-7.   However, Plaintiff did admit that his supervisors had to investigate the charge. Id. at p. 71, lines 12-15; p. 100, lines 21-22; p. 101, lines 1-11.

Furthermore, Plaintiff's Complaint misstates the factual nature of the sexual harassment complaint which precipitated the investigation. In his Complaint, Plaintiff repeatedly represents that Denise Arthur, the individual who accused him of sexual harassment, refused to provide an affidavit, sworn statement or any communication under penalty of perjury. See Compl. ¶¶14, 18 and 23. At the time Plaintiff filed this Complaint, however, he had a copy of the Report of Investigation compiled in the course of the Formal Investigation into his EEO Complaint, which included a statement from Denise Arthur, given to LCDR Trotta on March 19, 1999. 16. Ms. Arthur's signature appears immediately below the sentence: "I have reviewed and initial

[sic] any changes and attest that the information stated here is true and correct to the best of my knowledge." Attachment 16 at p. 3.

Finally, it bears repeating that Plaintiff was not disciplined as a result of the investigation.

### b.  Plaintiff was Criticized for his Inadequate Performance.

This alleged harassment occurred on March 4, 1999, when he discussed his 1998-1999 performance rating of "Acceptable" with his supervisor, Glenda Brown.  The criticisms were of no surprise to Plaintiff.  He acknowledged that there were complaints from his clients in Flag Housing, i.e.,  from Admirals and their families. Attachment 2 (Lipscomb Dep.) at p.96, line. 22, p. 97, lines 1-12; p. 98, lines 20-22, p. 99, lines 1-4.  He also admitted that he did have performance problems (i.e. Plaintiff admits that there were complaints about missed appointments and deadlines. Id. at p.99, lines 15 – 20; p. 139, line 3-4).  Accordingly, it is hard to imagine how bringing admitted shortcomings to Plaintiff's attention can be deemed illegal harassment.

### C.  Counseling About Telephone Usage:

Plaintiff was counseled about his telephone usage because it was excessive and unauthorized. An audit revealed that Plaintiff made 307 landline calls in a 20 day period, as well as calls from his government cell phone, although his job is 80% away from desk. Employee Performance Journal, Attachment 13 at p. 4. Plaintiff agrees with this assertion, and in his deposition admitted that he made too many unauthorized calls. Attachment 2 at p. 94, lines 7-9;  p. 133, lines 14-22, p. 134, lines 1-6; p. 135, lines 1-6.  Plaintiff even states that he believed the counseling he received about his telephone usage was only discrimination because he did not like the way: "they came at me with this, because, like I say, I was just doing my

job." Id. at p. 94, lines 1-3. Moreover, the audit involved all employees who had made unauthorized personal telephones calls and were therefore counseled and directed to repay the charges. See Attachment 11 at 2; Attachment 15.

None of Plaintiff's allegations are repetitive, severe or pervasive, and instead were minor and isolated incidents. Such isolated incidents cannot be construed to allege the basis for a hostile work environment claim. See, e.g. DM Research v. College of American Pathologists, 170 F.3d 53, 55-56 (1st Cir. 1999) (while plaintiff's facts must be accepted as alleged, this does not automatically extend to bald assertions, subjective characterizations, and legal conclusions); Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1088, 1092 (2d Cir. 1995) ("[c]onclusory allegations of the legal status of the defendants' acts need not be accepted as true for the purposes of ruling on a motion to dismiss"); First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 771 (2d Cir.1994), cert. denied, 513 U.S. 1079 (1994) ("the well-pleaded material allegations of the complaint are taken as admitted; but conclusions of law or unwarranted deductions of fact are not admitted"); Bender v. Suburban Hosp., Inc., 159 F.3d 186, 192 (4th Cir. 1998) (conclusory allegations were not required to be taken as true in employment discrimination suit); Northern Trust Co. v. Peters, 69 F.3d 123, 129 (7th Cir. 1995) (conclusory statements of law, and their unwarranted inferences, are not sufficient to defeat motion to dismiss for failure to state claim); Anderson v. Clow, 89 F.3d 1399, 1403 (9th Cir. 1996), cert. denied, 520 U.S. 1103 (1997) (conclusory allegations of law and unwarranted inferences are insufficient to defeat motion to dismiss for failure to state claim).

Plaintiff has not pled any facts which could be construed to demonstrate that the alleged harassment was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment. There is no genuine issue of material fact where the

27

relevant evidence in the record, taken as a whole, indicates that a reasonable fact-finder could not

return a verdict for the non-moving party. Beyond Plaintiff's bare allegations, the record is

utterly devoid of any evidence of discrimination.

III.  **CONCLUSION**

For the reasons stated herein, this Court should dismiss this case or order summary

judgment against Plaintiff and for Defendant on all counts.

Respectfully submitted,

_____/s/_____
JEFFREY A. TAYLOR , D.C. Bar # 498610
United States Attorney

_____/s/_____
RUDOLPH CONTRERAS, # D.C. 434122
Assistant United States Attorney

_____/s/_____
CLAIRE WHITAKER, D.C. Bar # 354530
 Assistant United States Attorney
 555 4th Street, N.W., Room E-4204
 Washington, D.C. 20530
 202-514-7137

OF COUNSEL:

ISAAC J. NATTER
Associate Counsel
Department of the Navy
Office of General Counsel-NDW

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| MICHAEL E. LIPSCOMB, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 1:07CV00103 (JDB) |
| | ) | |
| DONALD C. WINTER, | ) | |
| Secretary of the Navy, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**<u>DEFENDANT'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE</u>**

1. Plaintiff's claims before this Court consist of an alleged nonpromotion on 4/21/99, and alleged harassment commencing on March 4, 1999, with accusations of his unauthorized use of the telephones; criticisms on March 5, 1999, about his job performance; and, an investigation by his supervisors into a sexual harassment claim brought against him in March 1999. Any other claims he raises in his complaint are untimely. <u>See</u> R. 1 (Complaint) at Exhibit A.

2. Plaintiff sought EEO counseling for these claims on March 31, 1999, and April 21, 1999. Attachment 1 (Counselor's Report) at 1.

3. Plaintiff began working for Defendant in 1992 as a Housing Management Specialist (GS-1173-07) in the Housing Office at the Bethesda National Naval Medical Center in a career ladder position with promotion potential to GS 11. Attachment 2 (Lipscomb Dep., p. 14, lines 18-22); Attachment 7.

4. In 1995, he was transferred to the Naval Support Activity-Washington (NSA-W) at the Washington Navy Yard ("Navy Yard"). Attachment 2 at p. 15, lines 21-22; p. 16, lines 1-4.

5.  When Plaintiff transferred to the Navy Yard, he worked for the Housing Office, Flag Housing Division, which was responsible for maintenance, upkeep and repair for the homes within the Washington Navy Yard occupied by the top Navy and Marine Corps brass (i.e. Admirals and Generals), known as the "Flag Officers." Id. at p. 18, lines 13-19.

6.  In June 1996, Plaintiff was non-competitively promoted from the GS-07 level to the GS-09 level on the recommendations of his first level supervisor (Barbara Beeler) and his second level supervisor (LCDR Jim M. Wink). See Attachment 8 (SF-50 form) and Attachment 9 (LCDR Wink Memo).

7.  In 1997, Plaintiff was rated as "Level 5/Outstanding" (on a five-tier rating scale, for which a rating of five was the highest possible) and recommended for promotion to the GS-11 level by his first level supervisor, LT Brett Blanton (who had taken over from Ms. Beeler). Attachment 10 (Performance Appraisal for period 3/2/97 – 10/17/97).

8.  Plaintiff was not promoted to the GS-11 level because LCDR Wink, his second level supervisor, did not feel that Plaintiff was qualified to perform at the GS-11 level at that time and because one of the Flag Officers, Rear Admiral (RADM) Mobley, had complained about Plaintiff. Attachment 2 (Lipscomb Dep.), pp. 42-44; Attachment 3 at p. 5.  Plaintiff did not seek EEO counseling for the nonpromotion and raised it for the first time in 1999. Id.; see also Attachment 2 (Lipscomb Dep.) at p. 45, lines 20-22; p. 46, lines 1-4.

9.  In December 1997, Glenda Brown (an alleged discriminating official) replaced LT Blanton as Plaintiff's first level supervisor. Attachment 11 (Affidavit of Glenda Brown) at p. 1.

10.  Ms. Brown submitted paperwork to promote Plaintiff to the GS-11 level after becoming his supervisor. Id.  Ms. Brown was informed that RADM Ellis, Commandant of the Washington Navy Yard (where the flag housing was located), would not approve the Plaintiff's

promotion, as RADM Ellis had personally barred Plaintiff from his own quarters due to Plaintiff's incompetence. Id.

11.  In March 1998, Plaintiff received his first performance evaluation under Ms. Brown and his new second level supervisor, LCDR Andrew Trotta, which rated Plaintiff as "Level 4: Exceeds Fully Successful." Attachment 12 (Performance Appraisal for period 10/18/97 – 2/28/98).  Ms. Brown also resubmitted her request to promote Plaintiff to the GS-11 level but he was not promoted. Attachment 11 at p. 2; Attachment 2 (Lipscomb Dep.), p. 66, lines 20-22. There is no record that Plaintiff sought counseling for this nonpromotion in 1998 or before his Formal Complaint in this case which is dated June 23, 1999. Attachment 3.

12.  In 1998, Plaintiff's performance began to deteriorate. See Attachment 13. (Employee Performance Journal – progress reports).  He did not complete tasks on time [id. at p. 2], slept during training [id.] and was the subject of additional complaints, e.g., a Flag Housing resident reported that Plaintiff had entered his home without permission, which Plaintiff acknowledged he had done. Id. at p. 3.

13.  In his performance evaluation by Ms. Brown for the 1998-1999 rating cycle, received on March 5, 1999, Plaintiff was rated as "Acceptable" (under a new two tier appraisal system - "Acceptable" or "Unacceptable"). Attachment 14 (Performance Appraisal for period 4/1/98 – 2/28/99).  In the comments section on the performance appraisal, Ms. Brown noted that Plaintiff had been distracted and struggling during the rating cycle, he was failing to complete simple tasks and that his performance was "at the bare minimum level for acceptance." Id. at 4. Ms. Brown scheduled Plaintiff for additional formal training and noted that his performance would be closely monitored for the next 60 days and then re-evaluated. Id.

Ms. Brown also raised the possibility of re-assigning Plaintiff out of Flag Housing into another Housing Manager position. Attachment 11 at p. 2; see also Attachment 13 at p. 3.

14.  Plaintiff sought EEO counseling, not for the rating itself, but because he considered it to be harassment by management. Attachment 1 at 1.

15.  In February 1999, several people in the Housing Office, including Plaintiff, were notified that an independent audit had been conducted on government telephone usage (cellular and landline) during the months of October - December, 1998, and they were required to repay the Government for unauthorized calls. See Attachment 11 (Brown Affidavit), at p. 2.  Neither Plaintiff nor any other employees were disciplined for their excessive phone usage, although some, including Plaintiff, were counseled, and a memo discussing phone usage policy was disseminated to the entire Family Housing Staff. Memo to Family Housing Staff. Attachment 15.

16.  On or around March 4, 1999, a female mess steward, MS2 Denise Arthur, accused Plaintiff of sexually harassing her in ADM Nelson's residence. Attachment 16 (Denise Arthur's Statement).  ADM Nelson's wife became aware of the incident and ADM Nelson contacted Plaintiff's chain of command, which initiated an investigation. Attachment 11 at p. 3.

17.  Plaintiff's Command, specifically LCDR Trotta, conducted an investigation into the sexual harassment allegation, which included interviewing MS2 Arthur and obtaining a signed sworn statement from her (See Attachment 16) and interviewing Plaintiff, who also provided a statement. Requests for Statement and Statement. Attachment 17.  The investigation did not reach any formal conclusions, and Plaintiff was not disciplined for the alleged misconduct. Attachment 11 at p. 4.

18.  Plaintiff was laterally transferred within the Family Housing Office from the Flag

Housing to Customer Referrals in about November 1999. See Attachment 13 at p. 3.  Plaintiff

did not seek EEO counseling when he was transferred to the Customer Referral Office.

Attachment 2 (Lipscomb Dep.) at p. 81, lines 1-8; p. 160, lines 7-15.

                              Respectfully submitted,

                          _____/s/_____
                          JEFFREY A. TAYLOR , D.C. Bar # 498610
                          United States Attorney

                          _____/s/_____
                          RUDOLPH CONTRERAS, Bar # 434122
                          Assistant United States Attorney

                          _____/s/_____
                          CLAIRE WHITAKER, D.C. Bar # 354530
                          Assistant United States Attorney
                          United States Attorneys Office
                          Civil Division
                          555 4th Street, N.W., Room E-4204
                          Washington, D.C. 20530
                           (202) 514-7137

Attachment 1

## <u>EEO COUNSELOR'S REPORT</u>

Name: Michael Lipscomb

Job Title/Series/Grade:  Housing Manager, GS-1173-09

Place of Employment:  Office of the Executive Officer (09)
                              Flag Housing (091)
                              Public Works Center, Washington

Work Phone Number:  202-685-1188

Home Phone Number: 

Home Address:

Date of Initial Contact:  March 31, 1999

Date of Alleged Discriminatory Incident:  Most recent incident occurred March 4, 1999

Bases of Alleged Discrimination:  race (African-American), religion (Baptist), disability
                                         (physical), and sex (male)

Issues:  Harassment (non-sexual) and Failure to promote

Remedy Requested: Promotion to GS-11, back-pay beginning October 1997 at the GS-11 level,
                                    and to be reassigned out of the Family Housing, GS-1173 series.

### <u>Background</u>:

Mr. Lipscomb alleged that on March 4, 1999, Lieutenant Commander Andrew P. Trotta called him into his office and accused him of sexually harassing a Petty Officer Denise Arthur. Mr. Lipscomb stated that <u>he informed</u> the commander that on March 4, 1999 he was engaged in a casual conversation with Petty Officer Arthur, which started with her husband picking up their son in New York. Mr. Lipscomb further stated that during their conversation he mentioned that he was married and had two children. Mr. Lipscomb stated that he talked about his being a Sunday School teacher and that he was also involved in the music ministry at his church. Mr. Lipscomb further stated that Petty Officer Arthur asked him if he planned to have any more children. Mr. Lipscomb stated that he replied "no." Mr. Lipscomb further stated that Petty Officer Arthur asked him "why not." Mr. Lipscomb stated that his response was "having children was very expensive." Mr. Lipscomb further stated that Petty Officer Arthur asked him if he and his wife were doing anything in order not to have anymore children. Mr. Lipscomb stated that he told Petty Officer Arthur that they had sought the help of a physician. Mr. Lipscomb further stated that Petty Officer Arthur responded with "there are other things that you could do, such as having a vasectomy.

/ 0

Page 2.

Mr. Michael E. Lipscomb, EEO Counselor's Report (Continued)

Mr. Lipscomb stated that the conversation ended, and Petty Offficer Arthur never indicated to him that she was uncomfortable with their conversation. Mr. Lipscomb alleges that after he had briefed Lieutenant Trotta, regarding his conversation with Petty Officer Arthur, Lieutenant Commander Trotta requested that he put his response in writing and submit it to him ASAP. Mr. Lipscomb stated that he hasn't provided a written statement to the Commander. Mr. Lipscomb further stated that Lieutenant Commander Trotta and Ms. Glenda Brown (immediate supervisor) have been harassing him to provide a written statement. Mr. Lipscomb stated that Ms. Brown and the Commander appear to think that he his guilty because he has failed to provide them with a written statement. Mr. Lipscomb stated that he did not want to produce a written statement until he knew what his legal rights were. Mr. Lipscomb further stated that he informed Lieutenant Commander Trotta and Ms. Brown that he wanted to speak with an EEO Counselor.

Mr. Lipscomb alleges that on March 16, 1999, Ms. Glenda Brown and Lieutenant Commander Trotta questioned him about the number of phone calls (307) he had made during a 20 day period. Mr. Lipscomb further alleges that Ms. Brown stated that the number of calls during that period of time was well over the average, and exceeded the number of calls of all the other employees in the Flag Housing Department. Mr. Lipscomb alleges that Lieutenant Commander Trotta also questioned him about the number of calls made on his government issued Cellular Phone. Mr. Lipscomb stated that in response to Commander Trotta's question, he informed him that 80% of his day is spent on the phone, out in the field, dealing with complaints from residence of family quarters as well as communicating with contractors. Mr. Lipscomb alleges that during the 6 years he has been working at Flag Housing, he has never been questioned regarding telephone usage. Mr. Lipscomb further alleged that Lieutenant Commander Trotta and Ms. Brown were well aware that his position calls for him to utilize the telephone at his desk or either his Cellular Phone.

Mr. Lipscomb alleges that on another occasion Ms. Brown stated that she had received a complaint from one of the residents who informed her that I was not "Flag Housing Material." Mr. Lipscomb further alleges that as a result of the resident's complaint, Ms. Brown informed him that she would review his performance over the next two months. Mr. Lipscomb alleges that Ms. Brown stated that he was incapable of dealing with high ranking officials (Generals, Admirals, etc.).

Mr. Lipscomb alleges that on March 5, 1999, Ms. Brown informed him that she had received a phone call from a Ms. Fargo (wife of Vice Admiral Fargo). Mr. Lipscomb further alleges that Ms. Brown stated that Ms. Fargo informed her that he failed to keep his appointments and failed to inspect the quarters in a timely manner. Ms. Lipscomb stated that he informed Ms. Brown that when dealing with contractors they set the time over which he has no control.

Mr. Lipscomb further alleges that Ms. Brown confronted him about an appointment he allegedly missed regarding the inspection of one of the residence. Mr. Lipscomb alleges that in this instance a co-worker (Ms. Pam Curry) was the responsible party, and that he had no knowledge regarding the matter. //

Page 3.

Mr. Michael E. Lipscomb, EEO Counselor's Report (Continued)

Mr. Lipscomb further alleged that in October 1997, he received an Outstanding Performance Appraisal and was recommended by his immediate supervisor (Lieutenant Brett Blanton) for immediate promotion to the GS-1173-11 level. Mr. Lipscomb alleges that Lieutenant Commander Jim M. Wink (Lieutenant Blanton's superior) stated that Mr. Lipscomb had not received the required training to qualify him for promotion. Mr. Lipscomb stated that he has attended all of the courses he was advised to take to qualify for promotion.

Mr. Lipscomb alleges that Lieutenant Commander Wink informed Lieutenant Brett Blanton that he had also received a verbal complaint from Rear Admiral Mobley regarding the projected budget. Mr. Lipscomb stated that it was Ms. Barbara Beeler and Lieutenant Wink's responsibility to brief the Admiral regarding the projected budget.

**Lieutenant Commander Andrew P. Trotta, Flag Housing Officer, Interim Housing Director/ Ms. Glenda Brown, Flag Housing Director, Deputy Director for Family Housing (Supervisor)**

On May 17, 1999, in a meeting with Lieutenant Commander Trotta and Ms. Brown contended that that there was a review done regarding all telephone usage. Ms. Brown contends the review revealed a high usage of calls from the telephone on Mr. Lipscomb's desk. Ms. Brown further contends that since Mr. Lipscomb spends 80% of his time in the field, there should not be very many calls from the phone on his desk. Ms. Brown contends that Mr. Lipscomb had the highest volume of calls recorded from both his desk and cellular phone. Ms. Brown contends that Mr. Lipscomb was praying with church members and conducting bible study sessions over the phone. Ms. Brown further contends that she never told Mr. Lipscomb that he could not talk to his church friends, but that he should spend less time talking to them. Ms. Brown further contends that time Mr. Lipscomb spends talking with church members might be preventing him from providing better customer service.

Ms. Brown contends that customers were complaining about Mr. Lipscomb not showing up for appointments he scheduled or arriving late. Ms. Brown further contends that Mr. Lipscomb would write down task to be performed but apparently did not have a system to keep track of them.

Lieutenant Commander Trotta and Ms. Brown contend that the conversation with Mr. Lipscomb on March 4, 1999, was as a result of a complaint by an Admiral Nelson. Ms. Brown stated that Admiral Nelson had informed the Commandant of Navy District Washington that his wife had complained about Mr. Lipscomb's failure to show up for an appointment he had scheduled with her. Ms. Brown further stated that the Admiral's wife had another appointment she had to attend and informed Petty Officer Denise Arthur (who was also present for the meeting) that she had to leave. Ms. Brown contends that Petty Officer Arthur had expressed concern to the Admiral's wife regarding being alone with Mr. Lipscomb. Ms. Brown further contends that when Ms. Nelson questioned Officer Petty about her concern, she stated that during a previous meeting with Mr. Lipscomb, he started talking in graphic details regarding having a vasectomy, therefore, she was uncomfortable about being alone with him.

/2

Page 4.

Mr. Michael E. Lipscomb, EEO Counselor's Report (Continued)

Ms. Brown stated that regarding Mr. Lipscomb's allegation of failure to promote him, she
submitted his paperwork to Commander Arrowood, Commander, Naval Station Washington.
Ms. Brown further stated that Commander Arrowood denied the proposed promotion, citing that
Mr. Lipscomb did not have the required experience to move to the next level. Ms. Brown further
contends that Mr. Lipscomb had the tendency to blame others when he was at fault.

**Summary of Informal Resolution Attempt:**

Mr. Lipscomb indicated that if management would not grant his request for promotion, then he
wished to proceed with the processing of his complaint. In that management and Mr. Lipscomb
were unable to come to an amicable resolution, the required Notice was issued and forwarded to
Mr. Lipscomb and his representative.

Original Counselor's Report prepared by Loretta Johnson, EEO Specialist

Edited by Dennis A. Dew, EEO Complaints Manager, HRO-W

_____ 8/10/99
EEO Complaints Manager

Human Resources Office Washington
Washington Navy Yard
1014 "N" Street, S.E., Suite 1
Washington, DC 20374-5050

/3

Attachment 2

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - -x
                              :
MICHAEL E. LIPSCOMB,              :
                              :
    Plaintiff,        :
                              :
  vs.                 : Civil Action
                          : No. 07-0103(JDB)
    Defendant,          :
                              :
- - - - - - - - - - - - - - - -x

Washington, D.C.
Wednesday, December 12, 2007

    The deposition of MICHAEL E. LIPSCOMB,

called for examination by counsel for Defendant in

the above-entitled matter, pursuant to Notice, in the

offices of Civil Division, U.S. Attorney's Office,

501 Third Street, N.W., Washington, D.C., convened at

9:38 a.m., before Cathy Jardim, a notary public in

and for the District of Columbia, when were present

on behalf of the parties:

14

1     Q.  In the record there is some indication about

2   your brother.  Was he convicted of a crime?

3     A.  Yes.

4     Q.  What was that?

5     A.  Rape charge.

6     Q.  It was a rape?

7     A.  Yes.

8     Q.  Because there was some indication it may not

9   have been rape.

10        Give me an overview of your employment for

11   the last, say, 20 years?

12     A.  Can you repeat that again?

13     Q.  Your employment, where have you been

14   employed?

15     A.  I have been working with the Department of

16   Navy Housing.

17     Q.  When did you start?

18     A.  In '92.  I have been working with them ever

19   since, started up at the Bethesda Naval Hospital,

20   went down to Anacostia --

21   Q.  This is all housing?

22   A.  Yes.

15

1    Q.  You started in 1992.  Your first assignment

2  was Bethesda Naval Medical Center?

3    A.  Yes, up in the housing office.

4    Q.  So you are familiar with Bethesda?

5    A.  Yes.

6    Q.  How long did you stay at the Bethesda Naval

7  Medical Center?

8    A.  Maybe about two or three years --

9    Q.  Roughly 1992 to --

10    A.  1993, '94 -- maybe up to about '95, I think.

11    Q.  And were you doing the same type of position

12  you are doing now, housing -- is it specialist?

13    A.  Housing manager specialist.  Basically I was

14  in the referral status, basically just starting out,

15  learning the process, doing referrals.

16    Q.  You were doing mainly referrals in those

17  three years?

18    A.  Right.

19    Q.  Were you in the 1173 series?

20    A.  Yes.

21     Q.  And then in 1995, you came to Anacostia?

22     A.  Right, I think it is -- I came to work for

16

1  flag housing.

2   Q.  1995, you started in the position that you

3  were in when you filed this complaint?

4   A.  Yes.

5   Q.  That is called flag housing?

6   A.  Flag housing.

7   Q.  And you were in flag housing from 1995,

8  roughly --

9   A.  I did about five years -- five to six years

10  with flag housing.

11   Q.  Roughly to 2000?

12   A.  About 2000.

13   Q.  And then where are you now?

14   A.  Working at the referral office in Anacostia

15  Naval Base in Washington, D.C.

16   Q.  So flag housing is also in Anacostia -- so

17  you are still in Anacostia?

18   A.  When I was in flag housing it was at the

19  Washington Navy Yard, that was the main office,

20  located at the Washington Navy Yard, and then they

21    also had an office, the main office -- the referral

22    itself was in Anacostia, but they have been shifting

18

1   maintaining their homes, and basically I worked

2   definitely with their wives, not usually with the

3   admiral himself because he had to do the work.  I was

4   just there to be the housing manager for their house,

5   for each one.  I had about 30 flag houses that I was

6   working with, keeping up the maintenance, keeping up

7   the -- with the furniture, the maintenance, making

8   sure repairs were getting done in their quarters,

9   basically answering to the wife at each one of the

10   units and also the senior person that worked at the

11   house, making sure everything ran smoothly.

12       Q.  So it is primarily maintenance?

13       A.  Maintenance, doing the -- dealing with --

14   typing up the assignment paperwork, the termination

15   paperwork, assigning them to the quarters, doing the

16   change of occupancy for the units, dealing with their

17   lodging when they first come to the area.  I was the

18   main point of contact with them, getting them

19   prepared for their quarters or for their relocation.

20       Q.  That must have been a tough job?

21     A.  Can be quite busy, yes.

22     Q.  I want to ask you specifically about your

37

1    Q.  We can look at that in more depth.

2        The next one is Wink, Lt. Comdr. Wink?

3    A.  Lt. Comdr. Wink was my second-line

4    supervisor when Lt. Blanton was my immediate

5    supervisor, and his part in it was he held me from

6    getting my promotion.

7    Q.  Wink?

8    A.  Yes.

9    Q.  And what is the timeframe on that?

10   A.  That would be -- I was put in around '97,

11   and then there was nothing that happened.  Once Lt.

12   Blanton put me in for the promotion, the way it used

13   to work is I had to make sure that I could meet all

14   of the objectives of my supervisor, and he gave me

15   one year, these objectives you have to meet, he gave

16   me a normal outstanding, and the second year he said,

17   you can complete this, this, this, and this cert

18   training, which I did, and then he put me in as fully

19   successful and recommended me for promotion, and

20   Comdr. Wink was the one that put a stop to that.

21    Q.  And when was that?

22    A.  The 1997 timeframe.

38

1    Q.  1997?

2    A.  Yes.  I was recommended for the promotion.

3    Q.  And when did he leave?

4    A.  I can't really recall that.  Could have been

5  two years, three years after.  I am not sure.

6    Q.  I am looking at page 7 of the ROI.  Do you

7  have it?

8        If you would look back to page 4, you will

9  see that this is -- page 7 is within your formal

10  complaint of discrimination.

11    A.  Yes.

12    Q.  That you filed on June 22, 1999?

13    A.  Yes.

14    Q.  Correct?

15    A.  Yes.

16    Q.  And that is your signature on page 4, is it

17  not?

18    A.  Yes.

19    Q.  And page 7 is incorporated as part of your

20  formal complaint?

21    A.  Yes.

22    Q.  Now, you just mentioned Lt. Comdr. Wink, and

39

1    you said Lt. Comdr. Wink -- I don't want to put words

2    in your mouth, but I believe you said Lt. Blanton

3    recommended you for promotion, but Lt. Comdr. Wink

4    put a nix on it or something.

5        A.    Correct.

6        Q.    Now, it says here:  Lt. Comdr. Wink stated

7    that I had not received enough training to promote

8    me.  Did you know that at the time?

9        A.    He had mentioned that to my supervisor and

10    to me, but, again, Lt. Blanton gave me a whole list

11    of training that I had to take and to get it done

12    before the next year.  That is what I did, with all

13    my training, and he felt I was qualified for the

14    next-level grade.

15        Q.    Right now we are talking about October 1997.

16    That is the year we are talking about.  That is what

17    this complaint deals with -- let me make sure.

18            Is it 1998 that you are saying -- why don't

19    you explain that again.  You got the training later,

20    but at that time you didn't have it, right?

21    A.   When they put me in for recommendation for

22    the promotion, I had all of the training that Lt.

40

1   Blanton wanted for me in the 1997 timeframe.  The '96

2   timeframe is when I was outstanding, but then I had

3   to do some more obligations because I was really

4   pursuing to get to that next-level grade, and Lt.

5   Blanton put out some objectives that I needed to do

6   and I went forward.

7      Q.  So you are saying in 1996 you got the

8   training.  1997 you were put up again for it?

9      A.  Exactly.

10     Q.  And then Lt. Comdr. Wink stated that he

11   believed you didn't have sufficient training.  You

12   believed you did?

13     A.  Right, from my supervisor.

14     Q.  And Blanton you believe did, at least that

15   is what you say?

16     A.  Yes.

17     Q.  But Wink did not think you did?

18     A.  Exactly.

19     Q.  That was the first thing that Wink said,

20   apparently, because you have it here in your formal

21  complaint.  Then he also stated that he received a

22  verbal complaint from Rear Admiral Mobley that I was

42

1    Q.  At this time you cannot?

2    A.  No, I cannot.

3    Q.  And it was your belief, at least in 1999,

4  that Lt. Comdr. Wink and Ms. Beeler, it was their

5  responsibility to handle that issue, not you?

6    A.  Correct.

7    Q.  And then Lt. Comdr. Wink also stated that

8  the commandant of the Washington Navy Yard would put

9  a stop to my promotion.  What did he mean by that,

10  do you know what he was talking about?

11    A.  It was, from what I got out of it, that they

12  was -- because he was the commander -- commandant of

13  the Washington Navy Yard was the overseer.  My

14  promotion had to go through his desk, and due to the

15  fact that they had a complaint from the rear

16  admiral --

17    Q.  And that is Mobley?

18    A.  Mobley, it was like I became -- I was like

19  blackballed.

20    Q.  And so, your feeling was the complaint

21   shouldn't have been directed toward you?

22      A.   Correct.

43

1    Q.  Who was the commandant of the Washington

2   Navy Yard at the time, do you know -- you didn't know

3   him, he didn't know you?

4    A.  I worked with his house.  I was the manager

5   for his quarters too, but I can't remember the name,

6   but I was the manager for his house too on the

7   Washington Navy Yard.

8    Q.  Did you -- when did you seek counseling with

9   regard to this -- well, we are not sure exactly.  I

10  believe it is 1997 or 1998 issue, this particular

11  issue, that you have raised in D?

12    A.  Excuse me.

13    Q.  When did you seek EEO counseling with regard

14  to this Wink issue, telling you that you didn't have

15  enough training to promote you, that he had gotten a

16  verbal complaint from Mobley, and that Ms. Beeler and

17  Wink had the responsibility and that -- with this

18  complaint, that you would not be promoted?  If you

19  notice the second paragraph down, you comment, I have

20  since then inquired about my promotion in October '97

21  and October '98.

22      So is this the 1997 period when Rear Admiral

44

1  Mobley complained?

2     A.  Right, that is when Lt. Blanton put in my

3  recommendation highly recommending me for the

4  promotion because of all of the training I did in the

5  prior to get to that level.

6     Q.  And then the next year you were put in,

7  1998, for a promotion.  Who put you in for that?

8     A.  Well, I wasn't put in no more after that

9  timeframe.  I was not put in.  I got stopped right

10  there.

11     Q.  When did you seek counseling with regard to

12  this 1997 non-promotion?

13     A.  I can't recall that because I kept going

14  back to my supervisor explaining what was going on,

15  and I said it was wrong, I couldn't see why --

16     Q.  Did you put in for EEO counseling in 1997 --

17  did you talk to an EEO counselor and file an informal

18  complaint or a formal complaint in '97?

19     A.  I would have to look back through my notes.

20  I can't recall.

21    Q.  It is not in this record.  That is why I am

22   asking you.

45

1    A.  I can't recall.

2    Q.  So with regard to this particular case, you

3  did not seek counseling for the 1997 non-promotion --

4       MR. JONES:  I am going to object --

5       MS. WHITAKER:  You can object, but no

6  speaking objection.

7       MR. JONES:  I am just objecting.  He

8  answered.

9       THE WITNESS:  I am thinking.  My complaint

10  was basically with all of the transactions that are

11  stated here with the promotion and the -- but can you

12  repeat your question one more time?

13       BY MS. WHITAKER:

14    Q.  The record shows that you sought counseling

15  in March of 1999.

16    A.  Yes.

17    Q.  That is what the record says.

18    A.  Okay.

19    Q.  I just want to know if there is something I

20  don't have that says more than that.  Is March of

21   1999 when you sought counseling for this particular

22   issue --

46

1    A.  Yes.

2    Q.  The 1997 non-promotion -- I call it that

3  because I think that is what you would call it.

4    A.  Yes.

5    Q.  Now, if we could go back to Ms. Brown's

6  affidavit, which is on page -- I think you have

7  located it, so we can speak about that.  Mr. Jones?

8        MR. JONES:  Just a moment.

9        (Pause.)

10        MR. JONES:  What did you say?

11        MS. WHITAKER:  Page 33 and 34 of Ms. Brown's

12  affidavit.

13        BY MS. WHITAKER:

14    Q.  You are familiar with this, this is part of

15  the report of investigation?

16    A.  Yes.

17    Q.  So you have reviewed this at some point?

18    A.  Yes.

19    Q.  In her comments it says, on the bottom of

20  page 1 of her declaration, which is on, I guess, the

21  top of 34 -- it is kind of hard, my document is a

22  little different -- regarding his not being promoted

47

1 to the GS-11 level -- do you see that?

2     A.  Yes.

3     Q.  I note that shortly after I became

4 complainant's supervisor, I forwarded paperwork for

5 his promotion.  Did you know that she had forwarded

6 paperwork for your promotion?

7     A.  Yes.

8     Q.  You did know that?

9     A.  Yes.

10     Q.  So in addition to commander -- Lt. Blanton,

11 in addition to Lt. Blanton forwarding your paperwork

12 for promotion, Ms. Brown did too, correct?

13     A.  Yes, because I was in that last GS step

14 series.

15     Q.  So the answer is yes?

16     A.  Yes.

17     Q.  And then she goes on to say:  Subsequently,

18 I was informed by Rear Admiral Ellis -- no, I was

19 informed that Rear Admiral Ellis, commandant, and I

20 guess that is the name you couldn't remember --

21   A. Right.

22   Q. Had indicated that he would not approve

65

1    Q.  Did you seek counseling after February of

2  2000?

3        MR. JONES:  I have some clarification if you

4  want it.

5        MS. WHITAKER:  I don't.  I want him to say

6  yes or no.  He knows whether he sought counseling.

7  That is a pretty important matter.

8        THE WITNESS:  Again, like I said, my thing

9  was continuously, even though -- yes, yes, I did.

10        BY MS. WHITAKER:

11    Q.  When did you do it?

12    A.  I was doing it with my representative,

13  Ms. Gross.

14    Q.  So Ms. Gross sought counseling for you?

15    A.  No.  Ms. Gross was the personnel I was going

16  to for guidance.

17    Q.  Do you have any recollection yourself

18  whether you ever sought EEO counseling for the

19  allegations of discrimination involving your

20  temporary promotion, and if you did, who and when --

21  who did you seek counseling with and when was it?

22  Those are really important dates.

66

1     MR. JONES:  Break it down.  Those are three

2  questions.  Take it one at a time.

3     BY MS. WHITAKER:

4   Q.  First question is did you seek counseling

5  for the events involving your 90-day promotion and

6  then failure?  I assume you believe that was

7  discriminatory.

8   A.  I just informed my representative that this

9  was going on with that transition.

10   Q.  So you did not go to an EEO counselor at the

11  Navy Yard or Anacostia -- the EEO office, Mr. Oliver

12  or anyone else?

13   A.  No.

14     MR. JONES:  Not for the temporary promotion.

15  That is what we are talking about, let's be clear.

16     THE WITNESS:  No.

17     MS. WHITAKER:  So we don't have to ask the

18  other questions, I assume.

19     BY MS. WHITAKER:

20   Q.  I note also on page 34 it appears that

21   Ms. Brown not only put you in in 1997 -- late '97 and

22   early '98 for that GS-11 promotion that we discussed

67

1   earlier, where there was some issue with Rear Admiral

2   Ellis that we can't remember, but at the top of page

3   34 it says: I routinely resubmitted the promotion in

4   March of 1998 to Mabel Charlton. Did you know that,

5   that she had resubmitted the promotion packet?

6   A. Yes.

7   Q. You did know that she had resubmitted it?

8   A. Yes.

9   Q. She submitted it in 1997 --

10   A. Because there was a lot of transition back

11   and forth with that promotion.

12   Q. So when you testified earlier that only

13   Mr. Blanton had submitted, I think it was Blanton,

14   that was not quite correct. Ms. Brown also did. In

15   the very beginning you said that you had not been

16   considered -- didn't get a promotion in '97, and it

17   was not put in again, but it was indeed put in again

18   by Ms. Brown?

19   A. Yes.

20   Q. Then do you remember discussing with

21  Ms. Brown -- ever discussing the fact that she would

22  always consider you if you put in for a GS-11

71

1  conveying?

2    Q.  Convey, when you say Rear Admiral Nelson and

3  his wife communicated the complaint, was it your

4  understanding they were just telling, I am not sure

5  if it was Ms. Brown or --

6    A.  Trotta, about what actually occurred with

7  the conversation between me and Arthur --

8    Q.  From her point of view?

9    A.  From her point of view.

10    Q.  You don't make any claims of discrimination

11  against Nelson or his wife, do you?

12    A.  I would have to say yes, because it was them

13  that pushed for my commander to get involved because

14  they brought the complaint to my commander, not

15  Ms. Arthur.  When all that was going on, that is what

16  was brought to me.

17    Q.  Did Rear Admiral Nelson know you?

18    A.  I was his housing manager.

19    Q.  Did you ever meet him?

20    A.  Yes, I did work for his house.

21    Q.  Did you meet Mrs. Nelson?

22    A.  Yes.

81

1   Q.  And did you seek EEO counseling concerning

2   that move, reassignment?

3   A.  No, because it was still in the process with

4   the first one I put in.  All that kind of played in

5   the same way, with the promotion and everything, when

6   I first put in my EEO --

7   Q.  But the answer is no, you did not?

8   A.  I did not.

9   Q.  Now, getting back to the flag position, the

10  position that you were in when you filed your

11  complaint, in Ms. Brown's affidavit on page 3, which

12  is on page 35, the second line starts:  I have told

13  him that I did not think he was suited for the

14  position of flag housing.  I told him that because of

15  the ranks of the individuals and the intricacy of the

16  position --

17       MR. JONES:  What page?  35?

18       MS. WHITAKER:  Maybe it is 34.

19       MR. JONES:  The sentence is where on the

20  page?

21     MS. WHITAKER:  Perhaps at the very top.  Do

22  you see that, where it says, I told him I did not

85

1   your formal complaint.

2      A.  Yes.

3      Q.  There is some indication in the report of

4   investigation that after you filed your formal

5   complaint, that you did not participate in the EEO

6   process, the investigative process, and indeed, I

7   couldn't find an affidavit from you.  Was there any

8   reason why you did not do that?

9      A.  I was guided by my representative, Ms.

10   Gross, not to participate because she was not a

11   lawyer, but she was giving me guidance through that

12   transition.  At that time I couldn't afford a lawyer,

13   so that is why.

14      Q.  And you were asked to provide an affidavit?

15      A.  Yes.

16      Q.  Did you meet with the EEO investigator --

17   did you meet with the EEO investigator?

18      A.  He did come to our office.

19      Q.  But you determined not to speak to him?

20      A.  No.  I was in the office with the

21   investigator and my director, Ms. Connie Clausen.

22      Q.  And what happened?

86

1   A.  He presented himself to me, unannounced when

2   he came in.  I didn't know who he was.  Thought he

3   was another customer.  Then he came back -- I left to

4   go to school and they said they wanted me back in my

5   director's office, and then I found out he was the

6   investigator in reference to the Department of Navy,

7   and I was in the office with him and my director and

8   then he started presenting the case to me and trying

9   to give me some proposals of how we can resolve this,

10   and he felt he could resolve it, but I told him I did

11   not want to say anything until I talked with my

12   representative.  I wanted some kind of legal

13   guidance.

14   Q.  And then Ms. Gross gave you legal guidance

15   even though she was not an attorney?

16   A.  She worked for the State Department.  She

17   was an EEO supervisor that was referred to me that

18   would help me through.

19   Q.  She was like -- a representative, I think

20   you said.

21    A.  Yes.

22    Q.  An EEO rep that, I guess, was trained by EEO

87

1   to provide assistance?

2     A.  Right.

3     Q.  And you are saying she told you not to

4   cooperate?

5     A.  Until she could be present with me.

6     Q.  And was there a time that she was present

7   with you?

8     A.  Not during that portion when he came over to

9   investigate me -- to present everything to me, no, he

10  was not.

11    Q.  Why not -- why didn't you make another

12  appointment and meet with him?

13    A.  Well, she got in touch with him, and I can't

14  recall to the depth of how far that went, but I know

15  that she set up to meet with him on that transition

16  because when he came, he was aware that she was my

17  representative because he had my case, and he just

18  never got in touch with her to be there.  So that is

19  how that played out.

20    Q.  So either she or he, but certainly not you,

21  is that your testimony, didn't get in touch with the

22  other and therefore you never participated --

88

1    A.  I wasn't able to get in touch with my

2  representative until I was able to get out of the

3  office with my director, Connie Clausen, and the

4  investigator, because, again, as I stated, I didn't

5  know that is what I was coming in there for.

6    Q.  I understand that, but you never met with

7  him later on, right?

8    A.  No.

9    Q.  Did you ever present the name of your

10  representative, the name and address and telephone

11  number of your representative to anybody?

12    A.  Yes, to the investigating officer, to

13  whoever was investigating my case, had that

14  information.

15    Q.  And did you ever -- or did your

16  representative ever turn over materials to the

17  investigator?

18    A.  Certain letters were given to them that she

19  guided me through when they asked me to respond to

20  certain things.

21    Q.  So you did give them documents?

22    A.  Yes, it was requested, but through my

93

1    A.  Yes.

2    Q.  And your current supervisor was Ms. Brown?

3    A.  Yes.

4    Q.  She said that you used the phone to make 307

5   telephone calls from the telephone on your desk in a

6   20-day period, and this was in addition to your

7   cellphone use?

8    A.  Yes.

9    Q.  You had a government cellphone?

10    A.  Yes, government cellphone.

11    Q.  And I believe it says that you spend about

12   80 percent of your day out on the field, which means

13   that most of your calls are made from your cellphone?

14    A.  Yes.

15    Q.  And you believe that you were made to -- you

16   were criticized for the number of telephone calls and

17   made to repay the calls that were personal?

18    A.  Yes.

19    Q.  And you believe that was discrimination?

20    A.  No.

21    Q.   What do you believe was discrimination based

22   on this abusing telephone usage?

94

1     A.  It is just how they came at me with this

2   because, like I say, I was only doing my job.  That

3   is what I felt was discriminating.

4     Q.  So you didn't mind repaying for your

5   personal use?

6     A.  I had no problem paying for that portion.

7     Q.  And you did agree that there were perhaps

8   more calls than there needed to be?

9     A.  Exactly.

10    Q.  But you felt that this was at a time when

11   you were already under a lot of stress, and it was

12   inappropriate?

13    A.  I really felt it was not fair -- I came out

14   because I was just doing -- keeping people informed,

15   contractors with the house, with the office, with

16   everybody, trying to keep them abreast.

17    Q.  Why don't we skip over that one because the

18   other two, B and C, seem to be before that event and

19   maybe at that point in time, March 16, you were under

20   some stress because of B and C.  Can we look at this?

21  Maybe that is why you put that in.

22      Labeled as inadequate for my job.  That is

96

1     A.  Right.  Because I was out in the field when

2  I got the phone call, and it caught me off guard.

3     Q.  And you probably got the phone call as soon

4  as Trotta got it.

5     A.  Exactly, there was not a hesitation.  And

6  that is the way he presented to me, because he was

7  talking about an admiral.

8        MR. JONES:  Ms. Whitaker, you know I am not

9  objecting a whole lot.  I am allowing you to have a

10  conversation with my client.

11        MS. WHITAKER:  And I appreciate that.

12        BY MS. WHITAKER:

13     Q.  It looks like you were called on March 19.

14  So, on March 5, apparently that whole issue about the

15  sexual harassment issue and the charge was not in

16  front of Ms. Brown or Lt. Comdr. Trotta?

17     A.  No.

18     Q.  So on March 5, what happened?  Page 6.

19        MR. JONES:  I think we are in section B.

20        MS. WHITAKER:  Exactly.

21      (Pause.)

22      THE WITNESS:  The complaint they put on me

97

1   by me and the vice admiral not keeping up with the

2   appointments and inspecting the quarters, that was a

3   complaint I heard about it was brought against me,

4   and coincidentally they did not bring it to me, they

5   brought it to my supervisor, and then I get the

6   feedback. But dealing with contractors, they give

7   you a timeframe, and to my recall I was giving

8   feedback to the quarters and to the person working in

9   the quarters for the Mrs. of the admiral, but by them

10  stating that I didn't, because if I set up something

11  to have somebody do work in there, it was a timeframe

12  they gave me. They never gave me --

13      BY MS. WHITAKER:

14    Q.  An exact time?

15    A.  And they couldn't. That is how the

16  contractorS were working. They would give me a time,

17  from eight to noon --

18    Q.  Ms. Brown stated she received a telephone

19  call from Rear Admiral Fargo's wife that I was not

20  keeping appointments and inspecting the quarters in a

21   timely manner.  I stated to Ms. Brown that when you

22   are dealing with government and outside contractors,

98

1    they put you in a window frame, which means you could

2    be the first see they in the morning or the last they

3    will see in the late afternoon.

4        A.   Yes.

5        Q.   So what you were saying was Ms. Fargo may

6    have complained because she thought you were going to

7    be there at a certain time --

8        A.   At a certain time, maybe expecting me to be

9    there 10 or 11, and, again, I still called the

10   quarters to let them know I couldn't make that time,

11   but -- I couldn't force the contractor to come, and

12   would have upset anyone at the residence I dealt with

13   because they had other things going on, they had

14   functions, they had obligations they were dealing

15   with, and that is why I work not just with the wife

16   but the aide in the quarters, their cook or somebody

17   that could be there during that timeframe, so we

18   could get the work done, but they still wanted the

19   work done.

20       Q.   So the rear admiral's wife called Ms. Brown

21   and complained, and I understand that there was

22   reasons for missing the appointment.

99

1    A.  Yes.

2    Q.  But she still had to bring it to your

3  attention?

4    A.  Yes.

5    Q.  Ms. Brown also talked to me about another

6  complaint on my behalf.  Once again, it was about not

7  keeping an appointment that was set for inspecting

8  one of the quarters.  This error was made by a fellow

9  flag housing co-worker, Ms. Pam Curry.  Although this

10  particular quarters was not one that I was

11  responsible for, I was blamed because I supposedly

12  had the lead on this unknown situation.

13      So you don't know what that issue was?

14    A.  No, I do not.

15    Q.  You missed an appointment, but you believe

16  it was Ms. Curry's responsibility?

17    A.  Right, and I got tagged with it because I

18  was out in the field and they said that I supposed to

19  monitoring that, as to what happened with that

20  situation.

21    Q.    Was Ms. Curry also someone that went out to

22    inspect and do maintenance?

100

1    A.  She kind of played almost like a dual hat

2  when Ms. Brown was not around.

3    Q.  Was she in the customer relations at the

4  time or was she in --

5    A.  She was my supervisor in the customer

6  portion, for the -- during that --

7    Q.  I thought you said November '99 is when you

8  went to customer service.  I just saw the name Pam

9  Curry, and I thought you had said that she didn't

10  have anything to do with the flag housing, when we

11  talked about that list.  So I am wondering if the

12  name Pam Curry was not the right name?

13    A.  She became Driggers when she took over me in

14  the other area.

15    Q.  Right, but she didn't -- she wasn't in flag

16  housing?

17    A.  I can't recall.

18    Q.  In any event, you don't remember this

19  incident?

20    A.  No.

21    Q.  So, now C.  This is the sexual harassment

22  allegation by Ms. Arthur.  This came to your

101

1    attention on March 19.  So on March 5, you have this

2    complaint by Ms. Fargo, the rear admiral's wife, and

3    then the next -- two weeks later, you have Lt.

4    Trotter -- Trotter or Trotta?

5      A.  Trotter.

6      Q.  Call you into his office about the sexual

7    harassment charge?

8      A.  Yes.

9      Q.  Now, as you just testified, he had a

10   responsibility to call you in?

11     A.  Yes.

12     Q.  So what is the claim of discrimination based

13   on race or sex with regard to this allegation?

14     A.  This is more toward the sex portion because

15   of the fact that they were accusing me of sexual

16   harassment to Ms. Arthur.  The complaint came from

17   the vice admiral to my commander, and when I tried to

18   complain to my commander that this was not true, they

19   didn't believe me.  They was coming at me, coming at

20   me like -- they was treating me like I was -- that I

21  really did it, and I kept telling them I didn't.

22     Q.  But you did tell them what you did?

104

1  out. That is about all I can --

2    Q. You have no idea why she may have reported

3  this?

4    A. No.

5    Q. Could she have been one of these people that

6  is very sensitive about that kind of thing, if you

7  know?

8    A. She never gave me that impression, because

9  I --

10    Q. Had you been particularly friendly with her

11  before?

12    A. No, not -- with everybody I deal with, each

13  house, I keep a good rapport with each one, and I

14  treat her no different than I treat the other aides

15  in the quarters.

16    Q. Do you know if anybody else in the flag

17  housing had been accused of any sexual harassment

18  claims during that same time period?

19    A. No.

20    Q. So, is it just the fact that commander --

21  Lt. Comdr. Trotta confronted you about this

22  accusation that you think was discriminatory?

105

1    A.   Yes, it is just how he came at me.  He

2    came -- as my line of supervisor, I would think you

3    would at least try to hear me out, because I have

4    been working for him and doing good work for him, and

5    he didn't even give me the opportunity -- I spoke to

6    him, but he was like, I hear what you are saying.  I

7    don't believe you.

8    Q.   He said he didn't believe you, or did he

9    just --

10   A.   He gave me all the impressions that he did

11   not believe me, no matter what I said.  When he heard

12   it from the admiral, that was concrete, and the Mrs.,

13   that was concrete, because they spoke to Ms. Arthur.

14   When they got it and they presented it to him, I was

15   almost like chewed out that day, like everything had

16   blew up, and everything I had been doing went down

17   the drain.

18   Q.   So your feeling was that on March 19, you

19   had no inkling this was going to happen, and when it

20   happened, it was pretty devastating to you?

21    A.  Yes.

22    Q.  Did you meet with Lt. Comdr. Trotta any more

109

1  confused because it says in -- if you look at page

2  27 -- now, this went to you, not your representative,

3  but to you.  Do you see that?

4    A.  Yes.

5    Q.  You recognize the document?

6    A.  Yes.

7    Q.  The first -- the document is -- the subject

8  is notice of acceptance of discrimination complaint

9  by Michael Lipscomb versus Richard Danzig, Secretary

10  of the Navy, and then the number.

11      The purpose of this notice is to accept the

12  aforesaid complaint of discrimination.  The precise

13  issues accepted for investigation are as follows:

14  (a), you allege that you were subjected to continuous

15  and ongoing harassment by management officials

16  beginning March 4, 1999.

17    A.  Yes.

18    Q.  So that would have been -- included the

19  March 5 issue with Ms. Brown saying the vice

20  admiral --

21    A.  For the sexual harassment --

22    Q.  Vice Admiral Fargo's wife complained.  And

110

1    then March 19, the sexual harassment investigation?

2      A.  Yes.

3      Q.  What else does it include?  I believe it

4    would include what we have not talked about, and that

5    was the telephone?

6      A.  The telephone.

7      Q.  The telephone was March 16, correct?

8      A.  Yes.

9      Q.  When Ms. Brown pointed out to you that you

10   had had numerous phone calls?

11     A.  Yes.

12     Q.  That is why I wondered with the chronology,

13   it appeared as if the sexual harassment investigation

14   was probably the precipitating factor going forward

15   and then these others were joined in?

16     A.  Yes.

17     Q.  And then (b), you allege that on April 21,

18   you were denied a promotion to housing manager

19   because of your race -- and then of course religion,

20   and disability are out of it -- and sex, so race and

21  sex.  You allege that on April 21, 1999, you were

22  denied a promotion to housing manager GS-1173-11

111

1  because of your race and sex, correct?

2    A.  Yes.

3    Q.  Now, it is your understanding that those are

4  the issues to be investigated and those are the

5  issues that are before the agency for resolution at

6  that time, December 13, 1999?

7    A.  Yes.

8    Q.  And that if you wanted something else to be

9  investigated, you had to tell them -- you had to

10  make -- you had to pursue having the scope of the

11  investigation expanded; you understood that?

12    A.  Yes.

13    Q.  And you did not?

14    A.  Correct, yes.

15    Q.  On April 21, 1999, did you make a formal

16  request to Ms. Brown to be promoted?

17    A.  Can you say that again?  I am sorry.

18    Q.  It says that you allege that on April 21,

19  1999, you were denied a promotion to housing manager.

20      I just want to ask, did something happen on

21  April 21, 1999?  Did you go -- did you have something

22  pending, was there a response that you weren't going

112

1    to be promoted?  I just want to know the facts as far

2    as that particular claim is concerned.

3        A.  I can't recall.  I can't recall that.  Not

4    all the time I was working there.  I kept approaching

5    them about promotion until that incident hit me.

6        Q.  So, you do say in your -- I am not sure if

7    it is a normal complaint or where it is, but it says

8    in 1997 you pursued a GS-11 promotion, in 1998 you

9    pursued a GS-11 promotion, and I assume you must have

10   gone in to talk to her specifically on those two

11   dates, but you said you did not seek counseling with

12   regard to those two events until March of '99.

13           I am just wondering, on April 21, that was

14   after you sought counseling because counseling was on

15   March 31, did you go in to Ms. Brown and say, I want

16   a promotion, or do you remember?

17       A.  I don't remember, but -- no, I don't

18   remember, but I think what -- because they had --

19   that never got charged for that sexual harassment

20   transition, that I was not guilty, that shouldn't

21  have held me from getting my promotion.

22    Q.  Why don't you look at page 7, because that

113

1  is number D of your four claims, denial of promotion.

2  That is the only thing I have in any way, shape or

3  form that relates to April 21.  Would this be your

4  claim on April 21, 1999?

5     A.  I think this would have been ongoing from --

6  I still think this is ongoing from previous, 1997,

7  1998.

8     Q.  You don't have a recollection of actually

9  going in and asking anybody for a promotion?

10    A.  No.

11    Q.  And you do know that Ms. Brown, at least you

12  just testified that you did know that Ms. Brown on

13  two occasions did forward your promotion package to

14  someone higher up?

15    A.  Yes.

16    Q.  And one was in 1997 and the other was in

17  1998.  So it was just the fact that you weren't

18  promoted, not the fact that Ms. Brown held it up,

19  correct?

20    A.  Right.

21    Q.  Then it looks like in this D that you are

22    going back to 1997 and saying that Lt. Blanton

129

1   in now and not the flag housing.

2      A.   Right --

3      Q.   Paragraph 11 refers to customer service?

4      A.   Customer is where I was treated really

5   discriminatory and in a manner where it was like --

6   as long as I did the work, everybody is happy --

7      Q.   That would have been about -- sometime

8   around November 1999, roughly?

9      A.   Right.

10     Q.   Paragraph 12, why don't you read that over

11  and tell me what this refers to?

12     A.   Back to the -- that was when I was doing

13  flags, and a lot of my work took me out the office

14  and I basically was making phone calls with my cell

15  because that was my avenue of contact for

16  contractors, the residence, setting up appointments,

17  following up on appointments, trying to contact

18  resources to get jobs down in the flags, that I was

19  dealing with, because I was covering quite a few, 20,

20  30 units.  So, I was just shuffling --

21    Q.  12 says: One, plaintiff was harshly

22  criticized for a high number of telephone calls from

130

1  his office desk even though the official policy does

2  not limit the number of calls; [2] 80 percent of

3  plaintiff's job responsibilities lie outside of the

4  office; and [3] Caucasians who made excessive calls

5  and needed to reimburse the agency were not

6  criticized similarly.

7      Okay?

8    A.  Yes.

9    Q.  How were you criticized for making the high

10  number of calls, what happened?  I believe I

11  referenced the 307 calls from your desk that we

12  looked at before.

13   A.  Right, but that was --

14   Q.  You said you didn't have a problem with

15  paying the money back or the fact --

16   A.  For the personal calls --

17   Q.  And the fact that you may have made them,

18  but you didn't like the way you were criticized; that

19  is what you testified to earlier?

20   A.  Yes.

21     Q.  I just want to know how were you criticized.

22   What was said that was different from others?

131

1    A.  I think I was just singled out because,

2  again, like I said, they were just for my job

3  contacts.  That is all I was doing it for.  I was not

4  keeping a track on the calls.

5    Q.  When you say you were singled out, how do

6  you know the others were not criticized for making

7  telephone calls?

8    A.  The only way I got that impression is when

9  the complaint came up and I looked at -- they were

10  making as many calls as I was, but I had no

11  recognition of that.

12    Q.  So you don't know for a fact that they were

13  not admonished for their calls?

14    A.  When the complaint did come up, all of us

15  was presented a phone list, and in that list, that is

16  where it showed that I had more calls than they did,

17  and that is where it kind of stood out that I was

18  making more calls than they was.

19    Q.  Just because of the list?

20    A.  Right, because they had a record list.

21    Q.  But you don't know for a fact, unless you

22   do, that the others were not criticized for making

132

1   telephone calls?

2     A.  No, ma'am.

3     Q.  And you don't know -- or do you know whether

4   the others were required to pay the money back for

5   their personal calls?

6     A.  Yes, all of us was to pay back.

7     Q.  So, do you know whether or not you did make

8   more calls than the others?

9     A.  Amongst talk in the office, yes, that is

10  where that came from.

11    Q.  And I think you represented that most of

12  your time is spent out of the office, 80 percent of

13  your time is out of the office?

14    A.  Yes.

15    Q.  So what would have been the need to make so

16  many telephone calls from your desk instead of your

17  cellphone?

18    A.  That would be just -- that was my follow-up

19  calls when I did come back to the office because I

20  still had to do paperwork when I came back in and I

21  was still making --

22    Q.  So if you worked an eight-hour day, 80

133

1  percent of your time would be roughly seven hours.

2  You would have one hour in the office basically?

3     A.  It could vary between one and two and three

4  because if they kept me out of the office -- and then

5  there was sometime overtime that I used to be out

6  there.

7     Q.  But you represented that you spend 80

8  percent of your time out of the office?

9     A.  Yes.

10    Q.  So we will say between one and two hours in

11  the office.  Most of the time were you in the office,

12  you were on the telephone?

13    A.  On the phone and --

14    Q.  In the record it seemed to indicate that you

15  spent some time with a prayer group on the telephone;

16  is that true?

17    A.  Somebody would call and not -- yes, I have

18  talked to people in reference --

19    Q.  How did a prayer group on the telephone

20  work, did you actually pray on the telephone?

21    A.  No, no.  Somebody would call me and maybe

22   ask me a question about a scripture, and that is what

134

1  I would give them, but not praying on the phone.

2    Q.  How long were those calls, the average?

3    A.  They could last about 10, 15 minutes.

4    Q.  Were they usually made to the same few

5  people?

6    A.  Yes.

7    Q.  Were those the calls that you had to pay

8  back?

9    A.  The calls they charged me for was the ones

10  for making it home --

11    Q.  Long-distance?

12    A.  No, not long-distance.

13    Q.  They didn't charge you for the church-

14  related calls?

15    A.  I can't remember.  I know they said whatever

16  was personal, that is what they charged me for.  So I

17  know I paid for the ones calling home, but I can't

18  recall about -- if they distinguished -- it was never

19  distinguished what calls was from a person that might

20  have called me to ask me about a scripture.

21    Q.  So that may not have been charged to you?

22    A.  I am not sure.

135

1    Q.  Did you have the same few church members

2  calling you often?

3    A.  Yes, but then I would tell them I couldn't

4  take too much calls.

5    Q.  I understand.  You basically cut it back?

6    A.  Yes, I did.

7    Q.  Who were those people that called you?

8    A.  That could have been James Springs, Joanne

9  Kyler.  Those are the ones I can remember.

10    Q.  Are they pretty good friends?

11    A.  Yes.

12    Q.  What are their telephone numbers?

13    A.  I would have to get that to you -- I don't

14  have it written -- I keep it on my cellphone.

15    Q.  Why don't you just check your cellphone?

16      MR. JONES:  I am going to object on

17  relevance.

18      But if you have it.

19      THE WITNESS:  301 -- James Springs.

20  837-3018; Joanne Kyler, 301-455-0547; and Alvin

21   Baylor, 703-675-7052.

22        BY MS. WHITAKER:

139

1  all, when did this occur?  And secondly, do you know

2  what one resident complaint is that you referred to?

3      A.  The only complaints I recall is not meeting

4  the deadlines, appointments.

5      Q.  So you are speaking of -- if we could go

6  back to Exhibit No. 2 and look at your formal

7  complaint, which I think is on page 4 to 8.

8      A.  Basically --

9          MR. JONES:  There is no question on the

10  floor.

11         MS. WHITAKER:  The question was if he

12  knew --

13         MR. JONES:  I think we kind of got a little

14  lost.

15         MS. WHITAKER:  He got an acceptable rating,

16  but he was counseled for one resident complaint, and

17  I asked him when that was and if he knew what he was

18  referring to in paragraph 13.

19         THE WITNESS:  I can't remember the basic

20  complaint itself.  I am only going from the beginning

21   when they said I wasn't making meeting deadlines with

22   certain appointments --

146

1    A.  No, she didn't.

2    Q.  Did you ask her to put it in again between

3  March and April?

4    A.  No, I did not.

5    Q.  Number 15, I was just talking about your

6  claims of race discrimination.  Four, after plaintiff

7  was reassigned, the promotion, he was recommended

8  for -- the promotion he was recommended for was given

9  to a Caucasian he trained.  To justify the

10  appointment, plaintiff was informed that he did

11  poorly in a temporary GS-11 position he was detailed

12  to.

13      Now, that appears to be -- I am not sure

14  about the timing of this.  The first sentence

15  involves a claim of non-promotion in what year?

16    A.  We are on number 14?

17    Q.  On 15.  I think we are finished with 14.

18      MR. JONES:  Do you want to look at the ROI

19  for some dates?

20      MS. WHITAKER:  Yes, that would be fine.

21        What page are you showing him?

22        MR. JONES:  Page 34.  What she says in her

147

1   affidavit.

2       BY MS. WHITAKER:

3       Q.  So, we have Ms. Brown sending your package

4   through for a promotion to a GS-11 in '97, we have

5   her sending it through in 1998, we have her giving

6   you a temporary promotion in 1999.

7       A.  Yes.

8       Q.  Then this claim says that the promotion he

9   was recommended for was given to a Caucasian he

10  trained.  Who was that?

11      A.  That would have been -- I think that would

12  have been Cindy Lilly.

13      Q.  Is she the person that you say you trained?

14  I thought Ms. Lilly was in the customer service

15  office.  So are you talking about --

16      A.  I keep shifting back and forth.

17      Q.  I am not trying to confuse you, but I can't

18  put words in your mouth.

19      A.  Going back to flags, the person that was put

20  into my position in the flags was Ms. Teasha

21  Thompson.

22    Q.  And she was put in there in what year?

148

1    A.  That was in the 1999 frame when they were

2    taking me out.

3    Q.  It would have to be after 2000 because you

4    say that you -- to justify the appointment, plaintiff

5    was informed that he did poorly in a temporary GS-11

6    position he was detailed to, so we know it had to

7    have been after February of 2000.

8    A.  Right.

9    Q.  So this promotion for Teasha or Floramae

10   Thompson was sometime in 2000?

11   A.  What is confusing about what you are asking

12   is that when I was snatched out of flags, Teasha was

13   put into that position, but also with the temporary

14   promotion is when I was in a -- in the housing and

15   referral section where Glenda Brown tried to promote

16   all of the 9's into that temporary position, give

17   them opportunity to experience being a GS-11 and try

18   to handle that position and do it in a professional

19   manner.  That is when that was the temporary

20   promotion in the referrals area.

21    Q.  So Thompson's appointment didn't have

22    anything to do with that?

152

1    Q.  So just because -- I don't want to say just

2    because, but your boss was female, and the female

3    customer made a negative comment, you felt that was

4    sex discrimination?

5    A.  The female customer made that statement and

6    my supervisor kind of piggybacked off of the same

7    statement.  The reason why I said that was because

8    both of them was white and I was black.  That is why

9    I came into fact.

10    Q.  So it is not only because of their sex; it

11    was because of their race?

12    A.  Yes.

13    Q.  And you thought they were making the

14    allegation, statement that you were not flag housing

15    material because of your race and your sex?

16    A.  My race and my sex.

17    Q.  And how does not flag housing material

18    reflect that?

19    A.  That confused me because here I have been

20    doing it for almost four years --

21     Q. Four years?

22     A. Four to five years, I have been doing it,

153

1  until this came up.  It kind of shocked me because if

2  that would have been the case, they would have took

3  me out of there and had somebody else to do it.

4    Q.  Do you know who the female customer is?

5    A.  I am not sure.

6    Q.  Who do you think it is?

7    A.  Came from one of the residents, one of the

8  wives.

9    Q.  So most of the interaction would have been

10  from the wives and the aides?

11    A.  The wives and the aides.

12    Q.  And most of them are female?

13    A.  It was a mixture.

14    Q.  Anything else about that one?  You felt it

15  was an unfair comment, I am sure.

16    A.  Yes.

17    Q.  Number 18:  When a female accused

18  plaintiff -- before we leave 17, do you have any idea

19  when this event occurred?

20    A.  No.

21     Q.  Do you know when she said you were not

22   housing --

154

1    MR. JONES:  Objection.

2    BY MS. WHITAKER:

3    Q.  Housing material?

4    A.  No.

5    Q.  You do not?

6    A.  No.

7    Q.  It could have been before she sent your

8  package through or after; is that correct?

9    MR. JONES:  Objection.

10    BY MS. WHITAKER:

11    Q.  You assume that it must have been after?

12    A.  Yes.

13    Q.  Do you think that Ms. Brown was -- felt any

14  pressure for making sure that complaints were

15  resolved because they were flag officers that she was

16  dealing with, and their families?

17    A.  Can you say the beginning of that?

18    Q.  Do you think she felt any pressure to get

19  the operations running smoothly because of the rank

20  of these officers?

21   A.   Yes.

22   Q.   And Lt. Comdr. Trotter as well?

160

1   statement. That may have prolonged it a little bit

2   longer?

3      A.   Because they were trying to get something

4   out of me, because my rep told me, why are you

5   writing something when you didn't do anything?

6      Q.   Then eventually you were transferred?

7      A.   Eventually they transferred my position to

8   stay in the referral section, and that is --

9      Q.   And not go out to the flag officers' homes?

10     A.   Not at all. I was directed not to be

11  nowhere near the quarters.

12     Q.   And other than the fact that you were

13  transferred -- and you don't make any claims

14  concerning that transfer, not in this case?

15     A.   Yes.

16     Q.   Is that correct?

17        MR. JONES: Objection. I need a question.

18        MS. WHITAKER: He didn't quite -- he said

19  yes, but I don't know if she picked it up as yes.

20  That is not part of this case. The transfer has

21  nothing to do with the case.  The non-promotion is

22  the only thing that was accepted as a claim.

164

1   Where is that?

2       MS. WHITAKER:  Paragraph 19.  I am just

3   trying to figure out what paragraph 19 is all about.

4       MR. JONES:  Explain to her what it is all

5   about.

6       MS. WHITAKER:  Unless you can tell me.  It

7   is in quotes.  Is it referring to this affidavit?

8       MR. JONES:  The quotation is coming from the

9   affidavit, yes.

10      BY MS. WHITAKER:

11   Q.  Is that what you are saying, she told people

12   through this affidavit of these facts?

13   A.  I would say it was a lot of closed doors

14   with this transition.

15   Q.  I understand.  We are going to talk about

16   that, but you have this in quotes.  So, in paragraph

17   19 you are talking about what she said in her

18   declaration, correct?

19   A.  Yes.

20   Q.  Thank you, Mr. Jones.

21      MR. JONES:  You are welcome.

22      BY MS. WHITAKER:

167

1    Q.  Is there anything else that -- and that was

2    related to that investigation?  That is what caused

3    it?

4    A.  Yes.

5    Q.  And then B, of course, is the denial of

6    promotion.

7    A.  Yes.

8    Q.  Let's see if there is anything else here.

9        Perhaps I should ask you about 20.  The only

10    place I see any reference to your brother being a

11    convicted rapist is, again, in Ms. Glenda Brown's

12    declaration on page 36, maybe it is page 35.

13        MR. JONES:  I think it is 35.

14        MS. WHITAKER:  This point is on page 34, had

15    a contractor hire complainant's brother.

16        BY MS. WHITAKER:

17    Q.  I think that is the only reference I can

18    find in the record, unless you know of some other

19    reference where Ms. Brown talked about your brother.

20        MR. JONES:  Page 35.

21     BY MS. WHITAKER:

22    Q.  You never brought it up or responded to

168

1    anything during the investigation, so if you had

2    something to add, you could have done it then?

3       A.  Yes.

4       Q.  Let's talk about hostile environment based

5    on sex and race.  That is your third count.  Hostile

6    environment based on sex and race.  That, I assume,

7    is number (a) in the accepted claims, you were

8    subjected to continuous and ongoing harassment by

9    management officials beginning March 4, 1999, page

10   27.  That is where your hostile work environment

11   claim fits in?

12      A.  Yes.

13      Q.  Let's go through that.  22:  Upon

14   plaintiff's new supervisor's arrival, his evaluation

15   went from outstanding down to exceeds fully

16   successful down to acceptable down to reassignment.

17          Were you evaluated as reassignment?

18      A.  From --

19      Q.  I don't think that is an evaluation.  The

20   evaluations went from outstanding down to exceeds

21  down to acceptable, correct?

22     A.  Yes.

185

1  little faster on this if I can.

2      MR. JONES:  I am starting to think we may

3  have to postpone Mrs. Lipscomb's deposition depending

4  on time because we are almost an hour past the 2:00

5  time.

6      BY MS. WHITAKER:

7    Q.  Interrogatory number 2, each and every

8  inscident of discrimination based on race and sex

9  that you allege; complete description of the actions;

10  the dates of the actions; identify all employees who

11  you allege are similarly situated outside of your

12  protected class treated differently; list of names

13  and addresses of all people whom you believe have

14  knowledge concerning the allegations.

15      Your response is A and B, look at the

16  complaint, and its continuance since March 4, 1999.

17      C, you are referring to the people that you

18  say are similarly situated.  Cheryl Thompson.

19      The question I have here, of all of these

20  people -- Cheryl Thompson, is she in the 1173 series?

21    A.   Yes, she is.

22    Q.   Who is her -- who was her supervisor in

186

1    August -- April of 1999?

2       A.  Clausen.

3       Q.  April '99.

4       A.  Ninety-nine.  That would be Glenda Brown.

5       Q.  You had told me earlier she was not in the

6    flag housing office.  Am I confused?

7       A.  Cheryl Thompson not in the flag housing?

8       Q.  You told me that when we went past the

9    names.  Any information she may have was not as an

10   employee of that section?

11      A.  No, she was not doing flags, no.

12      Q.  She was in the --

13      A.  Referral side.

14      Q.  Customer service?

15      A.  Yes.

16      Q.  So she and -- her supervisor, you say, was

17   Brown or somebody --

18      A.  Ms. Brown was her first-line supervisor.

19      Q.  Who was her second?

20      A.  Connie Clausen.

21    Q.  Did she handle housing -- were her duties

22   like your duties, going out and working on

187

1  inspections with flag housing?

2    A.  Not with flag housing.  Hers was Bellevue,

3  Woodbridge, those units.

4    Q.  Those are not flag officer housing?

5    A.  No, they were not.

6    Q.  She worked in Anacostia and not the Navy

7  Yard?

8    A.  Yes, Anacostia.

9    Q.  So she was not in flag housing at all?

10    A.  Not that I can recall.

11    Q.  Ken Ridgeway, you told me he was the

12  engineer technical guy?

13    A.  Yes.

14    Q.  Andrew Trotta, he was the lieutenant

15  commander

16    A.  Yes.

17    Q.  So he is not in the same series as you, is

18  he?

19    A.  He is military.

20    Q.  And also your second-line supervisor, isn't

21  that true, he was --

22  A.  Yes.

Attachment 3

FORMAL COMPLAINT OF DISCRIMINATION

7.   You believe you were discriminated against on the bases of your:
(Check below)

| ✓ | RACE (If so, state your race)   Black | ☐ | NATIONAL ORIGIN (If so, state origin) |
| ☐ | COLOR (If so, state your color) | ✓ | SEX   _X_ Male   ___ Female |
| ✓ | RELIGION (If so, state your religion)   Christian | ☐ | AGE   Date of Birth |
| ✓ | DISABILITY (Please describe)   ___ Mental   _X_ Physical   *Crohns disease* | | |
| ☐ | REPRISAL   (If so, date and description of prior protected activity) | | |

8.   Have you discussed your complaint with an EEO Counselor?

☑ YES        ☐ NO

Name of Counselor:  Loretta Johnson

Date of Initial EEO Contact:  March 31, 1999

Date of Final Interview:  May 27, 1999

9.   EXPLAIN SPECIFICALLY HOW YOU WERE DISCRIMINATED AGAINST   (That is, treated differently from other employees or applicants, because of your race, color, religion, sex, national origin, age, mental or physical disability, or reprisal.) (If your complaint involves more than one allegation, list and number each allegation separately and furnish specific factual information in support of each.)

Allegation No. 1 (include basis(es) (See Question No. 7):

See memo to Loretta Johnson dated April 21, 1999

(Use additional sheets if necessary)

FORMAL COMPLAINT OF DISCRIMINATION

(Agency Use Only)
AGENCY DOCKET NO.

‐‐.   WHAT SPECIFIC CORRECTIVE ACTION DO YOU WANT TAKEN ON YOUR COMPLAINT?
(If your complaint involves more than one allegation, state corrective
action desired for each separate allegation.)

See memo to Loretta Johnson dated April 21, 1999.

11.   WITH REGARD TO THE ALLEGATIONS DESCRIBED IN Question No. 9, HAVE YOU: No

☐  filed a grievance through the negotiated grievance procedure?
If so, date filed _____.

☐  filed an appeal with the Merit Systems Protection Board?  If so,
date filed _____.

☐  filed a civil action in U.S. District Court? If so, date filed

| Signature of Complainant | 13.   Date Signed |
|---|---|
| *Michael E. Lipmont* | *22 June 1999* |

14a.   Received by:

*Loretta Johnson*

(Signature)

b.   Typed Name & Title

Loretta Johnson
EEO Specialist

c.   Activity Name and Address:

National Navy Medical Center
Human Resources Office Bethesda

d.   Telephone (incl: area code)

Comm: 301-295-6813

DSN 295-6813

15.   Complaint was:

☒  Mailed:

Postmark date *June 22, 1999*
Received date *June 28, 1999*

☐  Hand Delivered:

Date _____

4

April 21, 1999

To:   Loretta Johnson
From: Michael E. Lipscomb

I hereby file this complaint of discrimination on the bases of my
race (African American), sex (male), disability (physical) and
religion (Baptist).  I believe since October 1997, I have been
subjected to a pattern of continuous and on-going disparate
treatment.  Following are my specific allegations:

A. ABUSING TELEPHONE USAGE

I was accused of abusing my privileges of using my desk and
cellular telephone.

On March 16, 1999, my current supervisor, Ms. Glenda Brown stated
that I made 307 telephone calls from the telephone on my desk in
a period of 20 working days.  She said that this amount of
telephone calls was well over the average of telephone calls
required and that it was beyond the amount of telephone calls of
all the other employees in the Flag Housing Department.  Also,
LCDR Trotter questioned my about the number of telephone calls
made on the government cellular telephone.  I informed him that I
spend about 80% of my day in the field on the telephone dealing
with residence complaints, maintenance, supply facilities,
contractors, various family quarters, etc.  Since I have been
working here for the past 6 years, this has never posed a
problem.

LCDR Trotter and Ms. Brown are well aware that this position
requires that I handle the majority of my daily tasks either by
the use of my telephone on my desk or the cellular telephone.

B. LABELED AS BEING INADEQUATE FOR MY JOB

My immediate supervisor, Ms. Glenda Brown stated that she
received a complaint from one of the resident in reference to
their quarters.  This resident proceeded to say that I am not
"Flag Housing Material".  Ms. Brown said that she would review my
performance in 2 months which lead me to believe that she agreed
with the resident.  Ms. Brown also told me that maybe I am not
capable of dealing with residents/individuals of this
caliber/rank.  Speaking of Generals, Admirals, etc.  I have dealt
with residents/individuals of this rank for the past 6 years.

(cont. of B)

On March 5, 1999, Ms. Brown stated that she received a telephone call from Ms. Fargo (VADM Fargo's wife) that I was not keeping my appointments and not inspecting the quarters in a timely manner. I stated to Ms. Brown that when you are dealing with government and outside contractors, they put you in a window frame, which means you could be the first they'll see in the morning or the last they'll see late in the afternoon.

There is never a set time that you can meet with the contractors, you are put on their schedule.

Ms. Brown also talked to me about another complaint on my behalf. Once again it was about not keeping an appointment that was set for inspecting one of the quarters. This error was made by a fellow Flag Housing co-worker, Ms. Pam Curry. Although this particular quarters was not one that I was responsible for, I was blamed because I supposedly had the lead on this unknown situation.

## C. ALLEGED MATTER THAT OCCURRED ON OR ABOUT MARCH 4, 1999

I was accused of sexual harassment that occurred on or about March 4, 1999.

On March 19, 1999, LCDR Trotter called me in his office to discuss an alleged sexual harassment charge. He said that Petty Officer Denise Arthur said that I made her feel very uncomfortable while briefing her at VADM Nelson's quarters. We had a casual conversation on or about March 4, 1999 about Petty Officer Arthur and her husband picking up their son in New York. I stated that I was married with two children. I told her that I teach Sunday School and I'm involved with the ministries of music at my church. Petty Officer Arthur stated that she was glad she had a child. My response to this was that I was happy that I had two children. Petty Officer Arthur then asked me if I was planning on having more children and I stated "no". Petty Officer Arthur then asked me why, and I responded by saying that having children was very expensive. Petty Officer Arthur then asked me if my wife and I were trying to do something to not have anymore children. I told her that my wife and I had sought medical assistance. It was at that point that Petty Officer Arthur stated that there were other things we could do to prevent having children without having surgery, for example one of us could have a vasectomy.

6

(2)

(cont. of C)

The conversation ended with that and never did Petty Officer
Arthur state that she was uncomfortable with the conversation.
LCDR Trotter at this time told me to provide him with a written
statement stating what was discussed that day with Petty Officer
Arthur.  He said that he needed this statement ASAP (which I did
not provide).  My immediate supervisor Ms. Brown along with LCDR
Trotter has been harassing me about providing a written statement
also about this charge.  LCDR Trotter and Ms. Brown both gave me
the impression that they felt as though I was guilty because I
would not provide a written statement.  I did not want to give
LCDR Trotter nor Ms. Brown a written statement until I knew what
my rights were as a federal government employee.  I told them
that I would seek counsel from a EEO representative.


D. <u>DENIAL OF PROMOTION</u>

I was denied my promotion from GS-1173-09 to GS-1173-11.

In October 1997, after receiving an outstanding performance
appraisal, it was recommended by my immediate supervisor,
Lt. Brett Blanton that I be promoted immediately.  Lt. Blanton
presented his recommendation to LCDR Jim M. Wink.  LCDR Wink
stated that I had not received enough training to promote me.  He
also stated that he received a verbal complaint from RADM Mobley
that I was at fault in projecting their budget.  It was LCDR Wink
and Ms. Barbara Beeler's responsibility to brief RADM Mobley of
his projected budget.  LCDR Wink also stated that the Commandant
of the Washington Navy Yard would put a stop to my promotion.

I have attended all of the recommended courses that I was told I
had to take to receive my promotion.  I never received anything
in writing of this verbal complaint made against me, only
hearsay. I have since then inquired about my promotion in October
1997 and October 1998.

April 21, 1999

<u>REQUESTED RELEASE:</u>

In order to resolve these issues informally, I request the following:

(1) To receive my promotion to GS-11

(2) To receive back pay starting from October 1997 to present

(3) Reassignment out of the Family Housing Department Series - GS-1173


The stress and harassment that I have experienced of recent in my job has caused the recurrence of my Crohns disease.  I have had to make more frequent visits to the doctor who put me back on prescribed medication.  I am growing concern daily about the hazard this situation has put on my health.

Attachment 4

# NAVAL STATION WASHINGTON
## PERFORMANCE APPRAISAL REVIEW SYSTEM

**LIPSCOMB, MICHAEL**
EMPLOYEE'S NAME

SOCIAL SECURITY NUMBER

**HOUSING MANAGER/GS 1173-9**
POSITION TITLE/SERIES/GRADE

**N915**
ORGANIZATION CODE

POSITION DESCRIPTION REVIEWED WITH EMPLOYEE:  YES: X   NO: ☐

X   YES   ☐   NO        RATING PERIOD:
  PD CURRENT        From 1 APR 98  To  28 FEB 99

*People are our most important resource. We believe performance management is essential to the growth and prosperity of the individual and the command. Our mission speaks to workplace Quality of Work Life for our employees and our Core Values address our commitment to their professional and personal growth. This Performance Assessment process reflects and supports those values and ideas.*

|  | PERFORMANCE PLAN | PROGRESS REVIEW | PROGRESS REVIEW | PROGRESS REVIEW | PROGRESS REVIEW | FINAL APPRAISAL |
|---|---|---|---|---|---|---|
|  | SIGNATURE DATE | INITIAL DATE | INITIAL DATE | INITIAL DATE | INITIAL DATE | INITIAL DATE |
| RATER | Glenda C Brown 6/3/98 | gcb 6/3/98 | gcb 8/19/98 | gcb 1/14/99 | gcb 3/4/99 | gcb 3/5/99 |
| EVIEWER | 6/3/98 | 6/3/98 | 8/19/98 | 1/14/98 | 3/4/99 | 3/5/99 |
| MPLOYEE | 6/3/98 | ML 6/3/98 | ML 8/19/98 | ML 1/14/98 | ML 3/4/99 | ML 3/5/99 |

**PART I. WORK PERFORMANCE PLAN: THE FOLLOWING ACTIONS/OBJECTIVES HAVE BEEN AGREED TO:**

| # | ITEM | TARGET DATE | REVIEW DATE | ACCOMPLISH |
|---|---|---|---|---|
| 1 | Load remaining FY98 work from the 6-yr plan to the POAM | 15 Jun 98 | 3 Jun 98 | 29 Jun 98 |
| 2 | Load FY99 work from the 6-yr plan to the POAM | 15 Aug 98 | 7 Jul 98 | 30 Aug 98 |
| 3 | Conduct full accounting of property in non-WNY quarters | 1 Sep 98 | 14 Aug 98 | 15 Sep 9 |
| 4 | Write a Desktop SOP for Housing Managers w/checklists | 28 Aug 98 | 29 Jul 98 | 4 Sep 98 |
| 5 | Obtain accountability of keys as Key Control Officer | 30 Jun 98 | 4 Jun 98 | 7 Jul 98 |

**PART II. DEVELOPMENT PLAN: THE FOLLOWING ACTIONS/OBJECTIVES HAVE BEEN AGREED TO:**

| # | ITEM | TARGET DATE | REVIEW DATE | ACCOMPLISH |
|---|---|---|---|---|
| 1 | PM1-FHMI | 8-12 Jun 98 | 3 Jun 98 | 15 Jun 98 |
| 2 | AM1-FHMI | 30Nov3Dec98 | 8 Oct 98 | 6 Dec 98 |
| 3 | Managing Multiple Priorities | 25 Sep 98 | 11 Sep 98 | 28 Sep 98 |
| 4 | OM1-FHMI | 26Oct-5Nov98 | 8 Oct 98 | 8 Nov 98 |
| 5 | Creative Problem Solving | 3-5 Aug 98 | 27 Jul 98 | 6 Aug 98 |

X   ANNUAL RATING RECORD        ☐   CLOSE OUT/INTERIM RECORD

X   ACCEPTABLE        ☐   UNACCEPTABLE

PERFORMANCE ASSESSMENT
NAVSTA FORM 12430/B MAR 98                                Enclosure (2)

**EMPLOYEE PMI**

## Part III - Critical Elements and Performance Standards

Failure to attain an acceptable level of performance in any portion of a standard will result in an unacceptable for the entire element. "EAS" and "U" marks require factual documentation in the performance or developmental sections.

| | EAS | AS | U |
|---|---|---|---|
| **ELEMENT 1. TECHNICAL COMPETENCE/PROGRAM MANAGEMENT** | ☐ | X | ☐ |

Contributes to the operational effectiveness of the command by performing specific duties as contained in the position description and other duties as assigned.

**ACCEPTABLE:**

- Executes work assignments, follows appropriate procedures, complies with applicable regulations and policies, meets assigned deadlines.
- Meets accepted command standards with regard to work quality and quantity, completeness and accuracy, and consistency and timeliness.
- Requires minimal supervision. Works independently on routine assignments, needs supervisory guidance primarily for unusual or complex situations.
- Produces work that satisfies customer requirements and provides timely support.
- No more than 2 customer complaints per reporting period are noted.
- Assists in identifying process improvements and efficiencies.

**Where applicable - Security and Acquisition element**

- Complies with the security guidelines set forth in NDWINST 5510.1H.
- Purchase Card holders – complies with NAVSUP 4200.85C.
- Complies with Federal Acquisition Regulation (FAR)

| | EAS | AS | U |
|---|---|---|---|
| **ELEMENT 2. COMMUNICATIONS** | ☐ | X | ☐ |

Promotes flow of information and understanding needed to operate command programs, achieve command missions, supports customer service, and facilitates personnel interactions.

**ACCEPTABLE:**                    *199*

- In written and oral communications, the employee expresses information clearly, completely, correctly, and in a timely manner.
- Uses the chain-of-command to resolve problems, seeks assistance and clarifies work requirements.
- The employee fully staffs work assignments with others when issues being addressed impact other work areas.
- No more than two (2) valid customer complaints are reported within the rating cycle.

NAVSTA FORM 12430/B MAR 98

Part III - Critical Elements and Performance Standards, Employee PMP (continued)

| ELEMENT 3.  CUSTOMER SERVICE/WORKING RELATIONS | EAS | AS | U |
|---|---|---|---|
| Provides prompt, courteous and knowledgeable service to both internal and external customers. | ☐ | X | ☐ |

**ACCEPTABLE**:

- Knows the requirements of specific customer/markets.
- Understands customer goals, strategies and processes to ensure customer focused decisions.
- Maintains personal involvement with and seeks feedback from customers.
- Keeps resources focused on responding to customer needs.
- Strives for continuous work process improvement.
- Applies Customer Satisfaction as the ultimate guide in decision-making.
- Keeps supervisor informed of problems and potential problems.
- Is polite and courteous to all customers at all times with no more than one (1) substantiated complaint in a 90 day period.
- Demonstrates and promotes positive working relationships.

200

NAVSTA FORM 12430/B MAR 98

PERFORMANCE COMMENTS:  Describe any factors of performance (to be completed t    the final performance appraisal meeting).

Mr. Lipscomb excels in areas of attitude, politeness and internal working relations.  However, the employee has been generally distracted most of the rating cycle and is obviously struggling.  His performance is at the bare minimum level for acceptance.  A written complaint was received relative to the employee's performance from a customer.  Employee is failing to complete simple tasks in all elements.  Mr. Lipscomb's performance will be closely monitored over the next 60 days and re-evaluated.

DEVELOPMENT COMMENTS (Optional):  Describe mutually agreed upon steps to be taken to develop and enhance the employee's overall performance and capabilities.

The employee attended PM1 and FC1 training at FHMI this rating cycle, in addition to several managerial courses.  The employee will be scheduled for Microsoft Project and OM1 training through FHMI as scheduling and employee work performance permits.   The employee's performance will be closely monitored over the next 60 days and re-evaluated.

EMPLOYEE COMMENTS (Optional):
I have read and discussed this appraisal and have the following comments:

APPROVALS:

GLENDA C. BROWN

ANDY TROTTA                                                                2 0 )

DISCUSSED WITH:  MICHAEL E. LIPSCOMB

EMPLOYEE SIGNATURE                                        DATE    3/5/99

I UNDERSTAND MY SIGNATURE ACKNOWLEDGES THAT I HAVE READ/SEEN THIS REVIEW AND THAT IT DOES NOT NECESSARILY INDICATE AGREEMENT WITH THE RATING OF RECORD.

NAVSTA FORM 12430/B MAR 98

Attachment 5

REQUEST FOR PERSONNEL ACTION

3. Office of Personnel Management
FPM Supp. 296-33, Subch. 8

| ...RARY PROMOTION (NON-COMPETATIVE NTE 90 DAYS) | 2. Request Number N915-74-99 |
|---|---|

4. Proposed Effective Date

GLENDA BROWN 433-4191

| 5. Action Requested By (Typed Name, Title, Signature, and Request Date) | 6. Action Authorized By (Typed Name, Title, Signature, and Concurrence Date) |
|---|---|
| GLENDA C. BROWN  *Glenda C Brown*  HEAD, HOUSING DEPT (DETAILED)  2 NOV 99 | S.C. MAYBAUMWISNIEWSKI, CAPT, USN  CO, NAVSUPPACT WASH |

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| LIPSCOMB, MICHAEL E | | | 07 NOV 99 |

| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
|---|---|---|---|
| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |

| 14. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| HOUSING MANAGER  K1PH064001 | HOUSING MANAGEMENT SPECIALIST  FH003 |

| 7. Pay Plan | 8. Occ. Code | 10. Grade or Level | 11. Step or rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19. Step or rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| GS | 1173 | 09 | | | | GS | 1173 | 11 | | | |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|

| 14. Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| ...NG DEPARTMENT (N5)  ...HOUSING (N51)  ...AL STATION ANACOSTIA  WASHINGTON DC 20374 | HOUSING DEPARTMENT (N915)  CUSTOMER SUPPORT (N9152)  NAVAL SUPPORT ACTIVITY WASHINGTON  WASHINGTON DC 20374 |

**Employee Data**

| 23. Veterans Preference | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|
| 1 - None   3 - 10 Point/Disability   5 - 10 Point/Other  2 - 5 Point   4 - 10 Point/Compensable   6 - 10 Point/Compensable/30% | 0 - None   2 - Conditional  1 - Permanent   3 - Indefinite | | YES   NO |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|

**Position Data**

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1 - Competitive Service   3 - SES General  2 - Excepted Service   4 - SES Career | E - Exempt  N - Nonexempt | | |

| 38. Duty Station Code | 39. Duty Station (City - County - State or Overseas Location) |
|---|---|
| | WASHINGTON DC |

| 40. Agency Data | 41. | 42. | 43. | 44. | |
|---|---|---|---|---|---|
| | 68469 | N9152 | GN50 | LOC ID: | PAYROLL OFF ID: PE |

| 45. Educational Level | 46. Year Degree Attained | 47. Academic Discipline | 48. Functional Class | 49. Citizenship | 50. Veterans Status | 51. Supervisory Status |
|---|---|---|---|---|---|---|
| | | | | 1 - USA  8 - Other | | |

**PART C - Reviews and Approvals** (Not to be used by requesting office.)

| 1. Office/Function | Initials/Signature | Date | Office/Function | Initials/Signature | Date |
|---|---|---|---|---|---|
| A. | | | D. *156* | | |
| B. | | | E. | | |
| C. | | | F. | | |

2. Approval: I certify that the information entered on this form is accurate and that the proposed action is in compliance with statutory and regulatory requirements.

Signature                                                Approval Date

...TINUED ON REVERSE SIDE

Editions Prior to 7/91 Are Not Usable after 6/30/93

Attachment 6

# NAVAL STATION WASHINGTON
## PERFORMANCE APPRAISAL REVIEW SYSTEM

__MI CHAEL LIPSCOMB__
EMPLOYEE'S NAME

SOCIAL SECURITY NUMBER

__GS-1173-11 HOUSING MANAGER__
POSITION TITLE/SERIES/GRADE

__HOUSING DEPT. N9152__
ORGANIZATION CODE

POSITION DESCRIPTION REVIEWED WITH EMPLOYEE:   YES: ☒   NO: ☐

☐ YES        ☐ NO          RATING PERIOD:
PD CURRENT                  From __1/00__   To __4/00__

*People are our most important resource. We believe performance management is essential to the growth and prosperity of the individual and the command. Our mission speaks to workplace Quality of Work Life for our employees and our Core Values address our commitment to their professional and personal growth. This Performance Assessment process reflects and supports those values and ideas.*

|  | PERFORMANCE PLAN SIGNATURE DATE | PROGRESS REVIEW INITIAL DATE | PROGRESS REVIEW INITIAL DATE | PROGRESS REVIEW INITIAL DATE | PROGRESS REVIEW INITIAL DATE | FINAL APPRAISAL INITIAL DATE |
|---|---|---|---|---|---|---|
| RATER |  |  |  |  |  |  |
| REVIEWER |  |  |  |  |  |  |
| EMPLOYEE |  |  |  |  |  |  |

PART I. WORK PERFORMANCE PLAN:  THE FOLLOWING ACTIONS/OBJECTIVES HAVE BEEN AGREED TO:

| # | ITEM | TARGET DATE | REVIEW DATE | ACCOMPLISH |
|---|---|---|---|---|
| 1. | UPDATE HOUSING REFERRAL WEB PAG | 30 APRIL 00 |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

PART II. DEVELOPMENT PLAN: THE FOLLOWING ACTIONS/OBJECTIVES HAVE BEEN AGREED TO:

| # | ITEM | TARGET DATE | REVIEW DATE | ACCOMPLISH |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  | 165 |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

☐ ANNUAL RATING RECORD      ☒ CLOSE OUT/INTERIM RECORD

☐ ACCEPTABLE      ☒ UNACCEPTABLE

NAVSTA FORM 12430/B MAR 98                              Enclosure (2)

**EMPLOYEE PMP**

## Part III - Critical Elements and Performance Standards

Failure to attain an acceptable level of performance in any portion of a standard will result in an unacceptable for the entire element. "EAS" and "U" marks require factual documentation in the performance or developmental sections.

| ELEMENT 1. TECHNICAL COMPETENCE/PROGRAM MANAGEMENT | EAS | AS | U |
|---|---|---|---|
| | ☐ | ☐ | ☒ |

Contributes to the operational effectiveness of the command by performing specific duties as contained in the position description and other duties as assigned.

**ACCEPTABLE:**

- Executes work assignments, follows appropriate procedures, complies with applicable regulations and policies, meets assigned deadlines.
- Meets accepted command standards with regard to work quality and quantity, completeness and accuracy, and consistency and timeliness.
- Requires minimal supervision. Works independently on routine assignments, needs supervisory guidance primarily for unusual or complex situations.
- Produces work that satisfies customer requirements and provides timely support.
- No more than 2 customer complaints per reporting period are noted.
- Assists in identifying process improvements and efficiencies.

**Where applicable - Security and Acquisition element**

- Complies with the security guidelines set forth in NDWINST 5510.1H.
- Purchase Card holders – complies with NAVSUP 4200.85C.
- Complies with Federal Acquisition Regulation (FAR)

| ELEMENT 2. COMMUNICATIONS | EAS | AS | U |
|---|---|---|---|
| | ☐ | ☐ | ☒ |

Promotes flow of information and understanding needed to operate command programs, achieve command missions, supports customer service, and facilitates personnel interactions.

**ACCEPTABLE:**  *166*

- In written and oral communications, the employee expresses information clearly, completely, correctly, and in a timely manner.
- Uses the chain-of-command to resolve problems, seeks assistance and clarifies work requirements.
- The employee fully staffs work assignments with others when issues being addressed impact other work areas.
- No more than two (2) valid customer complaints are reported within the rating cycle.

NAVSTA FORM 12430/B MAR 98

Part III - Critical E      nts and Performance Standards, Employee PMP (continued)

| ELEMENT 3.  CUSTOMER SERVICE/WORKING RELATIONS | EAS | AS | U |
|---|---|---|---|
| Provides prompt, courteous and knowledgeable service to both internal and external customers. | ☐ | ☒ | ☐ |

**ACCEPTABLE**:

- Knows the requirements of specific customer/markets.
- Understands customer goals, strategies and processes to ensure customer focused decisions.
- Maintains personal involvement with and seeks feedback from customers.
- Keeps resources focused on responding to customer needs.
- Strives for continuous work process improvement.
- Applies Customer Satisfaction as the ultimate guide in decision-making.
- Keeps supervisor informed of problems and potential problems.
- Is polite and courteous to all customers at all times with no more than one (1) substantiated complaint in a 90 day period.
- Demonstrates and promotes positive working relationships.

167

NAVSTA FORM 12430/B MAR 98

PERFORMANCE ASSESSMENT

**PERFORMANCE COMMENTS:** Describe any factors of performance (to be completed before the final performance appraisal meeting). I met with Michael to discuss why his work assignments were not getting completed and what my expectations are from him. Michael was not meeting most of his work assignments in a timely manner and he was not requesting for additional time. Michael was not briefing me on status or problems. Michael is very unorganized which was making him unable to accomplish his work assignments. I informed Michael I would be working closely (micro-managing) him to ensure that the taskings where getting accomplished. I also explained to him he needed to work on his organization and management skills. I did explain to Michael I was disappointment in his performance since the temporary promotion to the GS-11 level. Michael has a lot of (next page)

**DEVELOPMENT COMMENTS (Optional):** Describe mutually agreed upon steps to be taken to develop and enhance the employee's overall performance and capabilities.
We agreed that I would work closely (micro-Managing) him to help with his organization and management skills.

We have both also agreed that I will search for him some classes to improve his organization, management, and leadership skills.

**EMPLOYEE COMMENTS (Optional):**
I have read and discussed this appraisal and have the following comments:

**APPROVALS:**

DISCUSSED WITH:                                    168

EMPLOYEE SIGNATURE                              DATE

I UNDERSTAND MY SIGNATURE ACKNOWLEDGES THAT I HAVE READ/SEEN THIS REVIEW AND THAT IT DOES NOT NECESSARILY INDICATE AGREEMENT WITH THE RATING OF RECORD.

NAVSTA FORM 12430/B MAR 98

Page 2

work to accomplish in order to develop his management, organization and leadership skills at the GS-11 level. Michael need to accomplish working more independently without so much supervision. His leadership skill need to increase so the lower grades will feel confident in requesting his assistance and ensuring their confidence when he is left in the leadership role.

The task on the PARS was completed because I work and assisted with the completion. Michael does not meet the majority of his work assignments. I have consistently worked closely with Michael to help improve his skills in organization, management and leadership.

169

Attachment 7

**DEPARTMENT OF THE NAVY**
HUMAN RESOURCES OFFICE WASHINGTON
WASHINGTON NAVY YARD
901 M STREET SE
BUILDING 200
WASHINGTON DC 20374-5050

IN REPLY REFER TO:

HROWASHDCINST 12335.1F
20

DEC 28 1993

HROWASHDC INSTRUCTION 12335.1F

From:  Director, Human Resources Office, Washington (HRO-W)

Subj:  MERIT PROMOTION PROGRAM

Ref:   (a)  FPM/CPI 335 and corresponding supplements
       (b)  DOD 1400.20-1-M, DOD Program for the Stability
            of Civilian Employment Policies, Procedures and
            Program Manual
       (c)  HROWASHDCINST 12300.1F: Detail of Civilian
            Employees
       (d)  HROWASHDCINST 12310.1D: Restriction on Advocacy and
            Employment of Relatives
       (e)  HROWASHDCINST 12310.2, Military Spouse Employment
            Preference
       (f)  DOD Instruction 5000.58: Defense Acquisition
            Workforce
       (g)  FPM 353

Encl:  (1)  Merit Promotion Procedures Manual

1.  <u>Purpose</u>.  To set forth policies and procedures for staffing
civilian positions at grades GS-15 and below and all wage grade
positions in accordance with the merit promotion provisions of
references (a) through (g).

2.  <u>Cancellation</u>.  HROWASHDC Instruction 12335.1E is cancelled.
Because of numerous revisions, additions and changes, this in-
struction should be read in its entirety.

3.  <u>Scope</u>.  This instruction applies to all activities receiv-
ing staffing services from the Human Resources Office, Washing-
ton (HRO-W).  The provisions of any current or subsequent ne-
gotiated labor-management agreement take precedence over this
instruction.

4.  <u>Policy</u>

    a.  It is the responsibility of managers and supervisors
to seek the best qualified individuals available for each po-
sition.  Merit promotion is but one means of filling a vacancy.
Managers may elect to fill positions by recruitment alterna-
tives other than merit promotion such as reassignment, change
to lower grade, transfer from another agency, reinstatement,
Office of Personnel Management (OPM) register, appointment of

HROWASHDCINST 12335.1F

the disabled, veterans readjustment appointment, 30% or more
disabled veteran, employee granted prior consideration for
placement, Department of Defense (DOD) Priority Placement Pro-
gram (also known as "stopper list") registrant, reemployment
priority list (RPL) registrant, etc.  These alternatives may
be properly used concurrently with or to the exclusion of the
merit promotion process.

Once initiated, the merit promotion process may be cancelled
at any time that management elects to fill a position through
other recruitment sources.  The HRO-W Staffing Department
staffing specialists are available to discuss these alterna-
tives.  In all cases, selections should be based upon manage-
ment's needs in terms of productivity and the total objectives
of the organization, including affirmative action and equal
opportunity.

    b.  A fundamental goal of any merit promotion program is
to provide management officials with a greater role in the
merit promotion process while also providing increased man-
agement flexibilities.  The guidance contained in this in-
struction places emphasis on providing flexibilities to the
maximum extent allowable by current laws and regulations.

    c.  The provisions of the DOD Program for Stability of
Civilian Employment (Priority Placement Program/Stopper List)
will have precedence over merit promotion and all other al-
ternatives to fill a position contained in this instruction.
Additional information about the Priority Placement Program
is contained in reference (b).

    d.  Selection and all procedures leading to selection shall
be made without regard to political, religious, or labor organ-
ization affiliation or non-affiliation; marital status; race;
color; sex; national origin; non-disqualifying disability; or
age.

    e.  Enclosure (1) is a comprehensive manual for staffing
civilian personnel positions.  HRO-W staffing specialists are
available to assist managers in all aspects of administering
the merit promotion program by determining basic qualifica-
tions, serving as evaluating officials, providing advice and
support, writing job analysis and crediting plans, preparing
vacancy announcements, and preparing pertinent supportive
documentation in response to management's needs.

HROWASHDCINST 12335.1F

5.  Improvements.  This program will be reviewed annually to maintain its effectiveness in meeting the requirements of Federal and DOD/DON merit promotion policy and the needs of serviced activities.  Constructive recommendations from employees, supervisors, and managers are solicited and may be addressed by memorandum to the Director, HRO-W.

6.  Action.  Heads of activities will ensure compliance with the procedures of this instruction in staffing civilian positions.

PATRICIA G. SANDBERG

Distribution:
HRO-W Standard Distribution List

HROWASHDCINST 12335.1F

## HUMAN RESOURCES OFFICE-WASHINGTON

## MERIT PROMOTION PROCEDURES

HROWASHDCINST   12335.1F

## TABLE OF CONTENTS

SECTION I          Definitions.......................................1

SECTION II         Actions Covered by Competitive Merit
                   Promotion Procedures............................5

SECTION III        Exceptions to Competitive Merit Promotion
                   Procedures......................................6

SECTION IV         Prior Consideration (Mandatory Pre-Recruitment
                   Placement Actions).............................8

SECTION V          Temporary Promotions...........................10

SECTION VI         Job Analysis/Job Element Rating................12

SECTION VII        Advertisement Procedures.......................14

SECTION VIII       Acceptance of Applications and Methods of
                   Locating Candidates............................16

SECTION IX         Determining Basic Eligibility..................19

SECTION X .        Evaluation of Qualified Candidates..............20

SECTION XI         Referral of Candidates.........................23

SECTION XII        Selection Procedures...........................24

SECTION XIII       Notification to Candidates.....................26

SECTION XIV        Prohibited Personnel Practices.................27

SECTION XV         Disclosure of Merit Promotion Information.......28

SECTION XVI        Records........................................30

SECTION XVII       Correction Action/Reconstruction...............32

APPENDIX A         Sample format for "Management Identification of
                   All Candidates" documentation..................A-1

HROWASHDCINST 12335.1F

SECTION I

DEFINITIONS

<u>Area of Consideration (AOC)</u>:  The geographic and/or organizational area in which the activity directs its search for candidates (where it is anticipated that highly qualified candidates can be located, where a vacancy announcement is distributed, and from which candidates' applications will be accepted).

<u>Best Qualified</u>:  Appointable qualified promotional candidates who rank at the top compared with all other promotional candidates and who are referred to the selecting official by the HRO-W.

<u>Career Ladder Positions</u>:  An occupational grouping of positions where employees were selected competitively from an Office of Personnel Management (OPM) register of eligibles or other competitive procedures.  Employees are given grade-building experience and are promoted without further competition when they demonstrate the ability to perform at the next higher grade level, meet regulatory and qualification requirements, and there is enough work at the full performance level for all employees in the group.

<u>Career Promotion</u>:  The noncompetitive promotion of an employee who competed at an earlier date (including the initial appointment of students in cooperative education programs and in the Federal Junior Fellowship Program) and was appointed to an entry level or intermediate position designed to prepare the employee for the full performance level of the position.

<u>Competitive Service</u>:  All civilian positions in the Federal Government which are not excepted specifically from the civil service laws.  Most civilian positions in the Executive Branch are in the competitive service.

<u>Days</u>:  For the purpose of this instruction, days mean calendar days unless otherwise specified.

<u>Detail</u>:  The temporary assignment of an employee to a different position for a specified period, with the employee returning to his/her regular position at the end of the detail.  Additional information about details is contained in reference (c).

<u>Evaluation Factors</u>:  Specific knowledge, skill, ability, or other characteristics essential for successful performance in a position as determined by job analysis.  These are used to distinguish the best qualified from the qualified candidates during the rating process.

1

HROWASHDCINST 12335.1F

Evaluation Method:  A method used to measure promotion candidates against each evaluation factor to determine the degree to which they possess the knowledge, skills, and abilities (KSA's) necessary for successful performance.

Evaluation Official:  A subject matter expert or other official appointed in writing by the selecting official or other management designee, normally at, above or equivalent to the full performance level of the position to (a) evaluate, rate, and rank eligible promotional candidates; (b) document the process; and (c) provide the selecting official with adequate information upon which to base selection(s).  HRO-W Staffing Specialists can evaluate and rank candidates at any grade level.  Selecting officials may serve as evaluation officials.  Additionally, an HRO-W staffing specialist may serve as an evaluation official.

Excepted Service:  All positions in the Executive Branch of the Federal Government which are excepted specifically from the competitive service.

Full Performance Level:  The highest grade of a career ladder or the highest grade recognized in the position classification standards which depicts an independent level of operation for a particular type of work in a particular organization, presuming proper position management considerations have been used in structuring the work of the group.

Job Analysis:  The process of using information (e.g., the position description) to provide job-related basis for evaluation and selection.

Job Element Rating Guide:  A type of evaluation method which assigns point values for each KSA involving combined benchmarks and level descriptions (typically referred to as a "Crediting Plan").

Known Promotion Potential:  Positions from which career promotions can be made.  These include positions at a grade (or grades) below the established or anticipated grade level, career ladder positions, apprentice and trainee positions, and understudy positions.

KSA:  An acronym for "Knowledge, Skill, and Ability".

Merit Promotion Certificate:  A list of promotional candidates referred for selection to the selecting official by the HRO-W Staffing Department.

2

HROWASHDCINST 12335.1F

<u>Noncompetitive Eligibles</u>:  Candidates who may be appointed or placed without evaluation and competition under the provisions of references (a) through (f) (e.g., reassignment eligibles, disabled applicants meeting schedule A criteria, and 30 percent disabled veterans).  These candidates may be referred and selected without regard to the area of consideration listed on the vacancy announcement.

<u>Promotion Panel</u>:  A panel of evaluation officials.  (See definition of evaluation official above.)

<u>Qualified Candidates</u>:  Appointable candidates who meet the OPM minimum qualification standards for the position, including any selective placement factor(s), and meet all legal and regulatory requirements.

<u>Reinstatement</u>:  Noncompetitive reemployment in the competitive service authorized on the basis of the appointee's previous service under a career or career-conditional appointment.

<u>Relative</u>:  Includes the specific relationships stated in 5 U.S.C. 3110 (i.e., father, mother, son, daughter, brother, sister, uncle, aunt, first cousin, nephew, niece, husband, wife, father-in-law, mother-in-law, son-in-law, daughter-in-law, brother-in-law, sister-in-law, stepfather, stepmother, stepson, stepdaughter, stepbrother, stepsister, half brother, or half sister).  For information regarding employment of relatives see reference (d).

<u>Screen-out Factor</u>:  A screen-out factor is mandatory for use for Federal Wage System positions.  A screen-out factor is identified as factor number one on the job element rating guide and includes all of the essential requirements of a position combined, e.g., "Ability to do the work of the position under normal supervision." Promotional candidates must rate a score of 2 or more points on this factor to be considered further in any evaluation process.

<u>Selecting Official</u>:  The individual (military or civilian) who has been delegated authority to make selections.  Normally the selecting official is the first or second level supervisor of the position(s) to be filled.  He/she should be appointed in writing (on the Request for Personnel Action (SF-52), Part I, Section I, Remarks).

<u>Selective Placement Factor</u>:  A knowledge, skill or ability which is required to establish basic eligibility for a position in addition to minimum qualifications required by OPM Handbook X-118 and X-118C.  The selective placement factor must be advertised in the

HROWASHDCINST 12335.1F

vacancy announcement (should be the first evaluation factor), iden-
tified in the position description, and applied consistently within
an organizational unit.  Examples are:  (1) Ability to speak, read,
and/or write a language other than English; (2) Ability in a func-
tional area (e.g., ability to evaluate alternative ADP systems);
or (3) Knowledge and ability pertaining to a certain program or
mission, when these cannot readily be acquired after promotion.
For additional information about selective placement factors see
Section IX.

Summary Ranking Factor:  A knowledge, skill or ability which in-
cludes all of the essential requirements of a position combined,
e.g., "Ability to do the work of the position under normal super-
vision."  If used, it should be the first evaluation factor of the
job element rating guide.  For additional information about summary
ranking factors see Section X.

Vacancy Announcement:  A written, distributed and posted notice
advertising one or more positions open to competition under the
Merit Promotion Program or alternative programs (e.g., direct
hire, temporary outside the register, delegated case examining,
etc.).

4

HROWASHDCINST 12335.1F

SECTION II

ACTIONS COVERED BY COMPETITIVE MERIT PROMOTION PROCEDURES

Competitive procedures must be applied to all promotions made under reference (a) except those discussed in Section III of this manual.  Accordingly, the following actions require competition under merit promotion procedures:

1.   Temporary promotions which exceed 120 days in higher graded positions (prior service under details to higher graded positions and previous temporary promotions during the preceding 12 months included).

2.   Term promotions to higher graded positions.

3.   Details which exceed 120 days to a higher graded position or to a position with known promotion potential.

4.   Selection for training which is part of an authorized training agreement, part of a promotion program, or required before an employee may be considered for a promotion, e.g., shorthand for clerks.

5.   Reassignment or change to lower grade to a position with more promotion potential than the position last held in the competitive service (except as permitted by reduction in force regulations).

6.   Transfer to a higher graded position.

7.   Reinstatement to a permanent or temporary position at a higher grade than the last grade held in a non-temporary position in the competitive service.  (Does not apply to the excepted service.)

8.   Promotion to a position having a higher grade, representative rate or potential than previously held under a non-temporary, competitive appointment.

5

HROWASHDCINST 12335.1F

SECTION III

EXCEPTIONS TO COMPETITIVE MERIT PROMOTION PROCEDURES

Competitive merit promotion procedures do not apply to the following actions:

1.   A promotion resulting from the application of new OPM position classification standards or correction of a classification error.

2.   A position change permitted by and processed under reduction in force regulations.

3.   The promotion of an employee occupying a designated career ladder position including a cooperative education student converted noncompetitively.  Employees are not entitled to promotion at any time and no promise of promotion is implied by selection to a career ladder position.  If an employee in a career ladder is not promoted, due to inability to perform at the higher grade level, within a reasonable amount of time, the employee should either be reassigned or appropriate adverse action should be taken.

4.   The promotion of an employee due to the accretion of additional duties.  All of the following conditions must be met for noncompetitive promotion through accretion of duties:

    a.   The major duties of the employee's old position are absorbed into the new position, and the former is cancelled;

    b.   The new position has no known promotion potential; and

    c.   The additional duties do not adversely affect another incumbered position.

5.   The position change (either reassignment, change to lower grade, or promotion) of a permanent employee from a position having known promotion potential to a position having no higher potential.

6.   Temporary promotions of 120 days or less, unless competition is required under a DOD career program.

7.   Selection of a candidate from the Reemployment Priority List for a higher grade position than the one last held in the competitive service.

8.   Repromotion to a grade or position from which an employee was changed to lower grade except when demoted for personal cause.

6

HROWASHDCINST 12335.1F

9.   Selection of an employee who did not receive proper considera-
tion in a prior promotion case due to a procedural, regulatory, or
program violation.

10.  Temporary promotion of an employee for more than 120 days to a
grade level previously held on a permanent basis in the competitive
service (except when the employee was demoted for personal cause).

11.  Repromotion of a current Federal employee in the competitive
service to a grade (or equivalent level in another pay system or
intervening grade) previously held on a permanent basis in the
competitive service (except when demoted for personal cause).  For
example, a GS-4 who has held a GS-5 with promotion potential to
GS-9 could be noncompetitively placed in any GS-5 position having
promotion potential to GS-9 or below, if otherwise qualified.

12.  Reassignment, change to lower grade, or promotion (including
transfer) to a position having no higher promotion potential than
that held or previously held on a permanent basis in the competi-
tive service (except when demoted for personal cause).  For example,
a current GS-4 who has held a GS-5 in the competitive service with
promotion potential to GS-9 could be noncompetitively placed in
any position having promotion potential to GS-9 or below, if other-
wise qualified.  When filling an excepted service position, the
employee may have previously held the higher potential in either
the excepted or competitive service.

13.  The promotion of an employee under an OPM/DOD/DON (as appli-
cable) approved training or executive development agreement upon
satisfactory completion of the training as determined by activity
management and the HRO-W Employee Development Department or Be-
thesda Satellite Office.

14.  The promotion of an employee to a position with a represen-
tative rate which is the same or lower than that of the position
currently held.

15.  Initial appointment to a position in the excepted service.

16.  Selection from Department of Defense mandatory referral pro-
grams.

17.  A detail of not more than 120 days to a higher-graded posi-
tion or to a position with known promotion potential.

18.  Reinstatement of a former Federal employee to a position
which is no higher than, and has no higher promotional potential
than the last permanent position held in the competitive service.

HROWASHDCINST 12335.1F


SECTION IV

PRIOR CONSIDERATION
(MANDATORY PRE-RECRUITMENT PLACEMENT ACTIONS)

1.  Certain activity employees may be entitled to prior considera-
tion before any other eligible candidates (competitive or non-
competitive) may be referred (except the placement of an employee
with statutory or regulatory rights).   HRO-W will refer to the
selecting official employees entitled to prior consideration in
the following order:

   a.  Law, court or other regulatory agency ordered referral.

   b.  Agency decision/settlement between parties.

   c.  Activity employees on retained grade/pay (not including
employees on grade/pay retention demoted for personal cause or by
request, e.g., employees who accept a change to lower grade to
enter formal developmental or upward mobility positions).  Employ-
ees will be referred for positions which are in the same pay plan
as the position from which demoted; and for which fully qualified,
including any selective placement factor.   Entitlement terminates
when eligibility for grade/pay entitlement terminates.

   d.  Qualified activity employees who did not receive proper
consideration for promotion due to a procedural, regulatory, or
program violation.   Prior consideration will be granted for the
next appropriate vacancy, which is:

      (1)  A similar type of position in the same pay system as
the position for which the employee failed to receive proper con-
sideration;

      (2)  One at the same grade level with no higher promotion
potential than the position for which consideration was lost.

Prior consideration in this instance will be granted for a one
year period.  It terminates when an employee is referred for bona
fide consideration, or at the end of the one year period, which-
ever occurs first.  Bona fide consideration will not exist if,
after referral, management decides not to fill the vacancy.  There
is no requirement for selection of a prior consideration eligible
in this instance, merely that the eligible is referred.


If the selecting official decides not to select the prior consid-
eration eligible, the application will be returned to HRO-W and
regular merit promotion procedures will apply to fill the posi-
tion.

HROWASHDCINST 12335.1F

    e.  Priority Placement Program registrants in priorities 1, 2, 2R and 3.

    f.  Activity employees who have fully recovered from a job related injury.

HROWASHDCINST 12335.1F

## SECTION V

### TEMPORARY PROMOTIONS

1.  Use of Temporary Promotions

    a.  Situations requiring the temporary service of an employee in a higher graded position for more than 30 days will be met generally through temporary promotion.  Typically, temporary promotions are utilized in the following situations:

        (1)  During the extended absence of the incumbent of the higher graded position;

        (2)  When the need exists to fill a vacant position until a permanent appointment is made;

        (3)  When the need to assume responsibility for an increased workload for a limited period exists;

        (4)  When the need to participate in a special project for a limited period of time exists.

    b.  Temporary promotions normally will not be made for less than 30 days and are prohibited in the following situations:

        (1)  For training or evaluating an employee in a higher graded position.  Temporary promotions may not be used to give an employee a trial period before permanent promotion, to decide among candidates for permanent promotion or to train an employee in higher graded duties.

        (2)  To provide qualifying experience to an employee not otherwise qualified.

2.  Making Temporary Promotions.  Competitive merit promotion procedures are required for a temporary promotion exceeding 120 days or, if after completing a period of service under temporary promotion, an employee will have spent more than 120 days in a higher graded position during the preceding 12 months (prior service under details and other temporary promotions included).  (Note: See Section III regarding non-competitive application of temporary promotion.)  Temporary promotions will normally be advertised activity/command-wide or subdivision) only.  A temporary promotion to another activity is not prohibited by regulation; however, this type of action may cause administrative problems (i.e., the releasing activity would have to agree to the release and thus to holding the employee's position for his/her return.)  An employee must meet all qualification, legal, and regulatory requirements before being eligible for temporary promotion.

HROWASHDCINST 12335.1F

3. <u>Notice and Documentation</u>. Employees selected for a temporary promotion must be informed, in advance of the promotion, of the circumstances that make a temporary promotion, rather than a permanent promotion, appropriate. They must be informed in terms that leave no doubt of the temporary nature of the action and all conditions related to it, including the expected duration. A statement prepared by the HRO-W Staffing Department indicating that the employee understands the temporary nature of the assignment must be signed by the employee.

4. <u>Length of a Temporary Promotion</u>. The initial duration of a temporary promotion must be for a definite period of one year or less. Extensions may be permitted, in one year increments, up to a total of four years. Any extension requiring total service beyond four years must have prior OPM approval. Adverse action procedures apply to the return of such an employee to his/her regular position after 2 years.

5. <u>Making a Temporary Promotion Permanent</u>. If the temporary promotion was not made in accordance with Section III, it may be made permanent non-competitively only if:

   a. Competitive merit promotion procedures were applied in making the temporary promotion; and

   b. The vacancy announcement stated that the promotion may become permanent.

6. <u>Ending a Temporary Promotion</u>. The promotion will end on the specified date unless extended or terminated by management prior to the not-to-exceed date. Management must provide HRO-W with a Request for Personnel Action (SF-52) to extend all temporary promotions. HRO-W must receive the extension SF-52 prior to the termination date to ensure timely processing. If an SF-52 is not received to extend a temporary promotion it will be terminated on the "not-to-exceed" date to ensure overpayments do not occur. HRO-W will notify management in advance of the termination date of a temporary promotion.

HROWASHDCINST 12335.1F

## SECTION VI

## JOB ANALYSIS/JOB ELEMENT RATING

1.  Scope of Job Analysis.  Job analysis need not be an involved
or cumbersome process.  It involves the determination of the major
duties of a position and the KSA's necessary to accomplish them.
The job analysis can be conducted by the supervisor or another
designated management official as long as the selecting official
certifies the currency of the KSA's prior to the beginning of the
recruitment process.

2.  Procedures for Job Analysis

    a.  Once the position description has been written, a list of
the major duties may be compiled.  From this list, KSA's are devel-
oped that are essential for successful performance of the position.
KSA's must refer directly to a duty statement in the position des-
cription.  Guidelines for identifying and phrasing KSA's are:

        (1)  Knowledge statements should refer to an organized
body of information, which, if applied, makes adequate performance
on the job possible.

        (2)  Ability statements should refer to the capability to
perform an activity.

        (3)  Skill statements should refer to the proficient manual,
verbal, or mental operation or control of data, people or things.

    b.  A KSA should identify one simple, readily identifiable
characteristic.

    c.  KSA statements should begin with "Knowledge of....", "Skill
in (or at)...." or "Ability to...."

    d.  Qualifiers (e.g., "thorough" or "basic" knowledge, "con-
siderable" skill, "demonstrated" ability) and terms which indicate
a level of performance (e.g., efficient, sound, or good) should not
be used since they normally cannot be determined by the candidate's
written application.

    e.  Each KSA should be reviewed to ensure a candidate can be
rated on the basis of information found in his/her written appli-
cation.

    f.  Each KSA should also be reviewed to determine if it will
distinguish a superior from a minimally acceptable candidate.

12

HROWASHDCINST 12335.1F

3.   Developing the Job Element Rating Guide

   a.  Candidates will be rated using job element rating which involves use of combined benchmarks/level descriptions for each of the KSA's determined during the job analysis.  Such descriptions define what is acceptable for assignment of a given point value, with all evaluation measures being included in the description. Activities will use a four point rating scale.  There is no requirement to define all four levels, but the four and two point levels must be defined.  Definition of all four levels is encouraged because processes other than merit promotion (e.g. Case Examining) require all levels be defined.  The following shows how level descriptions might be written for the KSA "Skill in written communication."

      4 points – – Superior level.  Writes reports concerning technical matters or controversial issues.

      3 points – – Highly satisfactory level.  Prepares reports concerning technical matters for higher level review. Writes letters responding to controversial issues.

      2 points – – Fully satisfactory level.  Writes letters providing information regarding non-technical matters.

      1 point – – Minimally satisfactory level.  Drafts letters, memorandums regarding internal procedures.

      0 points –  No experience related to this factor.

   b.  A job analysis and job element rating guide must be submitted to HRO-W with the Request for Personnel Action Request (SF-52) requesting a recruitment action.  A job element rating guide should be developed for every grade level; however, as a minimum no more than two grade levels can be defined on one job element rating guide (e.g., for a GS-5 through GS-12 rating guides could be developed at the GS-5/7, GS-9/11, and GS-12 levels).

   c.  HRO-W staffing specialists are available to assist in developing job analysis and job element rating guides.

13

HROWASHDCINST 12335.1F

## SECTION VII

### ADVERTISEMENT PROCEDURES

1.  <u>Vacancy Announcements</u>.  HRO-W will issue a vacancy announce-ment for position(s) to be filled under competitive merit promo-tion procedures unless other programs (i.e., DOD Priority Place-ment Program, Repromotion Priority List, etc.) take precedence. Paid advertisement in newspapers and/or other media may supplement the issuance of an announcement.  Serviced activities are required to pay for paid advertising.

2.  <u>Area of Consideration (AOC)</u>

    a.  The following AOC's will be used by HRO-W on merit promotion announcements:

    (1)  Activity/Command-wide (or appropriate subdivision of Activity/Command that will produce sufficient high quality candidates)

    (2)  Activities/Commands serviced by HRO-Washington

    (3)  Department of Navy - Commuting Area

    (4)  Department of Defense - Commuting Area

    (5)  Federal Agencies - Commuting Area

    (6)  Department of Navy - Nationwide

    (7)  Department of Defense - Nationwide

    (8)  Federal Agencies - Nationwide

    (9)  Department of Navy - Worldwide

    (10) Department of Defense - Worldwide

    (11) All sources - Commuting Area

    (12) All sources - Nationwide

    (13) Organizations undergoing consolidations, mergers, reorganizations, etc. (Specifically identify the organizations)

For this instruction, commuting area is an area in which the candidate can reasonably be expected to commute to work.

HROWASHDCINST 12335.1F

b.  The AOC may include reinstatement eligibles if such pro-motional candidates are to be considered.

c.  In determining the AOC, consideration should be given to:

(1)  Equal Employment Opportunity goals and objectives;

(2)  The likelihood of producing sufficient high quality candidates without unreasonably restricting fair and open competition;

(3)  Infusion of new ideas and strengths into the activity; and

(4)  Budgetary constraints and cost-effectiveness.

d.  Regardless of the AOC, applications will be accepted from spouses of relocating active duty military members during the 30 days preceding through the six months following their sponsor's relocation to the commuting area.  Applicants must be able to provide evidence of their sponsor's relocation (e.g., travel, assignment orders).

e.  Noncompetitive referrals and recruitment sources other than merit promotion are not limited by the AOC specified in the vacancy announcement.

3.  <u>Distribution and Duration</u>.  Vacancy announcements will be distributed within the area of consideration and will remain open based on the AOC as follows:

a.  Activity/Command-wide (including subdivisions), and organizations undergoing consolidations, mergers, reorganizations, etc.: minimum 7 calendar days;

b.  Within the commuting area:  minimum 14 calendar days

c.  Exceeding the commuting area:  minimum 21 calendar days

These are minimum periods only; announcements may be opened longer at the discretion of management.

4.  Announcements may be readvertised, cancelled, or amended as necessary.

HROWASHDCINST 12335.1F

## SECTION VIII

### ACCEPTANCE OF APPLICATIONS AND METHODS OF LOCATING CANDIDATES

1. <u>Acceptance of Applications</u>.  Candidates are responsible for the completeness and timely submission of their application.  Applications will be accepted at both the HRO-W Washington Navy Yard Office and the Bethesda Satellite Office.

   a.  All appointable candidates within the AOC who apply will be considered, including excepted service employees with personal competitive status.

   b.  To receive consideration, candidates must specify an HRO-W vacancy announcement number on their application.

   c.  Employees serving under Veterans' Readjustment Act appointments and those serving under Schedule A appointments for the disabled within the AOC may apply and be considered under the competitive staffing process.  In addition to being considered under merit promotion procedures, candidates under this paragraph may, at management discretion, be referred noncompetitively under applicable appointing authorities.

   d.  Regardless of the AOC, applications will be accepted from spouses of relocating active duty military members, in accordance with applicable directives.  See reference (e) for additional information regarding the military spouse program.

   e.  Candidates must submit a current Personal Qualification Statement (SF-171) to reach HRO-W, Washington Navy Yard Office or the Bethesda Satellite Office by the closing date or postmarked on or before the closing date specified on the vacancy announcement. A separate SF-171 is required for each vacancy announcement.

   f.  Candidates are requested to submit supplemental narrative statements providing information about their experience, training, and knowledge, skills, and abilities (KSA's) as they pertain to the evaluation factors specified on the announcement.

2. <u>Disapproval/Rejection of Applications</u>.  Applications will not be considered under the following conditions:

   a.  The candidate is not within the AOC specified on the vacancy announcement and non-competitive (or concurrent) consideration is not applicable (unless the candidate is a military spouse preference eligible).

16

HROWASHDCINST 12335.1F

b.  The candidate is a nonstatus candidate and the vacancy announcement limits application to status employees (unless the candidate is a VRA or Schedule A employee as stated in paragraph 1.(c) above).

c.  The SF-171 does not include enough information to make a qualifications determination.

d.  The SF-171 is not received in HRO-W (Washington Navy Yard Office or the Bethesda Satellite Office) by the closing date or is postmarked after the closing date.

e.  The SF-171 is received in a government postage paid envelope.

3.  All applications and supporting documents submitted under a merit promotion vacancy announcement become the property of HRO-W and will not be returned.

4.  <u>Methods of Locating Candidates</u>.  In addition to the merit promotion vacancy announcement process identified in Section VII the following methods of locating candidates will apply:

a.  Employees on approved leave, on official travel, detail, or training outside their activity may furnish their supervisor with copies of their SF-171 and request it be submitted for specified vacancies and activities serviced by HRO-W.  This is optional with each employee and it is the employee's responsibility to furnish the SF-171 to the supervisor.  It is then the supervisor's responsibility to submit the SF-171 in accordance with his/her employee's request.

b.  HRO-W serviced activity employees absent because of military duty, compensable injury, service with a public international organization or an assignment under the Intergovernmental Personnel Act (IPA), and who have reemployment rights, will be considered automatically for promotions to vacant positions for which they are qualified. Consideration will be restricted to the activity at which the employee has reemployment rights.  HRO-W Staffing Department will maintain a list of all employees receiving consideration under this paragraph and request an updated SF-171 from eligibles.  Employees considered under this paragraph will be referred to the selecting official on a promotion certificate only if they are among the best-qualified candidates available.

c.  HRO-W serviced employees who fully recover from compensable on-the-job injuries and apply for restoration under conditions specified in reference (g).

d.  <u>Management Identification of All Candidates</u>.  Management identification of candidates permits rapid determination of which

17

HROWASHDCINST 12335.1F 12335.1F

candidates will be competing in lieu of publicizing promotion opportunities via advertisement procedures. Its use is appropriate when the area of focus is small enough that all potential candidates are known to the selecting official. In order to reduce the processing time activities are encouraged to initiate the Request for Personnel Action (SF-52) as soon as it has been determined that "Management Identification of All Candidates" will be used. Activities which use this procedure are responsible for ensuring compliance with requirements of reference (a); completion of a job analysis to identify pertinent KSA's; development of a job element rating guide (if used); development of a summary ranking factor (if used); use of multiple assessment measures; use of an evaluation procedures which is consistent with the requirements of reference (a); uniform application of the evaluation process; and for forwarding all records used in the process to HRO-W, Staffing Department for retention to document compliance with appropriate regulations. To document the process selecting officials will use procedures outlined in Section X, paragraph 5.c.(1)(a) or (b), or 5.c.(2). A proposed format for documenting the process is attached to this manual as Appendix A.

    e. In addition to those methods specified in paragraphs a. through d. above, HRO-W may locate candidates by listing vacancies in appropriate OPM, DOD and Department of Navy job vacancy listings, and appropriate professional journals and newspapers; and by requesting lists of eligibles from automated referral systems where such referral systems are operational.

HROWASHDCINST 12335.1F

SECTION IX

DETERMINING BASIC ELIGIBILITY

1.  Candidates for promotion or placement must meet the minimum qualification requirements prescribed by OPM Handbook X-118 (General Schedule positions) or X-118C (Federal Wage System positions) and all other legal and regulatory requirements within 30 days of the closing date of the vacancy announcement.

2.  In addition to the minimum qualification requirements candidates must meet the requirements of any selective placement factor established as being essential for immediate satisfactory job performance.

3.  Candidates being considered for positions covered by the Defense Acquisition Workforce Improvement Act (DAWIA) must, in addition to the requirements above, meet requirements for entry into and movement within covered positions.  For additional information regarding DAWIA see reference (f).

HROWASHDCINST 12335.1F

SECTION X

EVALUATION OF QUALIFIED CANDIDATES

1.  Evaluation procedures for promotional candidates will include use of multiple assessment measures such as experience, education, training, awards, and annual performance ratings; documented job analysis to predetermine pertinent KSA's; and consideration of the annual performance appraisal to the extent it is relevant.  The evaluation procedures will be applied uniformly.  An HRO-W staffing specialist will serve as advisor to the rater(s) to ensure consistency in interpretation and application of the evaluation methods.

2.  A range of evaluation methods may be used as determined by the HRO-W staffing specialist and the selecting official based on the type of position, resources available, and number of applications. Candidates may be evaluated by any method within the context and guidance provided in reference (a).  Applicants for the same position will be evaluated in the same manner.

3.  When assessing candidates for supervisory positions, consideration must be given to their willingness to support the equal employment opportunity/affirmative action program.

4.  Evaluations will be made using those documents supplied by, and will not be based on personal knowledge of, the candidate (except when using the "Management Identification of All Candidates" process described in Section VIII paragraph 4.d.).  The information about the degree to which each candidate possesses the KSA's (identified on the merit promotion vacancy announcement) of the position will be obtained from the sources listed below:

   a.  <u>Experience</u>.  Information will be obtained from the SF-171 and any documents submitted in response to the vacancy announcement.

      (1)  The objective is to determine how well the experience has prepared the candidate for the duties of the position to be filled.  Evaluation should be directed toward the type and quality of the experience.

      (2)  Length of service/experience should not be used in the evaluation unless there is a clear and positive relation to the quality of performance.

   b.  <u>Annual Performance Appraisal</u>.  Candidates are requested to submit a copy of their most recent annual performance appraisal with their application; however, failure to submit an appraisal is

HROWASHDCINST 12335.1F

not grounds for rating him/her ineligible for consideration.  The appraisal will be used to the extent that it is relevant to the KSA's of the position being filled.

c.  <u>Awards</u>.  Consideration will be given to any awards the candidate has received.  The attributes demonstrated or implied by awards, such as initiative, resourcefulness, or planning ability, will be assessed in terms of their relevance to the position being filled.

d.  <u>Miscellaneous</u>.  Consideration will be given to education, training, self-development, and outside activities which would increase the candidate's potential for effective performance.

5.  <u>Evaluation Methods</u>

a.  <u>Evaluators</u>:  Evaluation officials should be knowledgeable about the position to understand job requirements and candidates' experience as it relates to the KSA's.  Merit Promotion program candidates may be evaluated by:

    (1)  Selecting officials;

    (2)  HRO-W staffing specialists;

    (3)  Other knowledgeable management designee(s)

b.  <u>Panels</u>.  Unless provided for by special program requirements (e.g., career programs, upward mobility, wage grade qualifications requirements, or a negotiated agreement), a rating panel is not required.  Decisions regarding whether to use a rating panel should be based on the grade level, importance, and sensitivity of the position; the number of candidates; the availability of technical resources; and the cost(s) involved. The selecting official will designate the rating panel members in writing.  There is nothing to prohibit a selecting official from serving on a rating panel.  Selecting officials should ensure that minority employees and women serve on rating panels whenever practical.  Activities have the option of having an EEO representative on panels.  A designated Chairperson will have responsibility for ensuring adherence to EEO principles and/or notifying EEO representatives that a promotion panel is being convened.  Panel members may be civilian or military as long as they are knowledgeable enough about the job to understand job requirements and applicants' experience in order to rate candidates.  Promotion panels should be completed in an expedient manner as they are a major, and often, time consuming, phase of the selection process.  A HRO-W staffing specialist will serve as technical advisor to the panel and will normally remain with the panel during the evaluation process.

HROWASHDCINST 12335.1F

    c.  <u>Small Number of Candidates</u>.  Normally, HRO-W will evaluate five of fewer qualified promotion candidates using the complete job element rating guide.  When evaluating a small number of qualified promotion candidates (i.e., ten or fewer), abbreviated evaluation procedures may be used in lieu of detailed formal evaluation.  Such procedures will include job analysis and documentation explaining the basis of grouping candidates into either "qualified" or "best-qualified" groups.  In addition to HRO-W evaluating five or fewer promotional candidates the following procedure can be used:

        (1)  <u>Referral Directly to Selecting Official</u>.  At the discretion of the selecting official when there are ten or fewer candidates, all qualified promotion candidates can be referred directly to the selecting official who will evaluate all of the candidates using one of the following evaluation processes:

            (a)  All promotion candidates must be determined to be either "best qualified" or merely "qualified" based on a general overview of their qualifications as they relate to the KSA's identified for the position.  Such evaluations will be documented in the form of short narratives explaining the basis of the differentiation between the two groups on the basis of the KSA's.

            (b)  A summary ranking factor for General Schedule positions, or factor number 1 on the wage grade job element rating guide, may be used alone to place promotional candidates into either "qualified" or "best-qualified" groupings.  An example of a summary ranking factor is "Ability to do the work of the position under normal supervision".

            (c)  When large numbers of candidates (over 25) are to be evaluated the number may be reduced to a more manageable level through use of an abbreviated procedure such as the summary ranking factor as described paragraph c.(1)(b) above.  After this initial grouping, the candidates selected for further evaluation will be evaluated using the full job element rating guide.

        (2)  There is no requirement to use a summary ranking factor; management has the option to use the full job element rating guide in their evaluation process.  Regardless of the evaluation method used, complete documentation of the process used must be returned to HRO-W.  Additionally, an HRO-W staffing specialist must be involved with every phase of the evaluation process.

HROWASHDCINST 12335.1F

SECTION XI

REFERRAL OF CANDIDATES

1.  Selecting officials should have the opportunity to make a choice from among an adequate, but not cumbersome, number of best qualified candidates.  To this end, the following procedures apply:

    a.  The best qualified candidates (listed alphabetically) will be those with the highest numerical scores above a naturally occurring break point from the evaluation process, or under abbreviated procedures, those grouped as best qualified.  Additional, lower scoring candidates may be referred if requested by the selecting official.  These additional candidates will be grouped as "qualified" and listed separately from the best qualified group.  If a qualified candidate is selected over a best qualified candidate, the selecting official must document in writing a rationale, based on merit factors, for the selection.

    b.  Information to accompany the applications provided the selecting official includes candidates' SF-171's, supplemental statements (if submitted), annual performance appraisals (if submitted), and ratings on the KSA's.

2.  Noncompetitive eligibles may be referred to the selecting official at any time (i.e., before rating and ranking of promotional candidates or at any other point in the process).

HROWASHDCINST 12335.1F

SECTION XII

SELECTION PROCEDURES

1.  The act of selection is a management prerogative involving informed judgment and responsibility for the consequences.  The selecting official should choose the person(s) who will best fulfill management's needs in terms of productivity and the total objectives of the organization, including affirmative action and equal opportunity.  When filling supervisory or managerial positions, selecting officials must give consideration to candidates' "willingness to support the EEO program".  Accountability for the end result (e.g., fair and equitable treatment without regard to nonmerit factors, fair and open competition, and selection based on relative ability, knowledge, and skill) rests with the selecting official.  He/she is free to select any certified candidate(s) or to non-select any and all candidate(s).  He/she retains the right to select from sources other than the Merit Promotion Program at any time during the recruitment and evaluation process.

2.  The selecting official may interview none, any, or all of the certified candidates but equity should be observed.  HRO-W strongly recommends selecting officials consult with at least the candidates' current supervisor prior to making a final selection.

3.  If a selecting official returns a certificate without making a selection, he/she may request readvertisement or use any other available recruitment sources.  In such cases, the selecting official should consult with the HRO-W staffing specialist to determine the best course of action based upon a mutual knowledge of the availability of qualified candidates.

4.  Selection(s) will be made within 30 days after issuance of the candidate transmittal.  Extenuating circumstances requiring an extension may be discussed with the servicing staffing specialist.  Reasons for and the length of the extension will be documented by the staffing specialist and retained in the merit promotion case file.

5.  Selecting officials may use a current or previously issued certificate to fill any unanticipated vacancy with the same title, series, grade(s), activity, qualification requirements, and evaluation factors as originally advertised.  The certificate may be reissued for a period up to 90 days from the original issuance.

6.  Release of Employees

   a.  Selectees normally will be released as follows:

HROWASHDCINST 12335.1F

     (1)   Promotion:  Within two weeks.

     (2)   Reassignment or change to lower grade:  Within 30 days.

     (3)   Overseas:  Within 45 days.

   b.  Release dates not granted within these time frames will be negotiated between the gaining and losing activities.

7.  Normally, personnel actions will be effective on the first calendar day of the pay period.  Change to lower grade from temporary promotion will be effective upon management's termination of the promotion or on its expiration date, whichever is first. No action can be effective until the position has been classified and the candidate has met all legal and qualification requirements.

25

HROWASHDCINST 12335.1F

## SECTION XIII

## NOTIFICATION TO CANDIDATES

1.  HRO-W will notify all candidates for each vacancy announcement in writing as follows:

    a.  Candidates found ineligible or unqualified will be informed of the reasons for their disapproval.

    b.  Eligible candidates will be informed of their nonselection after an offer has been accepted by the selectee.  They will be informed whether or not they were referred for selection.

    c.  Selected candidates will be made a written offer which will contain a confirmation to be signed by the selectee and returned to the HRO-W Staffing Department.

2.  Only an authorized HRO-W representative may offer employment to selectee(s).  No other person is authorized to make a job offer and, if an offer is made by someone other than a HRO-W representative, the offer will be considered invalid and cannot be honored.

HROWASHDCINST 12335.1F

SECTION XIV

PROHIBITED PERSONNEL PRACTICES

1.   Supervisors and public officials are prohibited from partici-
pating in any portion of the selection process if a relative is
under consideration.  For these purposes, public officials are
defined in Federal regulations as employees who have the authority
to appoint, employ, promote, or advance individuals, or even to
recommend such actions.  Any member of the evaluation process is
considered a public official for merit promotion purposes.  The
prohibition includes advocating or referring the application of a
relative for consideration.  For additional information regarding
restrictions on the advocacy and employment of relatives see
reference (d).

2.   Selection and all procedures leading to selection must be made
without discrimination for any nonmerit reason such as race, reli-
gion, sex, national origin, political affiliation, marital status,
nondisqualifying physical disability, age, or membership or non-
membership in a labor organization.

3.   Federal employees are prohibited from deceiving or willfully
obstructing any person from competing for a position.

4.   Federal employees are prohibited from influencing any person
to withdraw from merit promotion competition.

5.   No Federal employee may give unauthorized preferential treat-
ment or advantage to improve or injure the prospects of any person
competing for a position.

6.   A Federal employee may not violate any law, rule or regulation
implementing or directly concerning merit promotion principles.

HROWASHDCINST 12335.1F

SECTION XV

DISCLOSURE OF MERIT PROMOTION INFORMATION

1.  Disclosure of merit promotion information will be in accord-
ance with the Privacy and Freedom of Information Acts and the
guidance contained in reference (a).  All candidates must have
equal access to information on merit promotion processes and pro-
cedures.  Information that might give some candidates an unfair
advantage shall not be released.

2.  Candidates may be provided the following information:

    a.  Whether or not they were qualified;

    b.  Whether or not they were referred for selection;

    c.  Their own rating/scores on the KSA's.  If composite or
summary sheets were used, other candidates' and panel members'
names will be deleted;

    d.  Their written test scores, if used;

    e.  In what areas, if any, they can improve to increase their
chances for future selection (normally this would not be applica-
ble for those candidates certified for selection); and

    f.  Any comments made for the record, either general in nature
or concerning the individual in question.

3.  Candidates are not permitted access to the evaluation criteria
used in a merit promotion action.  Such access would provide an
unfair advantage in future actions for the same type position.  If
a candidate gains access to the criteria, by any means, the cri-
teria will be destroyed and new criteria must be developed.

4.  A candidate who is a grievant/complainant and/or his/her rep-
resentative is entitled to see additional information providing
that it is relevant to the issue(s).  This information can be
provided earlier if it will resolve the grievance or complaint at
an informal stage.  However, in accordance with the Privacy Act,
unless written permission is obtained from the individual in ques-
tion, all personal identifying information must be obliterated
first.  If it is not possible to completely sanitize these records,
a narrative statement should be provided instead.  The following,
sanitized as appropriate, may be provided only when relevant to
the issue(s):

HROWASHDCINST 12335.1F

a.  Rating sheets on other candidates;

b.  Application forms and supplemental questionnaires;

c.  Supervisory appraisals; and

d.  KSA's of activity-developed job element rating guides.

The following information may not be released:

e.  Test material;

f.  Identifiable material on other candidates or any information which would be an invasion of privacy;

g.  Information which may give some candidates an unfair advantage (e.g., job element rating guides); and

h.  Names of voting panel members.

29

HROWASHDCINST 12335.1F

SECTION XVI

RECORDS

1.  <u>Maintenance of Merit Promotion Records.</u>  HRO-W will maintain a record of each merit promotion action.  All records will be kept for two years or until an OPM evaluation is conducted (whichever occurs first), providing no grievance or complaint has been filed or is in process.

2.  <u>Contents of Merit Promotion Case Files</u>

    a.  Documentation showing consideration of employees eligible for prior consideration for placement.

    b.  Documentation of stopper list checks from the date the SF-52 was received in the HRO-W Staffing Department through the date selection was made.

    c.  Copy of the official position description(s).

    d.  Documentation showing target or full performance level if the position was filled below the established full performance level.

    e.  Documentation that a job analysis was conducted to arrive at the KSA's used in the evaluation process.

    f.  Justification for selective placement factors, if used.

    g.  Documentation of the evaluation method used.

    h.  Copy of the vacancy announcement.

    i.  Documentation of notification to candidates who were not qualified or ineligible or whose applications were rejected.

    j.  Candidates' evaluations and ratings.

    k.  SF-171's, supplemental questionnaires, performance appraisals, narrative statements, etc., on all candidates, as applicable.

    l.  Any other material/information submitted by candidates and considered in the evaluation and selection process.

    m.  Merit Promotion Certificate showing candidates from whom selection was made and who was selected.

HROWASHDCINST 12335.1F

n.  Documentation of the reasons for last minute additions to the certificate, or long delays in the selection process, if applicable.

o.  Documentation of notification to qualified candidates who were not selected.

3.  <u>Contents of "Management Identification of All Candidates" Case File</u>

a.  Documentation of management's identification of area of focus and all qualified candidates considered.

b.  Copy of SF-52 and official position description.

c.  Documentation showing consideration of employees eligible for prior consideration for placement, if applicable.

d.  Documentation of stopper list checks from the date the SF-52 was received in the HRO-W Staffing Department through the date selection was made.

e.  Documentation showing target or full performance level if the position was filled below the established full performance level.

f.  Documentation that a job analysis was conducted to identify the pertinent KSA's.

g.  Identification of the evaluation criteria used to determine the best qualified candidates.

h.  Documentation of evaluation method used to identify best qualified candidates.  (See Section X, paragraph 5.c.(1)(a) and (b).

i.  Merit Promotion Certificate showing candidates from whom selection was made and who was selected.

j.  Documentation of notification to qualified candidates who were not selected.

HROWASHDCINST 12335.1F

SECTION XVII

CORRECTIVE ACTION/RECONSTRUCTION

1.   In order to determine which, if any, corrective action is re-
quired as a result of a procedural, regulatory, or program violation,
it is necessary to reconstruct the case.  Only by reconstruction can
it be determined if any employee was adversely affected by a viola-
tion and which, if any, program changes should be made.

    a.  Reconstruction.  Reconstruction begins at that point in
the merit promotion process at which the violation occurred.  If
the violation was failure to advertise the vacancy in accordance
with the merit promotion plan, reconstruction would involve adver-
tising the vacancy properly, noting that it is for the purpose of
reconstruction; evaluating qualifications as of the time of the
original action; and establishing a best qualified group.  If the
violation involved incorrect evaluation of candidates, then recon-
struction would involve reevaluating all candidates and establish-
ing the best qualified group.  If the violation involved a failure
to rank employees who are otherwise eligible, reconstruction would
be from that point where ranking should have been done to identify
the group for selection.  If a promotion action is inadequately
documented and a determination cannot be made as to whether the
action was proper, HRO-W Staffing Department will record the steps
not documented, document, then determine whether the action should
or could stand.

After reconstruction, it is necessary to determine which, if any,
corrective action is necessary concerning the promoted employee
and the employees who are adversely affected. Additionally, pro-
gram corrections may be necessary.

The reconstruction process may show the following employees to
have been adversely affected:

    (1)  Employees in the best qualified group, but who were not
selected because of the selection of an unqualified employee; and

    (2)  Employees who were not in the best-qualified group in
the original action, but who were in the reconstructed action.
They may include:

        (a)  Those originally in the qualified group but
improperly excluded from the best qualified group, or

        (b)  Employees not considered in the original action
but who were in the best qualified group upon reconstruction.

32

12335

From:
To:     Human Resources Office, Washington (HRO-W),
        Staffing Department (Attn:               )
Via:

Subj:   MANAGEMENT IDENTIFICATION OF ALL CANDIDATES

Ref:    (a)   HROWASHDCINST 12335.1F
        (b)   Request for Personnel Action No.

Encl:   (1)   Supporting Documentation

1.  In accordance with requirements set forth in reference
(a) the following information regarding the criteria used
under the "Management Identification of All Candidates"
evaluation method is provided:

Area of Focus:  IDENTIFY AREA OF FOCUS

Names of all promotional candidates:  LIST ALL CANDIDATES
IN ALPHABETICAL ORDER

2.  The following evaluation method was used to differentiate
between the "best qualified" and  "qualified":

All promotion candidates were evaluated based upon a general
overview of their qualifications as they relate to the know-
ledge, skills and abilities (KSA's) identified for the posi-
tion.  The evaluations have been documented in the form of
short narratives explaining the basis of the differentiation
between the two groups on the basis of the KSA's and are
attached as enclosure (1).

                    OR

A summary ranking factor was used alone to evaluate the pro-
motional candidates:

     IDENTIFY THE SUMMARY RANKING FACTOR

The supporting documentation is attached as enclosure (1).

                    OR

                                            Appendix A
                    A-1

The full job element rating guide was used to evaluate the promotional candidates.  The supporting documentation is attached as enclosure (1).

2.  Based upon the above evaluation the following promotional candidates are determined to be best qualified:

        LIST BEST QUALIFIED CANDIDATES IN ALPHABETICAL ORDER

3.  I select _____ for the subject vacancy. Please review enclosure (1) and upon approval make offer.


                        Selecting Official


Appendix A

Attachment 8

Standard Form 50-B
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

# NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|---|
| LIPSCOMB MICHAEL E | | | | 06-23-96 |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5-A. Code | 5-B. Nature of Action PROMOTION | 6-A. Code | 6-B. Nature of Action |
| 702 | | | |
| 5-C. Code | 5-D. Legal Authority REG 335.102 CAREER PROM | 6-C. Code | 6-D. Legal Authority |
| N6M | | | |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |

| 7. FROM: Position Title and Number | | 15. TO: Position Title and Number | |
|---|---|---|---|
| HOUSING MANAGER | K1PH063001 | HOUSING MANAGER | K1PH064001 |

| 8. Pay Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| GS | 1173 | 07 | 03 | $26,733.00 | PA | GS | 1173 | 09 | 01 | $30,658.00 | PA |
| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | | | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay | | |
| $25,210 | $ 1523 | $26,733 | $ 0 | | | $28,912 | $ 1746 | $30,658 | $ 0 | | |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| OFFICE OF THE EXECUTIVE OFFICER (09) FLAG HOUSING (09F) PUBLIC WORKS CENTER, WASHINGTON | OFFICE OF THE EXECUTIVE OFFICER (09) FLAG HOUSING (09F) PUBLIC WORKS CENTER, WASHINGTON |

## EMPLOYEE DATA

| 23. Veterans Preference | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|
| 6   1 - None   3 - 10-Point/Disability   5 - 10-Point/Other   2 - 5-Point   4 - 10-Point/Compensable   6 - 10-Point/Compensable/30% | 1   0 - None   2 - Conditional   1 - Permanent   3 - Indefinite | | X YES   NO |

| 27. FEGLI BASIC LIFE ONLY | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| | 3 RET ENLISTED | 0 |

| 30. Retirement Plan FERS AND FICA | 31. Service Comp. Date (Leave) 12-14-75 | 32. Work Schedule F FULL TIME | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|

## POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1   1 - Competitive Service   3 - SES General   2 - Excepted Service   4 - SES Career Reserved | N   E - Exempt   N - Nonexempt | | 7777 |

| 38. Duty Station Code 11-0010-001 | 39. Duty Station (City - County - State or Overseas Location) WASHINGTON DC |
|---|---|

| 40. AGENCY DATA | 41. UIC: 68925 | 42. ORG CODE: 09F | 43. COST CNTR: 160 | 44. PAYROLL OFF ID: PE LOC ID: |
|---|---|---|---|---|

45. Remarks

FULL PERFORMANCE LEVEL, GS-11
CONGRATULATIONS ON YOUR PROMOTION!

247

APR 5 1900

| 46. Employing Department or Agency DEPT OF THE NAVY | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| 47. Agency Code NV25 | 48. Personnel Office ID 2114 | 49. Approval Date 06-20-96   3KP | DESIGNATED APPOINTING OFFICIAL WASHINGTON DC 20374-2000 |

TURN OVER FOR IMPORTANT INFORMATION
Part    50-316
1 - Employee Copy - Keep for Future Reference
Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540-01-333-6238

Attachment 9

DEPARTMENT OF THE NAVY

*Memorandum*

18 Jun 96

From: Flag Housing Officer, PWC Washington
To:   J. P. Collington, HRO

Subj: PROMOTION OF MR. MICHAEL LIPSCOMB TO GS-1173-9

Ref:   (a) Position Description for GS-1173-9
       (b) SF 52 dtd 24 April 96

1. After reviewing reference (a) I concur with Barbara Beeler's recommendation of reference (b).

2. Accordingly I request Mr. Lipscomb be promoted to GS-1173-9, effective immediately.

3. If you have any questions, please call me at 685-0427.

J. M. Wink

2 4 6

APR 0 1 1999

Attachment 10

# PERFORMANCE APPRAISAL REVIEW SYSTEM

## PART 1

| 1. IOD COVERED | 2. |
|---|---|
| M **02 MAR 1997** TO **17 OCT 97** | ☒ INTERIM APPRAISAL  ☐ RATING OF RECORD |

| 3E (est, Middle Initial) | 4. SSN |
|---|---|
| **LIPSCOMB, MICHAEL E.** | ███████ |

| 5. TION TITLE / SERIES / GRADE | 6. ORGANIZATION / CODE |
|---|---|
| **HOUSING MANAGER  GS-1173  09/02** | **NAVSTA WASHINGTON (CODE N51)** |

### 7. RECORD OF REVIEWS AND FINAL APPRAISAL
(Signature indicates that this step of the process has been completed  Must be signed and dated.)

| | STANDARDS | | PROGRESS REVIEW | | RATING | |
|---|---|---|---|---|---|---|
| | SIGNATURE | DATE | SIGNATURE | DATE | SIGNATURE | DATE |
| IATE ISOR | *(signature)* | 15 MAR 97 | | | *(signature)* | |
| D LEVEL ISOR | *(signature)* | | | | | |
| YEE | *M. E. Lipscomb* | | | | *Michael E. Lipscomb* 170CT97 | |

### 8. RATING OF RECORD OR INTERIM APPRAISAL

| ☒ Level 5 OUTSTANDING | ☐ Level 4 EXCEEDS FULLY SUCCESSFUL | ☐ Level 3 FULLY SUCCESSFUL | ☐ Level 2 MINIMALLY SUCCESSFUL | ☐ Level 1 UNACCEPTABLE |
|---|---|---|---|---|

### 9. EMPLOYEE'S POSITION DESCRIPTION IS CURRENT AND ACCURATE?

☐ YES    ☐ NO

### 10. SUPERVISOR'S COMMENTS

Mr. Lipscomb is an outstanding employee who is dedicated to the improvement of Flag Housing and himself. He is the cornerstone of our office. He oversees the management of 30 Flag and General Officer Housing units in the Washing, DC area. He also supervises the Flag Housing Furniture Program and mentors junior housing personnel. He liaisons with outgoing and incoming residents to develop highly successful change of occupancy work plans. The success has been noted by NAVFAC and buy several of out residents, who gave him letters of appreciation. Mr. Lipscomb has established himself as a responsible, hard working employee who always gets the job done. He is very capable and has my recommendation to promotions to GS-1173-11.

*186*

| A. FITY HEAD SIGNEE APPROVAL | | Check Box IF APPROVED |
|---|---|---|
| | Signature        Date | ☐ Performance Award  $_____ |
| | | ☐ Quality Step Increase  $_____ |

PART III

| LIST CRITICAL ELEMENTS AND STANDARDS | INDIVIDUAL RATINGS | | |
|---|---|---|---|
| | ABOVE FULLY SUCCESSFUL | FULLY SUCCESSFUL | BELOW FULLY SUCCESSFUL |
| **EXAMPLE FORMAT:**  Define Individual Critical Elements and Standards<br><br>A. Element<br>   (1) Standard (F / S Level)<br>   (2) Optional Standard (EFS, MS)*<br><br>*May be required by major commands/activities. | | | |
| Track projected change of occupancies and plan work to prepare units for occupancy by new residents.  Supervise inspection of housing and develop detailed lists of deficiencies.  Ensure all required maintenance and repair is completed prior to move in date.  Liaison with new occupants to coordinate all details for their assignment to Flag Housing. | XX | | |
| Maintain an active inventory of all furnishings and equipment, reconciling inventory discrepancies.  Ensure the most economical method is used to maintain items in proper condition.  Plan and recommend solutions to satisfy customer needs in regard to furnishings and equipment. | XX | | |
| Independently investigate and resolve a variety of complex occupant concerns and complaints related to housing facilities and habitability conditions and recommend solutions to satisfy customer needs. | XX | | |
| Originate letters and memorandums (with minor grammar, capitalization and punctuation corrections) to the occupants, vendors and supervisors regarding conditions of the units and status of work on going work.  Responsible for proper spelling and format on correspondence.  Correspondence is submitted in time to meet deadlines as set forth by the supervisor. | XX | | |
| Develop internal operating procedures relating to housing maintenance / repairs.  Prepare and submit work requests for work accomplishment.  Determine the appropriate method of accomplishing identified work based on Navy Housing policy and procedures within deadlines set forth by the supervisor. | XX | | |
| Support "Total Quality Leadership" by working as a team player and the commitment to "Navy Neighborhoods of Excellence" by constantly improving processes that enhance customer service. | XX | | |

/ 8 7

Attachment 11

# A F F I D A V I T

*District of Columbia*

*I, Glenda Brown at Washington Navy Yard, make the following statement under oath or affirmation. Pursuant to Public Law 93-579 (Privacy Act of 1974), as an individual supplying information for inclusion in a system of records, I have been informed of the following:*

*EFFECTS OF NONDISCLOSURE: Disclosure of information by me is voluntary; however, my failure to respond will result in a recommended disposition of the case on the basis of information available.*

*AUTHORITY: The authority to collect the information requested by this interview is derived from one or more of the following: Title 5, code of Federal Regulations, Sections 5.2 and 5.3; title 5, United States Code, Sections 1302, 1303, 1304, 3301, and 3302; Executive Order 11478, as amended; Executive Order 10577; and 29 CFR 1614.*

*PURPOSE AND USES: The information supplied will be used as a part of the record in an equal employment opportunity discrimination complaint or grievance investigation. The record will be furnished to designees of agencies and departments of the Federal Government in order to resolve the complaint or grievance. The record may also be disclosed to any agency of the Federal Government having oversight or review authority with regard to Office of Personnel Management or Department of Defense activities, to the Federal intelligence agencies, or to others as published in the Federal Register.*

My name is Glenda Brown.  I am the Flag Housing Director, Deputy Director for Family

Housing, and for the period 1 December 1997-30 May 1999 I was Mr. Lipscomb's

(Complainant) immediate supervisor.  I am a GS-1173-13, Supervisory Housing Manager.  I am

race- Caucasian; sex- female, religion-Baptist; and physical disabilities-none.

I was aware that Mr. Lipscomb had Crohns disease, but I did not consider him to have a physical

disability as it did not interfere with the performance of his job.   I did not discriminate against

the Complainant with regard to the accepted issues in his complaint.

3 3

Regarding his not being promoted to the GS-11 level, I note that shortly after I became

Complainant's supervisor I forwarded paperwork for his promotion.  Subsequently, I was

informed that RADM Ellis (Commandant, NDW) had indicated that he would not approve

Complainant's promotion based on the fact that he (ELLIS) had personally barred Complainant

from his quarters due to Complainant's incompetence.  Having only a few months observing

Affiant's Initials

Complainants work, I routinely resubmitted the promotion in March of 1998 to Mabel Tarlton, Head, Housing Department, and she returned it to me on March 8, 1999 (the day she was relieved). In November 1998, I had asked for it back and she could not find it. In November 1998, I first approached Ms. Tarlton about reassigning Complainant out of Flag Housing to a position at the GS-09 level. We also discussed procedures to downgrade. The last time I discussed promotion with the Complainant was on 10 March 2000 when I gave him his copy of his appraisal. I told him that I will always consider him when I have a GS-11 vacancy because he has already competed for a position with GS-11 potential. To date, Complainant has not demonstrated that he can perform successfully at the GS-11 level. I note that I temporarily promoted Complainant to the GS-11 level in November 1999 for a period of 90 days. He did not perform successfully and Ms. Curry (his immediate supervisor; race-Black, sex-female, no disability) rated him as having failed in his performance at the GS-11 level and I concurred in that rating.

Regarding the allegation of continuing and ongoing harassment, Complainant was not treated differently with regard to telephone usage. Other Navy employees to include LCDR Trotta and Mr. Ken Ridgeway also had to reimburse the government for personal calls. Complainant did make an inordinate number of calls both from his desk and the cellular phone which suggested to me that he was not utilizing his time wisely nor organizing his thoughts before he acted. Additionally, it appeared that he was engaged in other than work related activities. I note that Cheryl Thompson and Brenda Smith were also issued letters requiring that they pay for personal phone calls.     3 4

Affiant's Initials

I never told Complainant or otherwise labeled him as being "inadequate" for his job. I have told

him that I did not think he was "suited" for his position in Flag Housing. I told him that because

of the ranks of the individuals and the intricacies of the position that I had not found him to be

successful in his job. For example, in the summer of 1998 the Complainant (without my

knowledge) had a contractor hire Complainant's brother (who the contractor later discovered

through a background check was a convicted rapist and was therefore dismissed ) as a

groundskeeper for Flag Housing. Complainant's actions in this regard were very inappropriate

and put the government at risk. I have indicated to the Complainant that he might be more

successful at doing something else.    Complainant also stated in his April 21, 1999 complaint

that "you are put on their (Contractor's) schedule". This is untrue and not Flag Housing Office

procedure. In Flag Housing the Government insists that the Contractor meets the schedule of the

resident customer, and if they cannot comply, another Contractor is engaged.

Regarding the incident with MS2 Arthur, I was present with LCDR Trotta during his March 29

2000 meeting with the Complainant. LCDR Trotta's 29 MFR concerning this meeting is

consistent with my recollection of the meeting. I note that Complainant, within our own office,

was very forthcoming about his vasectomy—he affirmatively told many people about it who

would not otherwise had known. He did indicate that his sperm count was still too high after the

vasectomy and that "it didn't take."                 3 5

When LCDR Trotta and I received the phone call from VADM Nelson (MS2 Arthur is the mess

steward for his house and VADM Nelson is our direct customer) concerning the incident, we

assigned him desk duty. We ordered him to have no contact with any customers. During the

March 29, 2000 meeting, LCDR Trotta informed Complainant that Complainant would now start

working in Housing Referral; Complainant was reassigned from Flag Housing to Housing

Affiant's Initials

Referral. I note that discussions concerning the reassigning of Complainant had been going on among management ( LCDR Trotta, Mabel Tarlton, Ruth Cooper, and myself) since November 1998. Additionally, I had discussed this off-line with his co-workers ( to include Ken Ridgeway, George Coffman, Cindy McMichael, and Elaine Crump). I was getting more negative complaints from Complainant than praise and it was across the board; i.e., from customers, co-workers, contractors, and LCDR Trotta. I was already working toward reassigning Complainant when the MS2 Arthur incident surfaced. I do not know why Complainant was not disciplined for the MS2 Arthur incident (I did participate in meetings with personnel concerning disciplining Complainant); subsequently, LCDR Trotta told me that Complainant was the "luckiest guy in the world."


END OF STATEMENT

*I have read the above statement, consisting of 4 pages, and it is true and complete to the best of my knowledge and belief. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.*

*Subscribed and sworn before me*

*at:* ___N D W, Washington, DC___

*on this* 13th *day of* June 2000 ~~1999~~

_____
*(Investigator's Signature)*

_____
*Affiant's Signature*

_____
*Affiant's Title* Deputy Head, Housing Dept.

36

Affiant's Initials *gcb*

Attachment 12

# DEPARTMENT OF THE NAVY
## PERFORMANCE APPRAISAL REVIEW SYSTEM

### PART I

| 1. PERIOD COVERED | 2. |
|---|---|
| FROM: 18 OCT 97   TO: 28 FEB 98 | ☐ INTERIM APPRAISAL    ☒ RATING OF RECORD |

| 3. NAME (Last, First, Middle Initial) | 4. SSN |
|---|---|
| LIPSCOMB, MICHAEL E. | ████ |

| 5. POSITION TITLE / SERIES / GRADE | 6. ORGANIZATION / CODE |
|---|---|
| HOUSING MANAGER  GS-1173  09/02 | NAVSTA WASHINGTON (CODE N51) |

### 7. RECORD OF REVIEWS AND FINAL APPRAISAL
(Signature indicates that this step of the process has been completed. Must be signed and dated.)

| | STANDARDS | PROGRESS REVIEW | RATING |
|---|---|---|---|
| IMMEDIATE SUPERVISOR | *Glenda Brown* 1 Nov 97 — GLENDA BROWN | | *Glenda Brown* 30 Mar 98 — GLENDA BROWN |
| SECOND LEVEL SUPERVISOR | *signature* ANDY TROTTA 1 Nov 97 | | *signature* ANDY TROTTA 30 Mar 98 |
| EMPLOYEE | *signature* 1 Nov 97 MICHAEL E. LIPSCOMB | | *signature* 7/5/98 MICHAEL E. LIPSCOMB |

### 8. RATING OF RECORD OR INTERIM APPRAISAL

| ☐ Level 5 | ☒ Level 4 | ☐ Level 3 | ☐ Level 2 | ☐ Level 1 |
|---|---|---|---|---|
| OUTSTANDING | EXCEEDS FULLY SUCCESSFUL | FULLY SUCCESSFUL | MINIMALLY SUCCESSFUL | UNACCEPTABLE |

### 9. EMPLOYEES'S POSITION DESCRIPTION IS CURRENT AND ACCURATE?

☒ YES    ☐ NO

### 10. SUPERVISOR'S COMMENTS

Mr. Lipscomb is a hard working and dedicated employee with a remarkably positive attitude. He consistantly updates his supervisor on the status of projects without being asked. Mr. Lipscomb has worked dilegently toward updating the furnishings inventory so that accurate and timely data may be maintained. He is the organizational leader of team spirit and team effort.

/ 88

11. ACTIVITY HEAD
DESIGNEE APPROVAL

Check Box IF APPROVED
_____ Performance Award $_____
_____ Quality Step Increase $_____

_____    _____
Signature                        Date

| PART II | | | |
|---|---|---|---|
| LIST OF CRITICAL ELEMENTS AND STANDARDS | INDIVIDUAL RATINGS | | |
| | ABOVE FULLY SUCCESSFUL | FULLY SUCCESSFUL | BELOW FULLY SUCCESSFUL |
| EXAMPLE FORMAT:   Define Individual Critical Elements and Standards<br><br>A.  Element<br>      (1) Standard (F / S Level)<br>      (2) Optional Standard (EFS, MS)*<br><br>* May be required by major commands/activities. | | | |
| Track projected change of occupancies and plan work to prepare units for occupancy, by new residents. Supervise inspection of housing and develop detailed lists of deficiencies.  Ensure all required maintenance and repair is completed prior to move in date.  Liaison with new occupants to coordinate all details for their assignment to Flag Housing. | X | | |
| Maintain an active inventory of all furnishings and equipment, reconciling inventory discrepancies.  Ensure the most economical method is used to maintain items in proper condition.  Plan and recommend solutions to satisfy customer needs in regard to furnishings and equipment. | | X | |
| Independently investigate and resolve a variety of complex occupant concerns and complaints related to housing facilities and habitability conditions and recommend solutions to satisfy customer needs. | X | | |
| Originate letters and memorandums (with minor grammar, capitalization and punctuation corrections) to the occupants, vendors and supervisors regarding conditions of the units and status of on going work. Responsible for proper spelling and format on correspondence.  Correspondence is submitted in time to meet deadlines as set forth by the supervisor. | X | | |
| Develop internal operating procedures relating to housing maintenance/repairs.  Prepare and submit work requests for work accomplishment.  Determine the appropriate method of accomplishing identified work based on Navy Housing policy and procedures within deadlines set forth by the supervisor. | X | | |
| Support "Total Quality Leadership" by working as a team player and the commitment to "Navy Neighborhoods of Excellence" by constantly improving processes that enhance customer service. | X | | |

/ 89

Attachment 13

**Employee performance journal - progress reports.**

| Date | Current Projects | Evaluation of Work, Problems, Successes, etc. |
|------|------------------|-----------------------------------------------|
| 3/5/99 | Overall work performance | Received a complaint from a resident stating Mr. Lipscomb was not inspecting the work he ordered and was making appointments with the resident and staff and then not coming, not following through, etc.  She has asked that although the employee is polite and nice, that he is not Flag Housing material.  Employee was counseled to limit contact with this resident and assure he makes and keeps appointments.  Employee was instructed to turn in weekly call sheets so that management can see the concerns of the residents.  Employee was notified that his performance will be reviewed again in two months and that progress is expected. |
| 3/16 | Overall work performance | Upon review of the October 98 phone bills, (just made available to me 3/15/99, it was discovered that Mr. Lipscomb made 307 phone calls from his desk in a period of 20 working days.  This does not include phone calls using the cell phone.  This number of calls is well over 100% more of the average of all other members of the Housing Department.  Management concerns are that with having only 12 customers it is nearly impossible to make an average of 15 calls from the desk phone per day when approximately 80% of the job responsibilities lie out side of the office.  Employee was instructed to immediately limit personal phone calls in and out to only essential calls which would allow him to touch base with his family, at a duration to normally not exceed over one phone call per day.  Employee stated he felt that at least 70% of the calls were work related.  It was suggested to him he may wish to try thinking through an issue without first trying to get others to track down information.  Employee concurred. |

/ 96

| 3/16 | | An appointment was scheduled with Mrs. Herdt (MCPON spouse) for 3/15/99 between Mr. Lipscomb, Ms. Curry and an outside contractor. Mr. Lipscomb had the lead on the project. After the time for the appointment had passed Mrs. Herdt phoned Ms. Curry asking why no one had shown up. It was Ms. Curry's understanding,the parties that were to go there were Mr. Lipscomb and the contractor. Neither Mr. Lipscomb nor the contractor let the customer or Ms. Curry know they would not arrive at the appointed time. Employee stated he didn't know there was an appointment. I urged Mr. Lipscomb, as lead on the project to make it his business to be aware of what is going on concerning issues, and urged him to see the ball is not dropped and our customers inconvenienced. |
| --- | --- | --- |

197

**Employee performance journal - progress reports.**

| Date | Current Projects | Evaluation of Work, Problems, Successes, etc. |
|------|------------------|-----------------------------------------------|
| 6/3/98 | Key Control | Employee has accomplished accountability of keys within the office. Working toward development of a Key Control SOP for the office. Making great strides. Very pleased with results. |
| | Load 98/99 work | Working with EMSI. Has accomplished both tasks. Have a few bugs to work out but basically ahead of schedule. Has made efforts to meet with EMSI. |
| 8/19 | IDP | Item 1 accomplished. Items 3-4 unavailable at this time - need to reschedule. |
| | Property Inv. | Some work accomplished. Unlikely will meet this suspense. No plan in place as to how to accomplish. |
| | Desktop SOP | About ¼ way through, but unlikely will meet this suspense. No further work occurred on Key Control SOP. |
| | Overall work performance | Employee seems pre-occupied, forgetful and unattentive. Work falling behind. Critical work orders are not in place for year end close-out. Seems lost. Have offered daily help checks and time saving tools to aid and assist. Received call from FHMI coordinator. Employee was observed dozing daily in class at PMI. It is believed this was from employee's medication. |

202

**Employee performance journal - progress reports.**

| Date | Current Projects | Evaluation of Work, Problems, Successes, etc. |
|---|---|---|
| 1/14 | Overall work Performance | Received letter of complaint from a resident stating employee entered his home without permission.  After discussion with the employee it was determined the statement was true.  The employees' intentions were to protect the quarters and the residents.  Discussed w/employee to not page this resident, and that even though he had the best intentions, we need to not enter quarters without permission. |
| 3/4/99 | Property Accountability | Employee has not completed this task and still has no plan in place.  Workload has not prevented this from being accomplished, but poor planning has. |
|  | Desk-top SOP | Little progress made and ample time was provided. |
|  | Overall work performance | Work continues to lag.  Employee looses track of appointments and commitments.  Employee has been told that his pending promotion is not forthcoming and that his performance will be monitored closely.  Employee is aware his performance is being documented in efforts to help him meet his obligations. |
| 4/9/99 | Overall work Performance | Due to conflicts between employee and a female house mess steward, Mr. Lipscomb must be reassigned to other duties.  His relationship with this customer has deteriorated to the point he is ineffective in his current position. |

203

**Employee performance journal - progress reports.**

| Date | Current Projects | Evaluation of Work, Problems, Successes, etc. |
|------|------------------|-----------------------------------------------|
| 1/3/98 | Key Control | Employee has accomplished accountability of keys within the office.  Working toward development of a Key Control SOP for the office.  Making great strides.  Very pleased with results. |
|  | Load 98/99 work | Working with EMSI.  Has accomplished both tasks.  Have a few bugs to work out but basically ahead of schedule.  Has made efforts to meet with EMSI. |
| 8/19 | IDP | Item 1 accomplished.  Items 3-4 unavailable at this time – need to reschedule. |
|  | Property Inv. | Some work accomplished.  Unlikely will meet this suspense.  No plan in place as to how to accomplish. |
|  | Desktop SOP | About ¼ way through, but unlikely will meet this suspense.  No further work occurred on Key Control SOP. |
|  | Overall work performance | Employee seems pre-occupied, forgetful and unattentive.  Work falling behind.  Critical work orders are not in place for year end close-out.  Seems lost.  Have offered daily help checks and time saving tools to aid and assist.  Received call from FHMI coordinator.  Employee was observed dozing daily in class at PMI.  It is believed this was from employee's medication. |

2/1

**Employee performance journal - progress reports.**

| Date | Current Projects | Evaluation of Work, Problems, Successes, etc. |
|------|------------------|------------------------------------------------|
| 1/14 | Overall work Performance | Received letter of complaint from a resident stating employee entered his home with permission.  After discussion with the employee it was determined the statement was true.  The employees' intentions were to protect the quarters and the residents.  Discussed w/employee to not page this resident, and that even though he had the best intentions, we need to not enter quarters without permission. |
| 3/4/99 | Property Accountability | Employee has not completed this task and still has no plan in place.  Workload has not prevented this from being accomplished, but poor planning has. |
| | Desk-top SOP | Little progress made and ample time was provided. |
| | Overall work performance | Work continues to lag.  Employee looses track of appointments and commitments. Employee has been told that his pending promotion is not forthcoming and that his performance will be monitored closely. Employee is aware his performance is being documented in efforts to help him meet his obligations.<br><br>2 / 2 |

**Employee performance journal - progress reports.**

| Date | Current Projects | Evaluation of Work, Problems, Successes, etc. |
|---|---|---|
| 3/5/99 | Overall work performance | Received a complaint from a resident stating Mr. Lipscomb was not inspecting the work he ordered and was making appointments with the resident and staff and then not coming, not following through, etc.  She has asked that although the employee is polite and nice, that he is not Flag Housing material.  Employee was counseled to limit contact with this resident and assure he makes and keeps appointments.  Employee was instructed to turn in weekly call sheets so that management can see the concerns of the residents.  Employee was notified that his performance will be reviewed again in two months and that progress is expected. |
| 3/16 | Overall work performance | Upon review of the October 98 phone bills, (just made available to me 3/15/99, it was discovered that Mr. Lipscomb made 307 phone calls from his desk in a period of 20 working days.  This does not include phone calls using the cell phone.  This number of calls is well over 100% more of the average of all other members of the Housing Department.  Management concerns are that with having only 12 customers it is nearly impossible to make an average of 15 calls from the desk phone per day when approximately 80% of the job responsibilities lie out side of the office.  Employee was instructed to immediately limit personal phone calls in and out to only essential calls which would allow him to touch base with his family, at a duration to normally not exceed over one phone call per day. Employee stated he felt that at least 70% of the calls were work related.  It was suggested to him he may wish to try thinking through an issue without first trying to get others to track down information.  Employee concurred. |

2/3

# Attachment 14

## NAVAL STATION WASHINGTON
## PERFORMANCE APPRAISAL REVIEW SYSTEM

__LIPSCOMB, MICHAEL__
EMPLOYEE'S NAME

SOCIAL SECURITY NUMBER

__HOUSING MANAGER/GS 1173-9__
POSITION TITLE/SERIES/GRADE

__N915__
ORGANIZATION  CODE

POSITION DESCRIPTION REVIEWED WITH EMPLOYEE:  YES: X   NO:

X   YES          ☐   NO              RATING PERIOD:
　　PD CURRENT                        From _1 APR 98_  To  _28 FEB 99_

*People are our most important resource. We believe performance management is essential to the growth and prosperity of the individual and the command. Our mission speaks to workplace Quality of Work Life for our employees and our Core Values address our commitment to their professional and personal growth. This Performance Assessment process reflects and supports those values and ideas.*

|  | PERFORMANCE PLAN SIGNATURE DATE | PROGRESS REVIEW INITIAL DATE | PROGRESS REVIEW INITIAL DATE | PROGRESS REVIEW INITIAL DATE | PROGRESS REVIEW INITIAL DATE | FINAL APPRAISAL INITIAL DATE |
|---|---|---|---|---|---|---|
| RATER | *Glenda C Brown* 6/3/98 | gcb 6/3/98 | gcb 8/19/98 | gcb 1/14/99 | gcb 3/4/99 | gcb 3/5/99 |
| REVIEWER | 6/3/98 | 6/3/98 | 8/19/98 | 1/14/99 | 3/4/99 | 3/5/99 |
| EMPLOYEE | 6/3/98 | ML 6/3/98 | ML 8/19/98 | ML 1/14/98 | ML 3/4/99 | ML 3/5/99 |

PART I.  WORK PERFORMANCE PLAN:  THE FOLLOWING ACTIONS/OBJECTIVES HAVE BEEN AGREED TO:

| # | ITEM | TARGET DATE | REVIEW DATE | ACCOMPLISH |
|---|---|---|---|---|
| 1 | Load remaining FY98 work from the 6-yr plan to the POAM | 15 Jun 98 | 3 Jun 98 | 29 Jun 98 |
| 2 | Load FY99 work from the 6-yr plan to the POAM | 15 Aug 98 | 7 Jul 98 | 30 Aug 98 |
| 3 | Conduct full accounting of property in non-WNY quarters | 1 Sep 98 | 14 Aug 98 | 15 Sep 9 |
| 4 | Write a Desktop SOP for Housing Managers w/checklists | 28 Aug 98 | 29 Jul 98 | 4 Sep 98 |
| 5 | Obtain accountability of keys as Key Control Officer | 30 Jun 98 | 4 Jun 98 | 7 Jul 98 |

PART II.  DEVELOPMENT PLAN:  THE FOLLOWING ACTIONS/OBJECTIVES HAVE BEEN AGREED TO:

| # | ITEM | TARGET DATE | REVIEW DATE | ACCOMPLISH |
|---|---|---|---|---|
| 1 | PM1-FHMI | 8-12 Jun 98 | 3 Jun 98 | 15 Jun 98 |
| 2 | AM1-FHMI | 30Nov3Dec98 | 8 Oct 98 | 6 Dec 98 |
| 3 | Managing Multiple Priorities | 25 Sep 98 | 11 Sep 98 | 28 Sep 98 |
| 4 | OM1-FHMI | 26Oct-5Nov98 | 8 Oct 98 | 8 Nov 98 |
| 5 | Creative Problem Solving | 3-5 Aug 98 | 27 Jul 98 | 6 Aug 98 |

X   ANNUAL RATING RECORD          ☐   CLOSE OUT/INTERIM RECORD

X   ACCEPTABLE          ☐   UNACCEPTABLE

PERFORMANCE ASSESSMENT

NAVSTA FORM 12430/B MAR 98                                Enclosure (2)

**EMPLOYEE PMI**

## Part III - Critical Elements and Performance Standards

Failure to attain an acceptable level of performance in any portion of a standard will result in an unacceptable for the entire element. "EAS" and "U" marks require factual documentation in the performance or developmental sections.

| ELEMENT 1. TECHNICAL COMPETENCE/PROGRAM MANAGEMENT | EAS | AS | U |
|---|---|---|---|

Contributes to the operational effectiveness of the command by performing specific duties as contained in the position description and other duties as assigned.

☐    X    ☐

**ACCEPTABLE:**

• Executes work assignments, follows appropriate procedures, complies with applicable regulations and policies, meets assigned deadlines.
• Meets accepted command standards with regard to work quality and quantity, completeness and accuracy, and consistency and timeliness.
• Requires minimal supervision. Works independently on routine assignments, needs supervisory guidance primarily for unusual or complex situations.
• Produces work that satisfies customer requirements and provides timely support.
• No more than 2 customer complaints per reporting period are noted.
• Assists in identifying process improvements and efficiencies.

**Where applicable - Security and Acquisition element**

• Complies with the security guidelines set forth in NDWINST 5510.1H.
• Purchase Card holders – complies with NAVSUP 4200.85C.
• Complies with Federal Acquisition Regulation (FAR)

| ELEMENT 2. COMMUNICATIONS | EAS | AS | U |
|---|---|---|---|

Promotes flow of information and understanding needed to operate command programs, achieve command missions, supports customer service, and facilitates personnel interactions.

☐    X    ☐

**ACCEPTABLE:**    *199*

• In written and oral communications, the employee expresses information clearly, completely, correctly, and in a timely manner.
• Uses the chain-of-command to resolve problems, seeks assistance and clarifies work requirements.
• The employee fully staffs work assignments with others when issues being addressed impact other work areas.
• No more than two (2) valid customer complaints are reported within the rating cycle.

NAVSTA FORM 12430/B MAR 98

| ELEMENT 3.  CUSTOMER SERVICE/WORKING RELATIONS | EAS | AS | U |
|---|---|---|---|

Provides prompt, courteous and knowledgeable service to both internal and external customers.

☐    X    ☐

**ACCEPTABLE**:

- Knows the requirements of specific customer/markets.
- Understands customer goals, strategies and processes to ensure customer focused decisions.
- Maintains personal involvement with and seeks feedback from customers.
- Keeps resources focused on responding to customer needs.
- Strives for continuous work process improvement.
- Applies Customer Satisfaction as the ultimate guide in decision-making.
- Keeps supervisor informed of problems and potential problems.
- Is polite and courteous to all customers at all times with no more than one (1) substantiated complaint in a 90 day period.
- Demonstrates and promotes positive working relationships.

2 0 0

PERFORMANCE COMMENTS:  Describe any factors of performance (to be completed b      the final performance appraisal meeting).

Mr. Lipscomb excels in areas of attitude, politeness and internal working relations.  However, the employee has been generally distracted most of the rating cycle and is obviously struggling.  His performance is at the bare minimum level for acceptance.  A written complaint was received relative to the employee's performance from a customer.  Employee is failing to complete simple tasks in all elements.  Mr. Lipscomb's performance will be closely monitored over the next 60 days and re-evaluated.

DEVELOPMENT COMMENTS (Optional):  Describe mutually agreed upon steps to be taken to develop and enhance the employee's overall performance and capabilities.

The employee attended PM1 and FC1 training at FHMI this rating cycle, in addition to several managerial courses. The employee will be scheduled for Microsoft Project and OM1 training through FHMI as scheduling and employee work performance permits.   The employee's performance will be closely monitored over the next 60 days and re-evaluated.

EMPLOYEE COMMENTS (Optional):
I have read and discussed this appraisal and have the following comments:

APPROVALS:

_Glenda C Brown_
GLENDA C. BROWN

_____
ANDY TROTTA                                          2o )

DISCUSSED WITH:  MICHAEL E. LIPSCOMB

_Michael E. Lipscomb_                          _3/5/99_
EMPLOYEE SIGNATURE                       DATE

I  UNDERSTAND MY SIGNATURE ACKNOWLEDGES THAT I HAVE READ/SEEN THIS REVIEW AND THAT IT DOES NOT NECESSARILY INDICATE AGREEMENT WITH THE RATING OF RECORD.

NAVSTA FORM 12430/B MAR 98

Attachment 15

DEPARTMENT OF THE NAVY

# *Memorandum*

2 Apr 99

From: Family Housing Department Head, Naval Support Activity Washington
To:     Family Housing Staff

Subj:  PERIODIC UPDATE

1. I wanted to provide all of you with periodic updates as we progress with various process improvements, personnel changes, and policy directives. I am pleased with what I see as the tremendous potential our department has for serving our customers, and ask each of you to continue with greatest efforts to focus your attention toward providing those services.

2. <u>Interviews with LCDR Ginnetti.</u>  I most strongly encourage you to take an opportunity to talk with LCDR Ginnetti (433-6505). As independent evaluator she is making herself available to all employees and has been scheduling visits to each of our sites. Follow-up meetings are also encouraged. **The information you will provide will greatly assist us in improving our processes for both the customer as well as yourselves**.

3. <u>Use of the Chain of Command.</u>  I want to remind everyone that the Commanding Officer, Executive Officer, and Command Master Chief have an open door policy if employees would like to speak with them, but only after utilizing the chain of command (working with your supervisors). **Direct communications of a working nature with the CO, XO, or CMC without department head permission is not authorized.**

4. <u>Use of Phones.</u>  The latest policies regarding the use of our government phones is:

   a. **Short duration calls to home are allowed on both the office and cellular phones. Short duration is 1-3 minutes.**
   b. **Personal calls are not authorized.**
   c. **If you are receiving unwanted calls on your government phone, state to the caller that you do not want to be called again and document each call with an e-mail to your supervisor. Supervisors will forward the documentation to Mrs. Brown, LCDR Ginnetti, and myself for appropriate action.**
   d. **Use of our 1-800 lines for personal calls, both incoming and outgoing, is not authorized.**

5. <u>Audit progress.</u>  I appreciate everyone's support assisting the Navy Audit Service and the Navy Criminal Investigative Service in their audit. The audit is quite independent, and as such I am unaware of the expected completion date.

APR    1999

6.  I am very enthusiastic of the efforts you all are putting forward.  I am a firm believer and follower of honesty and integrity.  The proper respect to any coworker, supervisor or subordinate is nothing less than being honest and forthright.  **I expect all of us to fully subscribe to exhibiting unwavering integrity and honesty in all of our actions**.  You are asked to sign, date and print your name at the bottom of this sheet acknowledging acceptance and understanding.

A.  P. TROTTA

Copy to:
CO/XO/CMC NSA-W
HRO Washington

MICHAEL E. LIPSCOMB    4/5/99

79

APR 21 1999

Attachment 16

## INTERVIEW WITH MS2 ARTHUR ON 19 MAR 99

This interview took place at ADM Nelson's residence, Quarters B, NNMC Bethesda at approximately 1015. This was a verbal interview, given to LCDR Trotta, Family Housing Director and LCDR Ginnetti, witness. This statement is being drafted from this interview and reviewed by MS2 Arthur.

MS2 Arthur stated this incident took place sometime in mid-February. Mrs. Nelson had a question about some filters on the washer machine and asked MS 2 to talk to Michael Lipscomb, the housing manager about them. Mr. Lipscomb came over to the house to see the fasteners. MS2 had to ask him a couple of times if he is going to take care of the fasteners. On one of his trips there, he started talking in the kitchen to MS2 explaining why he had not gotten to the fasteners earlier because of personal problems- he starting talking about his wife, kids and showing pictures of his kids to MS2. MS2 was returning the small talk about "oh I have a daughter too, she is 4, I don't have any pictures with me". Mr. Lipscomb than starting talking about how he did not want to have lots of kids, saying he was trying to prevent having too many, his wife had taken the pill, but did not like the pill, he finally got fixed or try to, but the doctors failed to tell him about a procedure. Mr. Lipscomb went on to tell her that the doctors forgot to tell him that he had to wait to have sex, he needed to heal first. When he went back to the doctor for his check-up he found out that it did not work. He told her that some young women told him to go and have lots of sex to get the sperm out. MS2 did not say anything to that and was not saying much at this point of the conversation. He kept talking. Finally MS2

42

said that she could not help him, that he needs to talk to his wife or Planned Parenthood or doctor. He than told her that he has talked to his doctor and all the doctor says is he needs the procedure again and his wife does not want to take the pill. He than asked her what do you use and do you know of other birth control? MS2 said no and that she could not help him with this.

Mr. Lipscomb than starting talking about God, going to church with Chief Nixon (the MS who worked there before). She finally cut him off and got him out of the house. The next day, Mrs. Nelson asked MS2 if Mr. Lipscomb had come over. Seeing something was wrong, she pressed her to tell her what had happened. She did. Mrs. Nelson told MS2 that she would not say anything to ADM Nelson or any one else so she would not be embarrassed but did ask MS2 if she told her husband. MS2 said yes, she had told her husband, EM2 Arthur the night before. MS2 does not know why Mrs. Nelson finally told ADM Nelson or when.

MS2 admitted she never did ask Mr. Lipscomb to stop or say anything to the effect this is making me uncomfortable etc (Red/yellow). She said she just try to steer the conversation to a different path that she couldn't help him, go elsewhere, tried the approach "I can't help you, these people can, professionals, and try to stop the conversation and lead him to the door.

43

When MS2 first reported on board, Mr. Lipscomb started coming around a lot, introducing himself, even though she had meet him through MSC Nixon. He would first

ask if there were any problems and than tell her to call him if there is a problem; he is the

one to call etc.  His coming over so frequently made her a call MSC Nixon to see if this

was normal or not.  MSC Nixon told her that Mr. Lipscomb must have a crush on you.

MS2 said she did not think so since she always wears her rings except when she is

~~cooking.~~  MRS. NELSON SAID TO MS2 THAT SHE THOUGHT IT WAS  ~~MSC Nixon told her that Mr. Lipscomb and himself use to pray together and~~  STRANGE THAT THEY PRAYED IN HER SPACES AND THAT WAS  ~~have lunch together until Mrs. Nelson asked that the praying stop, saying that they could~~  SOMETHING THAT SHOULD BE DONE ON THEIR LUNCH BREAK.  ~~pray on their lunch break.~~  DA

This statement contains 3 pages prepared by LCDR Ginnetti as we discussed.  I have
reviewed and initial any changes and attest that the information stated here is true and
correct to the best of my knowledge.


_Denise S. Otto_ _____          _3-20-99_  _1100_
         Name                                      Date/Time


Individual prepared statement:

_[signature] LCDR USN_ _____          _22 Mar 99_  _1102_
         Name                                      Date/Time


Director, Family Housing:

_[signature] LCDR CEC USN_ _____          _22 MAR 99_  _1102_
         Name                                      Date/Time


4/4

Attachment 17

April 1, 1999

**MEMORANDUM**

From:       Mr. Michael Lipscomb

To:         LCDR Andrew P. Trotta

Subject:    Verbal Statement Given By Mr. Michael Lipscomb

Ref:        Your memo dated 29MAR99

The purpose of this memo is to provide a response to your written memo referenced above.

Relative to paragraph numbers one and two of your memo, I agree.

With regard to paragraph number 3, I provide the following:

I agree the discussion between MS2Arthur and I took place on or about 4MAR99 and that I had a 0930 appointment with MS2Arthur to discuss the A/E book and check up on A/C unit repairs being done by Terrie and Ronnie (ESMI employees) as well as an issue Mrs. Nelson had with a serving tray. I agree I arrived to the quarters late, but before noon. However I disagree that I did not call the quarters to notify MS2Arthur that I would be arriving late for the appointment. I recall telephoning MS2Arthur for the purpose of letting her know that I would be late. I then attempted to explained to you and Ms. Brown the situation with the serving tray, but before I could finish Ms. Brown interrupted and said, "the serving tray is unauthorized because only special commands get serving trays, and you know that." I agree it was realized it was more of a serving cart that goes with the patio furniture (vice a silver serving tray).

I agree that I stated MS2Arthur initiated a casual conversation by stating she and her husband were picking up their son in NY. I also agree that I stated that I was married with two children. However, I did not state that I go to church, rather that I teach Sunday School and minister in music at my church. I disagree that it was me that stated I was glad she had a child. It was MS2Arthur that stated she was glad she had a child. My response to this was I was happy that I had two children. I agree that she asked me if I was planning on having more children and I stated, "no." I also agree that she then asked why and I responded that having children was very expensive. I agree she then asked if my wife and I were trying to do something to not have any more children. I also agree I stated that my wife and I had sought medical assistance. It was at this point that

*145*

APP 2 + 1999

- 2 -

MS2Arthur stated that there were other things we could do to prevent having children without having surgery, for example one of us could have a vasectomy.   I agree that the conversation ended with that, and never did MS2Arthur state she was uncomfortable with the conversation.

I agree that MS2Arthur initiated and led the casual conversation and that you notified me that I would be working in housing referral.  I then asked who I would be reporting to and Glenda stated that Ms. Shirley Lester would be my supervisor and would assign my duties.

cc: Representative

*146*

MEMORANDUM FOR THE RECORD                    29MAR99

From:  LCDR Andrew P. Trotta

Subj:   VERBAL STATEMENT GIVEN BY MR. MICHAEL LIPSCOMB

1.  On 29MAR99 at 0800 Mr. Lipscomb came to talk to myself and Glenda Brown in my office at bldg 414 in regards to the alleged discussion between he and MS2 Arthur. He stated he was advised to only give a verbal statement, vice written as I had requested.  He also gave me a memo that requested the following:

    a.  A copy of the written complaint
    b.  The legal authority for requesting a statement or account
    c.  Information that will assist in determining whether I am currently conducting an informal inquiry or a formal investigation

2.  Before Mr. Lipscomb began, I stated that I would be writing up a memorandum of his verbal statement, and that I was concerned that by doing so it may not be as accurate as his own written statement would be as there is a level of remembrance and interpretation that occurs.  I stated that I would be faxing this to HRO for review.  He said he understood.

3.  Statement from Mr. Lipscomb follows (Glenda took notes and we discussed afterward for accuracy):

Michael stated that he believed the discussion took place about 04MAR.  He had a 0930 appointment with MS2 Arthur to discuss the A/E book and check up on A/C unit repairs being done by Terrie and Ronnie (ESMI employees) as well as an issue Mrs. Nelson had with a serving tray.  He stated he arrived late, but before noon.  When asked by Glenda, Michael stated he had not called to notify the quarters he would be late.  A discussion between Michael, Glenda, and I ensued about the serving tray.  It was realized it was more of a serving cart that goes with patio furniture (vice a silver serving tray).

Michael stated that MS2 Arthur initiated a casual conversation by stating she and her husband were picking up their son in NY.  He then stated that he was married with two kids and goes to church.  He stated he was glad she had a child, and he was happy he had two children.  She then asked if Michael was planning on having more children.  Michael stated no.  She then asked why?  He stated that having children was very expensive.  She then asked Michael if he and his wife were trying to do something to not have any more children.  Michael stated that he and his wife had sought medical assistance.  Michael stated that the conversation ended with that and never did MS2 Arthur state she was uncomfortable with the conversation.

I asked Michael if MS2 Arthur had basically initiated and led the conversation and he said yes.  I asked if any more details were discussed during the conversation and he said no.

*147*

APR 21 1999

I then notified Michael that he would be working in housing referral. When asked, he was told by Glenda that Ms. Shirley Lester would be his supervisor and would assign his duties.

I will provide a copy to Michael and ask if it accurate.


A. P. TROTTA


I Aknowledge the receipt of ~~this~~ Receiving this memo and will Respond to this memo IN writing 3/30/99. (MEE)

1 4/8

March 29, 1999

**MEMORANDUM**

From:        Mr. Michael Lipscomb

To:          Housing Officer, Naval Support Activity Washington

Subject:     Response To Request for Statement

Ref:    (a) My memo dated March 24, 1999
        (b) Your memo dated 26MAR99

On the advice of my representative I came to see you, on the afternoon of March 26, 1999, regarding the alleged discussion between MS2 Arthur and me on March 4, 1999. I came to see you for the purpose of providing you orally with my account of the alleged discussion. However, because you were in a meeting with the budget analysts, I was unable to meet with you as planned. Subsequently, I returned to your office and learned that you had departed Anacostia.

Please be advised that I have been instructed to meet with you at your earliest convenience to provide "my side of the story." I understand that I am being requested to provide "my side of the story" for the benefit of having you evaluate the situation.

With regard to your request for a written statement, I have also been instructed to requested that you provide me with the following:

- a copy of the written complaint
- the legal authority for requesting a statement or account, and
- information that will assist in determining whether you are currently conducting an informal inquiry or a formal investigation

Upon receipt of the written complaint and the information I have requested, I will meet with my representative and a determination will be made regarding your authority to request a written statement, during what appears to be an informal inquiry.

*1 4 9*

cc: Representative

APR 2 ? 1999

FAX-433 0587

DEPARTMENT OF THE NAVY

# *Memorandum*

26 Mar 99

From: Housing Officer, Naval Support Activity Washington
To:   Mr. Michael Lipscomb

Subj: REQUEST FOR STATEMENT

Ref:   (a) Discussion btwn you and Mrs. Glenda Brown dtd 23MAR99
       (b) Your memo dtd 24MAR99
       (c) Discussion btwn you and me dtd 25MAR99

1. Michael, per your discussions with Glenda and I, references (a) and (c), we would like you to submit a statement in regards to the alleged discussion between you and MS2 Arthur in the month of February, 1999. I understand from references (b) and (c) that you are seeking advice in regards to your rights. You are requested to submit your statement by close of business Wednesday, 31MAR99. If your statement is not submitted by this time I will be forced to evaluate the situation without the benefit of having "your side of the story."

2. If you have any questions please contact me at (202) 685-0549.

A. P. TROTTA

Copy to:
HRO-W
Glenda Brown

/ 5 0

APR 2 1 1999

March 24, 1999

MEMORANDUM

From: Michael E. Lipscomb
To:    LCDR Andrew Trotta
       Glenda Brown

Subj: ALLEGED MATTER THAT OCCURRED ON OR ABOUT MARCH 4, 1999

Per our conversation of MS Denise Arthur on March 22, 1999, you
requested that I provide written justification for the alleged
incident which occurred on or about March 4, 1999.

Pursuant to 29 C.F.R. 1614.605 (representation and official time)
and Equal Employment Opportunity Commission Management Directive
110, (specifically page 513), I hereby exercise my right to
contact a representative who will advise me regarding this
matter.

After consulting with my representative you will be contacted by
my representative regarding the allegations.


cc: Representative

Attachment 18

## Brown, Glenda

| | |
|---|---|
| **om:** | Brown, Glenda |
| **nt:** | Monday, January 11, 1999 11:25 AM |
| **o:** | Tarlton, Mabel |
| **Cc:** | Trotta, Andrew (LCDR) |
| **Subject:** | Michael Lipscomb |

Just a memory jogger - if you get a chance to bounce this off Judy Mitchell - I think it would be a good idea.  Michael doesn't have another change of occupancy in his qtrs until April.  It would be good if we relocated him prior to then.

glenda

173

Attachment 19

## NAVAL STATION WASHINGTON
## PERFORMANCE APPRAISAL REVIEW SYSTEM

**LIPSCOMB, MICHAEL**
EMPLOYEE'S NAME                         SOCIAL SECURITY NUMBER

HOUSING MANAGER/GS 1173-9               N915
POSITION TITLE/SERIES/GRADE             ORGANIZATION CODE

POSITION DESCRIPTION REVIEWED WITH EMPLOYEE:   YES: X   NO: ☐

X   YES        ☐   NO        RATING PERIOD:
     PD CURRENT                From 1 MAR 99  To  19 APR 99

*People are our most important resource. We believe performance management is essential to the growth and prosperity of the individual and the command. Our mission speaks to workplace Quality of Work Life for our employees and our Core Values address our commitment to their professional and personal growth. This Performance Assessment process reflects and supports those values and ideas.*

|  | PERFORMANCE PLAN | PROGRESS REVIEW | PROGRESS REVIEW | PROGRESS REVIEW | PROGRESS REVIEW | FINAL APPRAISAL |
|---|---|---|---|---|---|---|
|  | SIGNATURE DATE | INITIAL DATE | INITIAL DATE | INITIAL DATE | INITIAL DATE | INITIAL DATE |
| RATER | 8/5/99 | 4/9/99 |  |  |  | 3/10/00 |
| VIEWER | 3/5/99 | 4/9/99 |  |  |  | 3/10/00 |
| EMPLOYEE | 3/5/99 | 4/9/99 |  |  |  | 3/10/00 |

PART I.  WORK PERFORMANCE PLAN:  THE FOLLOWING ACTIONS/OBJECTIVES HAVE BEEN AGREED TO:

| # | ITEM | TARGET DATE | REVIEW DATE | ACCOMPLISH |
|---|---|---|---|---|
| 1 | Conduct full accounting of property in non-WNY quarters | 3/31/99 | 3/26/99 |  |
| 2 | Write a Desktop SOP for Housing Managers w/checklists | 4/16/99 | 3/26/99 |  |
| 3 | Continue accountability of keys as Key Control Officer | 2/29/00 | 7/9/99 |  |
| 4 | Update 6 year plans for FY00/01 non-WNY quarters | 2/29/00 | 12/3/99 |  |
| 5 | Spearhead turnover of the non-flag quarters to Flag Hsg control | 6/30/99 | 5/7/99 |  |

PART II.  DEVELOPMENT PLAN:  THE FOLLOWING ACTIONS/OBJECTIVES HAVE BEEN AGREED TO:

| # | ITEM | TARGET DATE | REVIEW DATE | ACCOMPLISH |
|---|---|---|---|---|
| 1 | OM1-FHMI |  | 9/10/99 |  |
| 2 | Microsoft Project 98 Part 1 | 3/30/99 | 5/7/99 |  |
| 3 | 7 Habits | May 99 | 7/9/99 |  |
| 4 | The Indispensable Assistant | 3/25/99 | 5/7/99 |  |
| 5 | AM3-FHMI | 19-23 Apr 99 | 5/7/99 |  |

ANNUAL RATING RECORD        X   CLOSE OUT/INTERIM RECORD

X   ACCEPTABLE        UNACCEPTABLE

PERFORMANCE ASSESSMENT
STA FORM 12430/B MAR 98                                    Enclosure (2)

PERFORMANCE COMMENTS:  Describe any factors of performance (to be completed before the final performance      aisal meeting).

Due to conflicts between this employee and a female house mess steward, Mr. Lipscomb must be rea___gned to other duties. His relationship with this customer has deteriorated to the point he is ineffective in his current position. The employee is not performing at an acceptable level, however, due to the critical nature of this job, I cannot allow Mr. Lipscomb to remain in his current position long enough to be deemed "unacceptable" for civil service duty.  I have been forced to reassign him for the immediate good of the organization and to provide him an opportunity to succeed.  I am hoping he do well enough to keep his current grade, in another setting.  Although he has competed for the next higher grade on a developmental assignment, he show no signs as being long-term promotion material.

DEVELOPMENT COMMENTS (Optional):  Describe mutually agreed upon steps to be taken to develop and enhance the employee's overall performance and capabilities.

EMPLOYEE COMMENTS (Optional):
I have read and discussed this appraisal and have the following comments:

APPROVALS:

GLENDA C. BROWN                                   10 MAY 00

ANDY TROTTA                                       KEN RIDGEWAY
SIGNER DEPARTED AREA                              10 May 00

DISCUSSED WITH:  MICHAEL E. LIPSCOMB

EMPLOYEE SIGNATURE                                10 MAR 00
                                                 DATE

I UNDERSTAND MY SIGNATURE ACKNOWLEDGES THAT I HAVE READ/SEEN THIS REVIEW AND THAT IT DOES NOT NECESSARILY INDICATE AGREEMENT WITH THE RATING OF RECORD.

193

NAVSTA FORM 12430/B MAR 98

**EMPLOYEE PM**

## Part III – Critical Elements and Performance Standards

Failure to attain an acceptable level of performance in any portion of a standard will result in an unacceptable for the entire element. "EAS" and "U" marks require factual documentation in the performance or developmental sections.

| | EAS | AS | U |
|---|---|---|---|
| **ELEMENT 1.** TECHNICAL COMPETENCE/PROGRAM MANAGEMENT<br><br>Contributes to the operational effectiveness of the command by performing specific duties as contained in the position description and other duties as assigned. | ☐ | ☒ | ☐ |

**ACCEPTABLE:**

• Executes work assignments, follows appropriate procedures, complies with applicable regulations and policies, meets assigned deadlines.
• Meets accepted command standards with regard to work quality and quantity, completeness and accuracy, and consistency and timeliness.
• Requires minimal supervision. Works independently on routine assignments, needs supervisory guidance primarily for unusual or complex situations.
• Produces work that satisfies customer requirements and provides timely support.
• No more than 2 customer complaints per reporting period are noted.
• Assists in identifying process improvements and efficiencies.

**Where applicable - Security and Acquisition element**

• Complies with the security guidelines set forth in NDWINST 5510.1H.
• Purchase Card holders – complies with NAVSUP 4200.85C.
• Complies with Federal Acquisition Regulation (FAR)

| | EAS | AS | U |
|---|---|---|---|
| **ELEMENT 2.** COMMUNICATIONS<br><br>Promotes flow of information and understanding needed to operate command programs, achieve command missions, supports customer service, and facilitates personnel interactions. | ☐ | ☒ | ☐ |

**ACCEPTABLE:**                    *194*

• In written and oral communications, the employee expresses information clearly, completely, correctly, and in a timely manner.
• Uses the chain-of-command to resolve problems, seeks assistance and clarifies work requirements.
• The employee fully staffs work assignments with others when issues being addressed impact other work areas.
• No more than two (2) valid customer complaints are reported within the rating cycle.

Case 1:07-cv-00103-JDB    Document 19-20    Filed 01/18/2008    Page 5 of 5

| ELEMENT 3. CUSTOMER SERVICE/WORKING RELATIONS | EAS | AS | U |
|---|---|---|---|
| | ☐ | ☐ | ☒ |

Provides prompt, courteous and knowledgeable service to both internal and external customers.

**ACCEPTABLE:**

- Knows the requirements of specific customer/markets.
- Understands customer goals, strategies and processes to ensure customer focused decisions.
- Maintains personal involvement with and seeks feedback from customers.
- Keeps resources focused on responding to customer needs.
- Strives for continuous work process improvement.
- Applies Customer Satisfaction as the ultimate guide in decision-making.
- Keeps supervisor informed of problems and potential problems.
- Is polite and courteous to all customers at all times with no more than one (1) substantiated complaint in a 90 day period.
- Demonstrates and promotes positive working relationships.

/ 95

NAVSTA FORM 12430/B MAR 98

Attachment 20



**DEPARTMENT OF THE NAVY**
NAVAL SUPPORT ACTIVITY WASHINGTON
BUILDING 200/3 WASHINGTON NAVY YARD
901 M STREET SE
WASHINGTON DC 20374-5001

12713
70 /499
13 DEC 99

Mr. Michael Lipscomb


Dear Mr. Lipscomb:

Re:  NOTICE OF ACCEPTANCE OF DISCRIMINATION COMPLAINT
     OF MICHAEL LIPSCOMB V. RICHARD J. DANZIG, SECRETARY
     OF THE NAVY, DON CASE NUMBER 99-68469B-001

     The purpose of this notice is to accept the
aforementioned complaint of discrimination.  The precise
issues accepted for investigation are as follows:

     a.  You allege that you were subjected to continuous
and ongoing harassment by management officials beginning
March 4, 1999; and

     b.  You allege that on April 21, 1999, you were denied
a promotion to Housing Manager, GS-1173-11 because of your
race (African-American), religion (Baptist), disability
(physical), and sex (male).

     By copy of this letter, the Office of Complaints
Investigations (OCI), Columbia, Maryland is advised of the
allegations, which have been accepted for processing and
will be requested to assign an investigator.  The scope of
the investigation will be limited to the issues accepted
above, and the EEO investigator is not authorized to inquire
in any other matters.  If you have other matters you wish
to complain about, you must see an EEO Counselor
immediately.  For purposes of coordinating the
investigation, the individual to be contacted is Loretta
Johnson, EEO Specialist, Human Resources Satellite Office,
Bethesda, Maryland.  She can be reached on (301) 295-6813.

     Mr. Tom Randall, Labor Relations Department, Human
Resource Office, 1014 M Street SE, Suite 1, Washington, DC,
20374-5050, has been designed as the agency representative
in this matter.  He may be reached at (202) 433-4944.  Any
settlement or mediation agreements must be coordinated
through the Deputy Equal Employment Opportunity Officer,
Mr. Isaac Oliver.  27

Page 2.

If you claim compensatory damages you will need to provide objective evidence of compensatory damages and how the alleged discrimination and/or reprisal caused them. *(See enclosed copy of Notice of Evidence Required to Establish Compensatory Damages)*.

You must keep the Equal Employment Opportunity Office (EEO) advised of any changes of address.  Failure to do so could lead to the dismissal of your complaint.  You must also immediately advise EEO, in writing, of the name, address, and telephone number of any representative or attorney you may designate to represent you in this matter. All documents and decision will be provided to your representative, with copies to you, unless you advise us in writing, that you are no longer represented by that individual.  If your representative is an attorney, present regulation requires that all documents and the decision be sent only to your attorney.  Copies **will not** be sent to you.

If you do not receive a copy of the report of investigation of your complaint within 180 calendar days of the date you filed your formal complaint of discrimination, you have the right to request the Equal Employment Opportunity Commission (EEOC) to appoint an Administrative Judge to conduct a hearing on your complaint without waiting further.  You may not, however request a hearing before the 181st day, unless you receive the report of investigation sooner.  Any request for a hearing that you may file on the 181st day should be addressed to:

> Washington Field Office
> EEOC
> 1400 L Street, NW, Suite 200
> Washington, DC  20005

A copy of your request for a hearing should be sent to:

28

> Mr. Issac Oliver
> c/o Department of the Navy
> Human Resources Office
> Bethesda Satellite Office
> 8901 Wisconsin Avenue
> Bethesda, MD  20889-5600

Page 3.

If you have any questions concerning the processing of your complaint, please contact Ms. Loretta Johnson, EEO Specialist, at (301) 295-6813.

S.C. MAYBAUMWISNIEWSKI
CAPT US Navy

Enclosures

cc:  Marjorie S. Gross (Representative)
     1106 Cape Teal Court
     Upper Marlboro, MD  20772

Attachment 21

OCPMINST 12713.2
CPI 713-H

## NOTICE OF RIGHTS AND RESPONSIBILITIES OF COMPLAINANT

From:    EEO Counselor
To:      Michael Lipscomb

Subj:  NOTICE OF RIGHTS AND RESPONSIBILITIES OF COMPLAINANT

1.  This is to notify you that you have the following rights and responsibilities regarding the processing of your complaint, and as counselor, it is my responsibility to make sure that the rights and responsibilities are explained to you.  Please acknowledge these by placing your initial at the end of each paragraph.

2.  YOU HAVE THE RIGHT TO REMAIN ANONYMOUS DURING THE INFORMAL PROCESS.

    a.  If you choose to remain anonymous your anonymity is only protected during the informal stage of the complaint process.'

    b.  If you file a formal complaint, your anonymity is no longer protected.

Complainant
initial

3.  YOU HAVE THE RIGHT TO REPRESENTATION, INCLUDING THE RESPONSIBILITY TO NOTIFY THE COUNSELOR OR THE EQUAL EMPLOYMENT OPPORTUNITY OFFICER, IN WRITING, OF ANY REPRESENTATIVE OBTAINED.

    a.  If you obtain a representative, you must provide written notice of your representative's name, address, and telephone number.  All official correspondence shall be with the representative, with copies provided to you.

    b.  If you designate an attorney as your representative, service of documents and decisions shall be made on the attorney and time frames for receipt of materials shall be computed from the time of receipt by the attorney.

    c.  You must serve all official correspondence on the designated representative of the agency.

    d.  If you change representatives, please notify this office as soon as possible.

2-2

Complainant
initial

HRO 12713 (11/94)

Subj:   NOTICE OF RIGHTS AND RESPONSIBILITIES O. COMPLAINANT

4.  YOU HAVE THE RIGHT TO FILE A FORMAL COMPLAINT, A CLASS COMPLAINT, AND/OR A CIVIL ACTION.

   a.  Only the matter(s) raised during informal counseling (or issues like or related to issues raised during informal counseling) may be alleged in a subsequent complaint filed with the activity.

   b.  The issues in the formal complaint, which were discussed with me, EEO Counselor, and the matter giving rise to the complaint, must be sufficiently precise to describe generally the action(s) or practice(s) that form the basis of the complaint.

Complainant
initial

5.  IN PRESENTING OR PROCESSING A DISCRIMINATION COMPLAINT, YOU WILL BE FREE FROM RESTRAINT, INTERFERENCE, COERCION, HARASSMENT, DISCRIMINATION, AND REPRISAL.

Complainant
initial

6.  IF YOU ARE AN EMPLOYEE(S) COVERED BY A COLLECTIVE BARGAINING AGREEMENT THAT PERMITS ALLEGATIONS OF DISCRIMINATION TO BE RAISED IN A NEGOTIATION GRIEVANCE PROCEDURE.

   a.  You have the right to file an EEO complaint or grievance and raise the matter of alleged employment discrimination under either 29 CFR 1614 or the negotiated grievance procedure, but not both.

   b.  If you file under 29 CFR Part 1614, you may not thereafter file a grievance on the same matter. An election to proceed under a negotiated grievance procedure is indicated by the filing of a timely written grievance.

   c.  If your collective bargaining agreement allows allega- tions of discrimination and you raise these allegations in the grievance, you will not be allowed to later file a discrimination complaint on the same issue.

N/A
Complainant
initial

23

Sub.    NOTICE OF RIGHTS AND RESPONSIBILITIE: F COMPLAINANT

7.    YOU HAVE THE DUTY TO MITIGATE DAMAGES.

Complainant
initial

8.    YOU HAVE THE RIGHT TO REQUEST A HEARING BEFORE AN EEOC
ADMINISTRATIVE JUDGE AFTER THE INVESTIGATION BY THE ACTIVITY.

    a.    You have 30 days after receipt of the investigative file
to request a hearing before the administrative judge.

    b.    If the investigation is not completed and you have not
agreed to extend the period of time to complete the investiga-
tion, you may request a hearing at any time after 180 days has
elapsed from the filing of the complaint.

Complainant
initial

9.    YOU HAVE A DUTY TO KEEP THE ACTIVITY AND COMMISSION INFORMED
OF YOUR CURRENT ADDRESS AND TO SERVE COPIES OF APPEAL PAPERS ON
THE ACTIVITY.

Complainant
initial

10.  HOW YOU MAY FILE MIXED CASE COMPLAINTS

    a.    If the subject of the action is appealable to the MSPB,
you may file a complaint with the activity or an appeal with the
MSPB, but not both.

    b.    Whichever is filed first will be considered an election
to proceed in that forum.  If you file a mixed case appeal with
the MSPB instead of a mixed case complaint, and the MSPB
dismisses the appeal for jurisdictional reasons, you have the
right to contact the EEO counselor within 45 days of receipt of
the notice and to file an EEO complaint.  The date on which you
file your appeal with the MSPB from the activity's processing of
a mixed case complaint and the MSPB dismisses it for
jurisdictional reasons, you may have the right to a hearing
before an EEOC administrative judge.

24

N/A
Complainant
initial

Subj:  NOTICE OF RIGHTS AND RESPONSIBILITIES OF COMPLAINANT

11. HOW YOU MAY ALLEGE A VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT (ADEA).

    a.  You have the right to file a civil action in a U.S. District Court under the Age Discrimination in Employment Act (ADEA) against the Secretary of the Navy after giving the EEOC not less than 30 days notice of the intent to file such an action.

    b.  The notice must be filed in writing with the EEOC within 180 days of the occurrence of the alleged unlawful practice.  The notice must be submitted to:

           Equal Employment Opportunity Commission
           Office of Federal Operations
           Attn:  Hearing Programs Division
           1801 L Street, N.W.
           Washington, D.C.  20507

                                    _____
                                         EEO Counselor


                                    _____
                                              Date

25

Attachment 22

FROM: Chuanda Johnson
HRSC-CAP

TRANS/ANN. # 19-23
CAP/00E/002/CJ

REQUEST #
00NSW011405

TO: MICHAEL MUR~   *NDiv*

AREA OF CONSIDERATION:
ACTIVITY WIDE ONLY NSW/NDW

VACANCIES:
(1) One

| DATE ISSUED:<br>05/25/00 | DATE DUE:<br>06/23/00 | EXTENDED TO: | STOPPER LIST DATED (RESULT):<br>**SUBJECT TO PPP CLEARANCE**<br>**SUBJECT TO ICTAP CLEARANCE** |
|---|---|---|---|

TITLE, SERIES, GRADE:
HOUSING MANAGER GS-1173-11

SIGNATURE / PHONE # OF STAFFING SPECIALIST:
CHUANDA JOHNSON (202)764-1061
PERSONNEL STAFFING AND CLASSIFICATION SPECIALIST

---

| PART I | MERIT PROMOTION CANDIDATES | |
|---|---|---|
| **CANDIDATE** | **CURRENT POSITION / LOCATION** | **ACTION TAKEN / DATE** |
| FERGUSON, LEROY | HOUSING MANAGER GS-1173-09<br>NSW | NS |
| SIEBER, KELLY | HOUSING MANAGER GS-1173-09<br>NSW | NS |
| THOMPSON, CHERYL | HOUSING MANAGER GS-1173-09<br>NSW | NS |
| THOMPSON, FLORAMAE | HOUSING MANAGER GS-1173-11 (DETAILED)<br>NSW | S |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

ACTION CODES:
S – SELECTED
NS – NOT SELECTED
D - DECLINED

---

| REFERRING OFFICIALS:<br>CHUANDA JOHNSON | REMARKS: |
|---|---|

SIGNATURE / TITLE OF SELECTING OFFICIAL:
*Glenda C Brown*
*Head Hsg Dept (Acting)*   DATE: 6/5/00

INSTRUCTIONS TO THE SELECTING OFFICIAL: THESE TRANSMITTAL LISTS CANDIDATES CONSIDERED BEING THE BEST QUALIFIED FOR THE SUBJECT POSITION. YOU ARE ADVISED TO CONSIDER THE ATTACHED DATA FOR EACH CANDIDATE.

---

FOR HRSC USE ONLY:

DATE OF TENTATIVE OFFER: _____   _____ ACCEPTED   DATE OF FIRM OFFER: _____

_____ DECLINED   REASON: _____

153

Attachment 23

DoD 5500.7-R

accordance with statute.  See 10 U.S.C. 2601 (reference (g)).

2-301.    Use of Federal Government  Resources.

a.    Communication Systems.  See GSA regulation 41 C.F.R. Subpart 201-21.6 (reference (h)) on use of Federal Government telephone systems. *Federal Government communication systems and equipment (including Government owned telephones, facsimile machines, electronic mail, internet systems, and commercial systems when use is paid for by the Federal Government) shall be for official use and authorized purposes only.*

(1)    Official use includes emergency communications and communications that the DoD Component determines are necessary in the interest of the Federal Government.  Official use may include, when approved by theater commanders in the interest of morale and welfare, communications by military members and other DoD employees who are deployed for extended periods away from home on official DoD business.

(2)    Authorized purposes include brief communications made by DoD employees while they are traveling on Government business to notify family members of official transportation or schedule changes.  They also include personal communications from the DoD employee's usual work place that are most reasonably made while at the work place (such as checking in with spouse or minor children; scheduling doctor and auto or home repair appointments; brief internet searches; e-mailing directions to visiting relatives) when the Agency Designee permits categories of communications, determining that such communications:

(a)    Do not adversely affect the performance of official duties by the DoD employee or the DoD employee's organization;

(b)    Are of reasonable duration and frequency, and whenever possible, made during the DoD employee's personal time such as after duty hours or lunch periods;

(c)    Serve a legitimate public interest (such as keeping DoD employees at their desks rather than requiring the use of commercial systems;  educating the DoD employee on the use of the communications system; improving the morale of DoD employees stationed for extended periods away from home; enhancing the professional skills of the DoD employee; job-searching in response to Federal Government downsizing);

(d)    Do not put Federal Government communications systems to uses that would reflect adversely on DoD or the DoD Component (such as uses involving pornography; chain letters; unofficial advertising, soliciting or selling except on authorized bulletin boards established for such use; violations of statute or regulation; inappropriately handled classified information; and other uses that are incompatible with public service); and

(e)    Do not overburden the communication system (such as may be the case with broadcasts and group mailings), create no significant additional cost to DoD or  the DoD Component, and in the case of long distance communications, charges are:

<u>1</u>    Charged to the DoD employee's home telephone

number or other non-Federal Government number (third number call);

<u>2</u>    Made to a toll-free number;

<u>3</u>    Reversed to the called party if a non-Federal Government number (collect call);

<u>4</u>    Charged to a personal telephone credit card; or

<u>5</u>    Otherwise reimbursed to DoD or the DoD Component in accordance with established collection procedures;

(3)  *In accordance with applicable laws and regulations, use of Federal Government communications systems may be monitored. See DoD Directives 4640.1 (reference (i)) and 4640.6 (reference (j)).  DoD employees shall use Federal Government communications systems with the understanding that such use serves as consent to monitoring of any type of use, including incidental and personal uses, whether authorized or unauthorized.*  In addition, use of such systems is not anonymous. For example, for each use of the internet over Federal Government systems, the name and computer address of the  DoD employee user is recorded by the Government and also by the locations searched.

(4)  *Most Federal Government communications systems are not secure. DoD employees shall not transmit classified information over any communication system unless it is transmitted using approved security procedures and practices (e.g., encryption, secure networks, secure workstations).  In addition, DoD employees shall not release access information, such as passwords, to anyone unless specifically authorized to do so by the Agency Designee.*  See DoD Directives 5200.28 (reference (k)) and C-5200.5 (reference (l)).  DoD employees should exercise extreme care when transmitting any sensitive information, or other valued data.  Information transmitted over an open network (such as through unsecure e-mail, the internet, or telephone) may be accessible to anyone else on the network.  Information transmitted through the internet or by e-mail, for example, is accessible to anyone in the chain of delivery.  Internet information and e-mail messages may be re-sent to others by anyone in the chain.

b.  <u>Other Federal Government Resources</u>.  Other than the use of Federal Government communications systems authorized in accordance with subsection 2-301.a. of this Regulation, above; the use of Federal Government resources as logistical support to non-Federal entity events in accordance with subsection 3-211 of this Regulation, below; and the use of Federal Government time authorized in accordance with subsection 3-300 of this Regulation, below; *Federal Government resources, including personnel, equipment, and property, shall be used by DoD employees for official purposes only, except as follows:*

(1)  Agency Designees may permit their DoD employees to make limited personal use of Federal Government resources other than personnel, such as typewriters, calculators, libraries, and other similar resources and facilities, if the Agency Designee determines the following:

(a)  The use does not adversely affect the performance of official duties by the DoD employee or the DoD employee's organization;

Attachment 24

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MICHAEL E. LIPSCOMB, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 1:07CV00103 (JDB) |
| | ) | |
| DONALD C. WINTER, | ) | |
| Secretary of the Navy, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANTS' SUPPLEMENTAL RESPONSES TO
PLAINTIFF'S INTERROGATORIES TO DEFENDANT

COMES NOW the Defendant Donald C. Winter, Secretary of the Navy, by and
through undersigned counsel, and supplements his responses to Plaintiff's Interrogatories
to Defendant as follows:

PRELIMINARY STATEMENT

In his initial responses to Plaintiff's discovery requests, Defendant provided
complete and accurate responses to plaintiff's first set of interrogatories. Nevertheless,
Plaintiff filed a Motion to Compel. Defendant has attempted to resolve Plaintiff's
concerns by conferring with Plaintiff's counsel and ascertaining the nature of the
information sought. In an effort to resolve this matter without further litigation and
without waiving his previously-made objections, Defendant supplements his responses to
Interrogatories 1-2, 6-7, 9-14, 16-19, 22, 24-25 as follows:

1.    **Consistent with instruction (d) above, identify all persons promoted to a GS-11 in Plaintiffs office since 1997.**

Although defendant believes that plaintiff's claim before the Court is limited to his non-promotion in 1997 and that subsequent promotions of other employees are therefore not reasonably calculated to lead to the discovery of admissible evidence, in order to avoid discovery litigation and in light of the Privacy Act Consent Order recently entered by the Court, defendant supplements his responses to Interrogatory No. 1 as follows.

To the best knowledge and belief of the defendant, the following individuals were promoted from GS-09 to GS-11 within the GS-1173 job series in the plaintiff's office between 1997 and the present:

1. Ms. Floramae (Teasha) T. Thompson - (Caucasian, female, Service Comp. Date (SCD): 08/22/1987) - Ms. Thompson was temporarily promoted to GS-1173-11 not to exceed 9/15/2000 on 6/18/2000. Ms. Thompson subsequently competed for and was selected for a permanent GS-1173-11 position on 7/16/2000 from Merit Promotion Certificate CAP/00E/002/CJ dated 05/25/2000.

| | |
|---|---|
| Home Address: | 8090 Windsor Drive, King George VA 22485 |
| Home Telephone: | (540) 663-0172 |
| Work Address: | 2691 Mitscher Road SW, Bldg 414 Ana, Washington DC 20373 |
| Work Telephone: | (202) 433-0838 |

2. Mr. Hermes J. McAnulty - (Pacific Islander, male, SCD: 12/20/1985) – Mr. McAnulty competed for and was selected to a GS-1173-11 on 4/29/2007, selected from Merit Promotion Certificate NW7-GS1173-11-K1599625-CMP-28, Dated 2/28/2007.

| | |
|---|---|
| Home Address: | 1113 Ivy Club Lane, Apt 712, Landover MD 20785 |

2

Home Telephone:
Work Address:       2691 Mitscher Road SW, Bldg 414 Ana, Washington DC 20373
Work Telephone:     (202) 433-4573

3. Ms. Cynthia Lilly - (Caucasian, female, SCD: 10/27/2986) - Ms. Lilly was promoted

to GS-1173-11 in 2005. In 2007, Ms. Lilly was terminated for her medical inability to

work.

Home Address:       29541 All Faith Church Road, Mechanicsville, MD 20659.
Home Telephone:     Not Currently Known/Available
Work Address:       Not Currently Known/Available
Work Telephone:     Not Currently Known/Available

4. Ms. Peggy McWhite - (African American, female, SCD: 05/31/1981) - Ms. McWhite

was promoted to GS-1173-11 on 03/28/2004. In 2007, Ms. McWhite was terminated for

her medical inability to work.

Home Address:       5530 Slater Street, Fredericksburg, VA 22407.
Home Telephone:     Not Currently Known/Available
Work Address:       Not Currently Known/Available
Work Telephone:     Not Currently Known/Available

5. Ms. Rise Neal - (African American, female, SCD: 11/10/1980) - Ms. Neal was

promoted from GS-1173-09 to GS-1173-11, temporarily on November 4, 2001, and

permanently in 2003.

Home Address:       420 Collins Road, Edgewater MD 21037-3608
Home Telephone:     (410) 798-6803
Work Address:       NSA Annapolis Housing Dept 349 Kinkaid Road, Annapolis MD
                    21402-5006
Work Telephone:     (410) 293-9736

6. Ms. Cheryl Thompson - (African American, female, SCD: 08/12/1985) - Ms.

Thompson was competitively promoted from GS-1173-09 to GS-1173-11 on November

3

19, 2000. She was selected from Merit Promotion Certificate CAP/00E/0120/CJ dated

10/20/2000.

| | |
|---|---|
| Home Address: | 13005 Strathaven Circle, Fort Washington MD 20744-5345 |
| Home Telephone: | (301) 203-1991 |
| Work Address: | Bellevue Housing, 1 Cargo Court, Washington DC |
| Work Telephone: | (202) 404-6401 |

7. Ms. Patricia Anderson - (Caucasian, female, SCD: 09/14/1985) - Ms. Anderson was

hired as a GS-1173-11 on September 17, 2006, in a competitive interview process from

NAS Jacksonville, FL. She was selected from Announcement No. NW6-GS1173-11-

K1412774-CMP-26, dated 06/26/2006.

| | |
|---|---|
| Home Address: | 2 Regester Ave. Baltimore, MD 21212-1536 |
| Home Telephone: | (410) 377-5328 |
| Work Address: | Navy Housing Department, 21967 Cuddihy Road, Bldg 2371, NAS Patuxent River MD 20670-1122 |
| Work Telephone: | (301) 995-3611 |

8. Ms. Kelly Siebert - (Caucasian, female, SCD: Not presently known) – Competitively

promoted to a GS-1173-11 position in 2003 or 2004.

Home Address: Not currently known/available
Home Telephone: Not currently known/available
Work Address: Currently employed by the Air Force in Colorado.
Work Telephone: Not currently known/available

**2. With respect to the individuals provided in answer to #1 above, provide their [a] ethnicity, [b] skin color, [c] years of service in the agency, [d] years of experience in Plaintiff's office, [e] years of post-high school education, [f] years at the next lower grade before getting the promotion, [g] reason(s) they were promoted, and [h] who recommended them for a promotion.**

See Response to Interrogatory No. 1, above. Defendant also notes that the agency

does not maintain specific information on skin color or in aggregate form as requested in

Nos. (e) through (h).  To the extent that information exists in Defendant's retrievable

files concerning Nos. (e) through (h), it would be found in the Official Personnel File

("OPF") of each employee.  The OPFs for the individuals named in Defendant's

Response to Interrogatory No.1 have been ordered from the Records Storage facility on a

expedited basis.  Upon receipt, Plaintiff may review the information and ascertain the

information he seeks to the extent such information is available there.

**6. How many Caucasians, in Plaintiff's office, have the same number of years and experience as Plaintiff but have been deprived of a recommended promotion?**

To the extent that Plaintiff is attempting to arrive at the number of employees

who have the same work experience as Plaintiff or less, but were promoted to the GS-11

level, Defendant states that none of the employees listed in Response No. 1 have had the

same work experience or performance appraisals as Plaintiff.  To the extent that Plaintiff

is attempting to determine whether Plaintiff had more federal government service than

others who may have been promoted to the GS-11 level, the OPFs of the individuals

listed in No. 1 have been requested so that he may perform such calculations.

**7. How many Caucasians, in Plaintiff's office, have trained people formally or informally and the very ones trained have been promoted to a higher grade, in the same office, than the Caucasians who trained them?**

To the extent that this interrogatory is attempting to establish that plaintiff trained a

number of other employees who were subsequently promoted to the GS-11 level,

defendant is unable to provide such information after a good faith investigation into the

matter.  See Defendant's Response to Interrogatory No. 3, above.

5

**9. Identify, consistent with instruction "d" above, the individuals listed in "Plaintiffs Rule 26 Disclosures", part "A" (with the exception of Ms. Pamela Lipscomb). For all of the individuals you are incapable of giving instruction "d" information for, provide all information in your possession on there whereabouts, including but not limited to the address for mailing pension or retirement checks, address for forwarding property or correspondence, address for making any contact with them whatsoever, address the Office of Personnel Management has presently on file for them, etc.**

In a spirit of cooperation, Defendant has attempted to identify Plaintiff's potential witnesses and gather the information requested by this interrogatory. Defendant has been unable to provide complete addresses and/or other information, but continues to attempt to gather records. Defendant will supplement his responses as additional responsive information becomes known to him. At this time, defendant can provide the following:

| | | |
|---|---|---|
| Ms. Sharon Reynolds: | (202)433-0346, | sharon.reynolds@navy.mil |
| Ms. Cindy Lilly: | (202)685-5457, | cindy.lilly@navy.mil |
| Ms. Teasha Thompson: | (202)433-0838, | teasha.thompson@navy.mil |
| Ms. Connie Clausen: | (301) 757-4889, | connie.clausen@navy.mil |
| Mr. John Dreswick: | (202) 433-3232, | john.dreswick@navy.mil |
| Mr. Terrance Vanhook: | (202)-433-4191, | terrance.vanhook@navy.mil |
| Ms. Courtney Graham: | (202)-433-3503, | courtney.graham@navy.mil |

**10. Identify all Caucasians in Plaintiff's office who were transferred and deprived of a recommended promotion due to one complaint about their work.**

Defendant knows of no one who meets these criteria.

**11. Identify all Caucasians in Plaintiffs office who were transferred and deprived of a recommended promotion due to an allegation of sexual harassment when the accuser refused to sign an Affidavit about such harassment, despite a request for such by the EEO Investigator.**

Defendant knows of no one who meets these criteria.

**12. Identify all male Caucasians in Plaintiff's office whose supervisor was accused of directing unsolicited, male-condemning, criticisms to them due to some problems a relative of that person had.**

Defendant knows of no one who meets these criteria.

6

**13. How did Plaintiff make excessive telephone calls when no official limitation was placed on number of calls?**

Plaintiff used the Department of Navy's telephone system for his own personnel use and, in doing so, incurred unauthorized costs which he was required to repay.

**14. Why did the Defendant promote someone trained and/or taught by Plaintiff over him?**

Plaintiff has identified specific individuals in his representations to Defendant's counsel concerning his view of Defendant's inadequate response to Interrogatory No. 14. Defendant does not believe that the individuals identified by plaintiff as having been trained by him were, in fact, trained by him, and therefore defendant is unable to respond to this interrogatory because Defendant disputes the premise upon which it is based.

**16. Of the individuals in GS-11 positions in Plaintiff's office, how many of them physically work day-to-day in the office?**

In 1997, there were two, Pamela Curry (now Driggers) and Lester Greenwood. Presently, there are no individuals at the GS-11 level in plaintiff's office.

**17. Of the individuals provided in answer #15 above, who are they supervising to do the physical day-to-day work in the office?**

Pamela Curry (Driggers) supervised Thomas Watkins, Teasha Thompson and Kelly Seibert in 1997. Lester Greenwood supervised Peggy McWhite and possibly other employees in 1997. Pamela Curry (Driggers) and Lester Greenwood are no longer employed in the Plaintiff's office. At present, the following individuals are responsible for the day to day work in the plaintiff's office: Michael Lipscomb (GS-09), Courtney Graham (GS-05), Andre Anderson (GS-04) and Germaine Whitehead (contract employee).

7

**18. Of the individuals provided in answer #15 above, why are they not physically in the office?**

In 1997, Pamela Curry (Driggers) and Lester Greenwood were physically in the

office. Until recently, there were two individuals who filled GS-11 positions in plaintiff's

office who were out on workers' compensation benefits. Their names were Peggy

McWhite and Cindy Lilly.  They were not physically in the office because of individual

disabling conditions and, as noted, were receiving workers' compensation benefits.

**19. Of the individuals provided in answer #15 above, how long have they been physically out of the office?**

Until their termination in November 2007, Ms. McWhite had been injured and unable

to work, starting on 04/21/2006, and Ms. Lilly had been injured and unable to work

starting on 08/23/2006.

**22. When an employee in Plaintiff's 1997 office and his present office receives an "Outstanding" rating and a recommendation for a promotion, what <u>formal or official reason(s)</u> exists to deny such promotion?**

In 1997 and the present, career ladder promotions were and are not "denied" as they

are not entitlements. The formal and official regulations and procedures discussing career

ladder promotions, which is the best response to this interrogatory are contained within

HROWASHDCINST 12335.IF, which is included in the ROI at pages 249 – 285.

Additionally, to the extent that Plaintiff is referring to himself, Plaintiff understands the

reason for his non promotion in 1997 as stated in his own words in his Formal Complaint

of Discrimination (ROI at 7):

> "I was denied my promotion from GS-1173—09 to GS—1173—11.
> In October 1997, after receiving an outstanding performance appraisal, it
> was recommended by my immediate supervisor, Lt. Brett Blanton that I be
> promoted immediately. Lt. Blanton presented his recommendation to LCDR

Jim M. Wink. LCDR Wink stated that I had not received enough training to promote me. He also stated that he received a verbal complaint from RADM Mobley that I was at fault in projecting their budget. It was LCDR Wink and Ms. Barbara Beeler's responsibility to brief RADM Mobley of his projected budget. LCDR Wink also stated that the Commandant of the Washington Navy Yard would put a stop to my promotion."

Defendant understands that these were the reasons as well.

**24. From 1997, why did Plaintiff's new supervisor, Ms. Glenda Brown, continuously criticize Plaintiff about matters he was never criticized for before her arrival.**

To the extent that Ms. Brown counseled or was critical to Mr. Lipscomb, it was due to plaintiff's performance problems while under her supervision. See, e.g.: ROI pp. 33 – 36, 38, 40, 165-171, 192-197, 202-203, 211-213, 231-232 and 235-242.

**25. From 1997, why did Ms. Glenda Brown continuously find negatives in the work of Plaintiff who was both [I] rated "Outstanding" and [ii] recommended for a promotion, immediately prior to Ms. Brown's arrival.**

To the extent that Ms. Brown did not recommend plaintiff for promotion, it was due to plaintiff's performance problems while under her supervision. See, e.g.: ROI pp. 33 – 36, 38, 40, 165-171, 192-197, 202-203, 211-213, 231-232 and 235-242.

**26. From 1997, why did Ms. Glenda Brown continuously find negatives in the work of Plaintiff who was both [I] rated "Outstanding" and [ii] recommended for a promotion, immediately prior to Ms. Brown's arrival.**

To the extent that Ms. Brown counseled Mr. Lipscomb about his work, it was due to plaintiff's performance problems while under her supervision. See, i.e.: ROI pp. 33 – 36, 38, 40, 165-171, 192-197, 202-203, 211-213, 231-232 and 235-242.

9

## Certification

I hereby certify that the foregoing responses are true and correct to the best of my knowledge, information, and belief, formed after a reasonable inquiry.

Isaac J. Natter, Esq.
Assistant Counsel
Department of Navy
Naval District Washington
Bethesda Branch
National Naval Medical Center

As to Objections:

JEFFREY A. TAYLOR , D.C. Bar # 498610
United States Attorney

RUDOLPH CONTRERAS, Bar # 434122
Assistant United States Attorney

CLAIRE WHITAKER, D.C. Bar # 354530
Assistant United States Attorney
United States Attorneys Office
Civil Division
555 4th Street, N.W., Room E-4204
Washington, D.C. 20530
(202) 514-7137

10

Certification

I hereby certify that the foregoing responses are true and correct to the best of my knowledge, information, and belief, formed after a reasonable inquiry.

Isaac J. Natter, Esq.
Assistant Counsel
Department of Navy
Naval District Washington
Bethesda Branch
National Naval Medical Center


As to Objections:


JEFFREY A. TAYLOR , D.C. Bar # 498610
 United States Attorney

/s/
RUDOLPH CONTRERAS, Bar # 434122
Assistant United States Attorney

/s/
CLAIRE WHITAKER, D.C. Bar # 354530
Assistant United States Attorney
United States Attorneys Office
Civil Division
555 4th Street, N.W., Room E-4204
Washington, D.C. 20530
(202) 514-7137

11

## CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing responses to discovery were mailed, postage prepaid, on November 30, 2007, to counsel for the Plaintiff:

   Rickey Nelson Jones, Esq.
   1701 Madison Ave., 3rd Floor, Suite 5
   Baltimore, MD 21217

   CLAIRE WHITAKER, DC Bar #354530
   Assistant United States Attorney
   555 4th Street, NW Room 10-917
   Washington, DC 20001
   (202) 514-7137

11

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MICHAEL E. LIPSCOMB,               )
                                   )
            Plaintiff,             )
                                   )
      v.                           )        C.A. No. 1:07CV00103 (JDB)
                                   )
DONALD C. WINTER,                  )
Secretary of the Navy,             )
                                   )
            Defendant.             )
_____)

## DEFENDANT'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

COMES NOW the Defendant, Donald C. Winter, Secretary of the Navy, by and

through undersigned counsel, and supplements his responses to Plaintiff's First Request

for Production of Documents to Defendant, pursuant to Rule 34 of the Federal Rules of

Civil Procedure.

PRELIMINARY STATEMENT

Defendant has provided complete and accurate responses to plaintiff's first

request for production of documents. However, in an effort to resolve the discovery

disputes between the parties, and without waiving his objections, defendant further

responds as follows:

**1. All documents, papers, memorandums, graphs, charts, printouts,
computer-produced data, and writings or information of any kind whatsoever which
show [1] all promoted employees in Plaintiff's office since 1997, [2] their race or
ethnicity, [3] their years of service, and [4] the reason for their promotion.**

**Response:** This discovery request is not reasonably calculated to lead to the

discovery of admissible evidence in this case, as Plaintiff's claim of nonpromotion

1

involves a claim in 1997 of failure to promote. Without waiving objections noted in

Defendant's initial response, Defendant has expanded his response to include 1997 to the

present, but continues to direct Plaintiff to the documents detailing promotions of K1

employees from October 1, 1997, through September 30, 1999. This information is

located within the Report of Investigation ("ROI"), DON No. 99-68469B-001, pages 50-

53. With regard to additional information, defendant notes that the plaintiff's employing

agency does not record the race or ethnicity of employees who have been promoted in a

retrievable form. Defendant has attempted to identify the race of the employees listed in

Defendant's Supplemental Response to Interrogatory No. 1. To the extent that years of

service and promotion information may appear in the Official Personnel Files of those

employees identified in Interrogatory Response # 1, their OPFs have been ordered on an

expedited basis from the Records Storage facility used by the Department of the Navy

and, upon receipt, defendant will share the relevant information with plaintiff, subject to

the Privacy Act Consent Order recently approved by the Court.

**6. All documents, papers, memorandums, graphs, charts, printouts, computer-produced data, and writings or information of any kind whatsoever which show Plaintiff failing to do his job within the parameters of the Performance Appraisal Review System.**

**Response.** Defendant refers Plaintiff to Report of Investigation ("ROI") in this case at

to ROI pages: 5 - 7, 10 - 13, 33 - 36, 38, 40, 165-171, 192-197, 202-203, 211-213, 231-

232, 235-242.

**7. All documents, papers, memorandums, graphs, charts, printouts, computer-produced data, and writings or information of any kind whatsoever which show Plaintiff making any statements about vasectomy and/or sperm count.**

2

**Response:** Plaintiff is referred to the ROI pages: 6 - 7, 10-13, 35-36, 42-44, 145-151, 228.

**8. All documents, papers, memorandums, graphs, charts, printouts, computer-produced data, and writings or information of any kind whatsoever which show failures in Plaintiff's work performance warranting the following criticism: "He could not complete simple tasks in all elements."**

**Response:**   See response to #6, above.

**10. All documents, papers, memorandums, graphs, charts, printouts, computer-produced data, and writings or information of any kind whatsoever which show the duties performed by GS-11 employees who are physically absent from the office.**

**Response:** Attached.

**12. All documents, papers, memorandums, graphs, charts, printouts, computer-produced data, and writings or information of any kind whatsoever which show the duties Plaintiff performs in the office in the absence of GS-11 employees.**

**Response:** Attached.

Respectfully submitted,

JEFFREY A. TAYLOR , D.C. Bar # 498610
United States Attorney

RUDOLPH CONTRERAS, Bar # 434122
Assistant United States Attorney

CLAIRE WHITAKER, D.C. Bar # 354530
Assistant United States Attorney
United States Attorneys Office
Civil Division
555 4th Street, N.W., Room E-4204
Washington, D.C. 20530
(202) 514-7137

ISAAC J. NATTER, Esq.
Assistant Counsel
U.S. Department of the Navy
Naval District Washington
Bethesda Branch
National Naval Medical Center

# POSITION DESCRIPTION *(Please Read Instructions on the Back)*

FH003

| | | | | |
|---|---|---|---|---|
| 2. Position for Substitution | 3. Service | 4. Employing Office Location | 5. Duty Station | 6. OPM Certification No. |
| Redescription ☐ New ☐ | Hdqtrs. ☐ Field ☒ | WASHINGTON DC | FAMILY HOUSING DEPT | |
| Reestablishment ☐ Other ☒ | | | | |

Explanation *(Show any position replaced)*
Change in PD number
Replaces H5007

| 7. Fair Labor Standards Act | 8. Financial Statements Required | | |
|---|---|---|---|
| Exempt ☒ Nonexempt ☐ | Executive Personnel Financial Disclosure ☐ Employment and Financial Interests ☐ | | |

| 10. Position Status | 11. Position Is | 12. Sensitivity | 13. Competitive Level Code |
|---|---|---|---|
| Competitive ☒ | Supervisory ☐ | 1-Non-Sensitive ☐ 3-Critical Sensitive ☐ | |
| Excepted *(Specify in Remarks)* ☐ | Managerial ☐ | 2-Noncritical Sensitive ☒ 4-Special Sensitive ☐ | 14. Agency Use |
| SES (Gen.) ☐ SES (CR) ☐ | Neither ☒ | | |

| 15. Classified/Graded by | Official Title of Position | Pay Plan | Occupational Code | Grade | Initials | Date |
|---|---|---|---|---|---|---|
| a. U.S. Office of Personnel Management | | | | | | |
| b. Department, Agency or Establishment | | | | | | |
| c. Second Level Review | | | | | | |
| d. First Level Review | | | | | | |
| e. Recommended by Supervisor or Initiating Office | HOUSING MANAGEMENT SPECIALIST | GS | 1173 | 11 | | |

16. Organizational Title of Position *(if different from official title)*
17. Name of Employee *(if vacant, specify)*

| 18. Department, Agency, or Establishment | a. Third Subdivision |
|---|---|
| NAVAL SUPPORT ACTIVITY WASHINGTON | |
| a. First Subdivision | b. Fourth Subdivision |
| FAMILY HOUSING DEPT (N915) | |
| b. Second Subdivision | c. Fifth Subdivision |
| CUSTOMER SUPPORT DIV (N9152) | |

19. Employee Review-This is an accurate description of the major duties and responsibilities of my position.

Signature of Employee *(optional)*

| 20. Supervisory Certification. *I certify that this is an accurate statement of the major duties and responsibilities of this position and its organizational relationships, and that the position is necessary to carry out Government functions for which I am responsible. This certification is made with the* | *Knowledge that this information is to be used for statutory purposes relating to appointment and payment of public funds, and that false or misleading statements may constitute violations of such statutes or their implementing regulations.* |
|---|---|
| a. Typed Name and Title of Immediate Supervisor | b. Typed Name and Title of Higher-Level Supervisor or Manager *(optional)* |
| GLENDA C. BROWN | M.B. NEWTON, CDR, USN |
| HEAD, FAMILY HOUSING DEPT | EXECUTIVE OFFICER, NAVSUPPACT, WASH |
| Signature *Glenda C. Brown*   Date 8/31/99 | Signature    Date |

| 21. Classification/Job Grading Certification. *I certify that this position has been classified/graded as required by Title 5, U.S. Code, in conformance with standards published by the U.S. Office of Personnel Management or, if no published standards apply directly, consistently with the most applicable published standards.* | 22. Position Classification Standards Used in Classifying/Grading Position |
|---|---|
| Typed Name and Title of Official Taking Action | |
| | *Information for Employees. The standards, and information on their application, are available in the personnel office. The classification of the position may be reviewed and corrected by the agency or the U.S. Office of Personnel Management. Information on classification/job grading appeals, and complaints on exemption from FLSA, is available from the personnel office or the U.S. Office of Personnel Management.* |
| Signature    Date | |

| 23. Position Review | Initials | Date | Initials | Date | Initials | Date | Initials | Date | Initials | Date |
|---|---|---|---|---|---|---|---|---|---|---|
| a. Employee *(optional)* | | | | | | | | | | |
| b. Supervisor | | | | | | | | | | |
| c. Classifier | | | | | | | | | | |
| 24. Remarks | | | | | | | | | | |

25. Description of Major Duties and Responsibilities *(See Attached)*

NSN 7540-00-634-4265    Previous Edition Usable    5008-106    OF 8 (Rev. 1-85) U.S. Office of Personnel Management FPM Chapter 295

VH003

# HOUSING MANAGEMENT SPECIALIST
## GS-1173-11

## INTRODUCTION

This describes the position of a Housing Specialist in Customer Support Division, Family Housing Department, Naval Support Activity Washington (NAVSUPPACT, Washington), Washington, D.C. Incumbent must be eligible for a Secret clearance. This position may be physically located at any NAVSUPPACT, Washington housing location.

## DUTIES AND RESPONSIBILITIES

Represents all Navy Field Activities in the Washington, D.C. area to the civilian community in matters related to the availability of housing and acceptance of military families. Establishes liaison with local political bodies, governmental agencies, entrepreneurial organizations, realty boards, and planning commissions.

Establishes a continuing task force chartered to increase community awareness of military needs, resolve situational problems, which affect military families, and enhance the provision of community support to the Navy.

Develops and implements programs which will provide a unified approach to the identification of resources and facilities available to military families in the Washington, D.C. area. Coordinate the efforts of all DOD agencies in the provision of guidance and assistance to military families regarding the occupancy of community housing.

Acts as liaison for the Referral program for the Family Housing Department, Naval Support Activity, Washington. Ensures that military personnel and their dependents receive referral assistance regarding the availability, location, and cost of housing in the community which will satisfy their requirements. Ensures listings are kept updated and are purged when units are no longer available. Ensures that all families are aware of the equal opportunity in off-base housing laws, State landlord/tenant acts, and special assistance programs sponsored by HUD. Responsible for conducting validation inquiry into housing discrimination complaints and reports all circumstances to the Division Director. Responsible for the mediation or resolution of controversies or disputes for civilian landlords and their military occupants.

1

FH003

Analyzes and evaluates family and unaccompanied personnel housing utilization and base loading documents, and makes recommendations concerning the need for acquisition of additional housing assets, or necessity to excess housing assets. These documents may be classified up to Secret. Strict compliance with current command and Navy directives for the handling of classified material must be adhered to.

Conducts periodic educational classes for service members and their spouses pertaining to home ownership. Coordinates guest speakers to augment platform instruction. Maintains close relationship with the Housing Authorities for Washington, D.C., Virginia, and Maryland.

Keeps detailed information on off-post utilization of the Housing "Set-Aside" program, and strives for continued relationship success.

**FACTOR 1.   KNOWLEDGE AND SKILLS**

Knowledge of Federal, DOD, Navy, state, and local housing statutes, policies, programs, and procedures including the spectrum of Navy Family Housing policies, requirements, and instructions to perform overall planning, direction, and use of the resources within the Family Housing Department. Requires extensive skill in implementing Navy Family Housing program requirements within the framework of organizational restraints. Skill is required in negotiating with senior management personnel, in both the public and private sectors, in order to establish and maintain a standing task force intended to achieve the successful accomplishment of program objectives and the satisfactory resolution of problem related to the availability, use and occupancy of Government owned housing units.

A comprehensive knowledge and skill in applying housing management principles, concepts, and methodology is required to direct the accomplishment of a variety of difficult and complex functions incorporating the availability and use of community resources, conduct of the Family and Unaccompanied Personnel Housing Surveys, determination of future requirements, establishment of an occupant relations plan and institution of an effective Housing Referral Service throughout the Washington metropolitan area.

2

08/20/2007  08:29    2024330547    NAVY HOUSING    PAGE  05/09

FH003

Skill in the interpretation of policies, instructions, and procedures contained in the Navy Directives System (SECNAV, OPNAV, NAVFAC, etc.) to implement operating principles for the Family Housing Management Division in the fulfillment of its assigned functions.

Knowledge of the Navy Equal Opportunity of Off-Base Housing program to ensure a comprehensive understanding throughout the civilian community.

Skill in the formulation and implementation of administrative processes and techniques such as work flows, organizational procedures, and correspondence policies and methods to assure efficient accomplishment of functional responsibilities.

Skill required in public speaking, preparing briefs and platform instruction sufficient to present educational materials from the podium.

## FACTOR 2.  SUPERVISORY CONTROLS

The incumbent works within administrative direction and resources developed by the Division Director to fulfill program objectives with independent responsibility for planning and carrying out the functions. In conjunction with the Division Director, deadlines, scope, and levels of work are determined.

The incumbent is considered to be an authority in the functional areas for which the Division is responsible. Products of specific efforts are reviewed only from an overall standpoint in terms of feasibility, compatibility with other work, or effectiveness in meeting program requirements or expected needs. The incumbent has considerable independence in dealings with private individuals and organizations.

## FACTOR 3.  GUIDELINES

The incumbent is provided with general Federal and state laws, other government agency regulations, and broad Navy wide housing instructions and manuals concerning such functional areas as housing eligibility, assignments, use, termination, reporting requirements, and other related directives which are generally applicable to the Family Housing Department.

3

The work requires sound judgement and initiative in the
selection, interpretation, and application of occupancy,
funding, and other guides for specific work situations or
special projects within the framework of organizational
objectives.  The incumbent is frequently required to use
experienced judgement to formulate management techniques to deal
with special problems, such as large-scale influxes of
personnel, for which no guidelines exist.  The incumbent must
also review and evaluate housing procedures, workflow, and
methods as they affect the Family Housing Department to
recommend changes or adjustments conductive to increased
efficiency and economy of operations.

## FACTOR 4. COMPLEXITY

The work includes the application of the full range of methods
and processes related to management planing, operation,
occupancy, and utilization of housing facilities and other
assets.  The work also includes participation in the planning
stages for acquisition or construction of additional housing
facilities.  In addition, the incumbent is responsible for the
coordination of Housing Referral Services among all military
organizations in the Washington D.C. area.

Decisions regarding what needs to be done include the assessment
of problems encountered which can pertain to any and all phases
of organizational management, such as in areas of occupancy and
aggravated tenant relations.  Critical problems can occur
because of heavy influx of time.  The incumbent must be
sensitive to possible trouble areas such as discontentment among
tenants or local area residents, and continually evaluate
housing requirements or data to identify variations of
conflicts.

The work requires many decisions concerning such factors as the
determination of military requirements, the availability of
community resources, the sociological impact of adversities, and
the desirability of program development.  The work also requires
the development of proposals and justification for additional
funds or materials for the institution of Division initiatives.

FH003

## FACTOR 5. SCOPE AND EFFECT

The purpose of the work is to administer the development of
housing management program policies, resolve critical problems
or issues related to policy application or conflict, and
coordinate major programs among a wide range of activities
representing other military agencies and myriad civilian
organizations or institutions.

The work involves treating a variety of extraordinary problems by
planning, scheduling, and coordinating the management and efficient
utilization of community housing facilities, analyzing problem
areas, and implementing appropriate corrective measures within the
framework of organizational program requirements.

The work affects the development of Navy and DOD housing policies,
the satisfaction of the Naval Support Activity Washington mission,
the efficiency of operations within the Division, and the
well-being of substantial numbers of military members. The
successful accomplishment of these functions bears a direct
relationship to the satisfactory fulfillment of HUD requirements,
creates a positive influence on civilian landlords and realty
personnel which enhances the provision of civilian housing, and
generates community support and acceptance of military families.
In addition, the performance of these duties has a significant
impact on the successful accomplishment of all functions within the
Family Housing management as well as the efficiency of the
personnel within the Division. The work also affects the welfare
and morale of all military families assigned to the Washington
metropolitan area.

## FACTOR 6. PERSONAL CONTACTS

Personal contacts include a variety of senior management officials
and representatives of public, private and law enforcement
agencies; senior military officers and DOD civilian managers; local
political officials; housing committees; and officials of
professional business organizations. Frequent contact is made with
local groups and representatives of civic, welfare, or recreational
organizations. The assignments or objectives dictate the frequency
of personal contacts. They are generally held at the workplace,
meeting halls, conference facilities, or other locations available
to the persons contacted.

08/20/2007  08:29  2024330530
PAGE 08/09

PH003

## FACTOR 7.  PURPOSE OF CONTACTS

The purpose of contacts is frequently used to influence or persuade the persons contacted to accept or agree with changes in plans, schedules, and policies or recommendations with proposals submitted for approvals.  The persons or groups contacted may be anxious, skeptical, uncooperative, or in a position to make judgements on current or proposed activities and must be approached in a manner conducive to obtaining desired results.

## FACTOR 8. PHYSICAL DEMANDS

The work is principally sedentary.  No special physical demands are required; however, there may be some walking, standing, bending, carrying light books, or driving an automobile.

## FACTOR 9. WORK ENVIRONMENT

The work involves normal risks or discomforts associated with an office environment.  The work area is usually adequately lighted, heated, and ventilated.  There may be occasional exposure to dusty or dirty conditions while visiting housing units or facilities undergoing repair, maintenance, or renovation.

PAGE  08/08          H2O WASH          2024332344   11/26/2007  13:42

# POSITION DESCRIPTION (Please Read Instructions on the Back)

**4. Employing Office Location:** WASHINGTON DC

**5. Duty Station:** FAMILY HOUSING DEPT

Establish/Classify/ReAlignment to New PD

| Certified/Graded by | Official Title of Position | Pay Plan | Occupational Code | Grade | Initials | Date |
|---|---|---|---|---|---|---|
| First Level Review | Housing Management Specialist | GS | 1173 | 09 | ML | 2/16/00 |
| Recommended by Supervisor or Initiating Office | HOUSING MANAGEMENT SPECIALIST | GS | 1173 | 09 | | |

**17. Name of Employee:** Michael Fipporant

NAVAL SUPPORT ACTIVITY WASHINGTON

FAMILY HOUSING DEPT (N915)

CUSTOMER SERVICE DIV (N915Z)

GLENDA C. BROWN
HEAD, FAMILY HOUSING DEPT

M.B. NEWTON, CDR, USN
EXECUTIVE OFFICER, NAVSUPPACT, WASH

Date 12/27/99

Date 1/11/0

MATTIE LINDSAY
CLASSIFICATION SPECIALIST

Date 2/16/00

OPM, PCS, GS-1173, TS-56, 9/81

FPL  GS-9
PLC  GS
BUS  1173
FLSA  N

NSN 7540-00-634-4265   Previous Edition Usable   5008-106   U.S. Office of Personnel Management

# HOUSING MANAGEMENT SPECIALIST
## GS-1173-09

This position is located in the Customer Support Division,
Housing Department, Naval Support Activity, Washington, D.C.
This position is responsible the principle point of contact with
public and private housing in the community.  Incumbent must be
eligible for a Secret clearance.  This position may be
physically located at any NAVSUPFACT, Washington housing
location.

## DUTIES

Frequently contacts property owners, other Government agencies,
real estate brokers, planning/zoning commissions and
redevelopment housing authorities within the commuting vicinity
to solicit their participation in the Housing Referral Program
and in the Equal Opportunity in Off-Base Housing Program.
Maintains continuous liaison to advise military families of
housing needs, to encourage open housing policies and obtain
open housing listings.

In support of the Housing Referral Program, obtains listings of
vacant living accommodations in apartment housing, individual
residences, housing developments and mobile home parks within
the commuting vicinity.  Inspects, in detail, any housing
facility when there is reason to question the suitability of the
housing based on Navy Department guidelines for environmental
conditions including health and safety considerations.

Compiles detailed information on sales and rental units
available, and from this data publishes brochures and
information listings.  Provides to the housing offices in the
commuting area any additions/deletions as they occur.  Brochures
include information on subsidized/low rent housing developments,
mobile home parks and real estate brokers.  Assures
dissemination of a variety of printed material to the housing
offices in the commuting area including such items as printed
copies of inspection forms, rental/sales listings, sanctions
list, equal opportunity and discriminatory instruction sheets,
lease information sheets, certificates of referral, etc.

Interviews military and civilian personnel of all ranks applying
for housing in the civilian community.  Briefs and counsels
applicants on leasing practices, standards on conduct, on
availability of assistance in resolving complaints, on deposits
and responsibility of residents in normal care of premises.

Assists personnel requesting information in locating schools, shopping center, churches, public transportation, hospitals and other community services. Reviews application forms for completeness of entries and adds applicant to the housing list under the appropriate category of housing requested or needed. Is responsible for arranging referral meetings with landlords or rental agents.

Coordinates the mailing of pay memos, reviews for accuracy and forwards to the appropriate commands and PSD for action in a timely manner for withdrawing BAH for military members assigned to Government housing.

Provides transportation and personally accompanies military and civilian personnel of all ranks to prospective rental/sale units. Customers are picked up from Navy Lodge, command or various other locations, and transported to the Welcome Center, counseled on housing options and then accompanied to the addresses they have selected. They are further assisted with interface with the Navy Marine Corps Society, Personnel Support Detachment (PSD), Family Services, etc., as needs dictate.

Periodically, reconfirms policies, availability and currency of listing data on all properties carried on the inventory of housing assets. Updates master record, record changes, additions, and deletions daily on the FAMIS system. Information includes housing developments, schools, shopping centers, churches, public transportation, hospitals, and other community services. Monitors rental and sales properties in advertising media, such as station newspaper, bulletin boards, brochures and local newspaper to add to and update listings.

Establishes and maintains liaison with other Government agencies such as VA and HUD regarding the availability of real estate for sale in the commuting area. Keeps abreast of housing loan market, eligibility requirements, and proper procedures for FHA/VA conventional financing and in-service loans. Provides this information to housing offices and military members within the area.

Actively supports the Equal Opportunity in Off-Base Housing (EOOBH) Program by ensuring that all listings are available for all DOD personnel regardless of race, color, creed, sex, age, handicap, or national origin. Provides EEO investigative services to the housing offices in the commuting area. Investigates and negotiates settlement of EEO discrimination complaints brought by military members of dependents alleging

discrimination in off-base housing.  Interviews charging parties
and their witnesses to obtain evidence relevant to the
allegation of discrimination.  Contacts real estate
agent/landlord to advise of charges and interviews to obtain
additional.  Mediates and negotiates settlement.

If alleged complaint appears valid, attempts to persuade
agent/landlord to accept tenant.  Prepares report of incident of
forwards to Commander Naval Base for adjudication and final
disposition of the case.  If the Commander's decision upholds
the discrimination charge, documents the decision and adds the
real estate agent/landlord to the restrictive sanction list.

Reviews Customer Service evaluations; contacts customers
regarding comments to determine ways of improving services and
quality of services provided at the Welcome Center.  Evaluates
information received and provides suggestions for modification
or additions to available service

Investigates and mediates civilian rental complaints from
landlord/tenant relations, following through to completion.
Initiates correspondence soliciting military command assistance
as required.  Interprets and advises on provisions of the
"Virginia Residential Landlord and Tenant Act."  Provides
military members of avenues of redress if arbitration is
unsuccessful.  Appears in court as expert witness when disputes
are elevated to that level.  Serves as a Civilian Advisor to and
appears before the Armed Forces Disciplinary Control Board,
Virginia Area.  As required, contacts local welfare agencies,
police, juvenile court, Navy Relief, etc.

Participates in various surveys, disseminating information,
collecting data, compiling results, and submitting completed
reports, to determine housing trends and requirements.

Formulates briefing materials and makes presentations to Command
Master Chief's Training, Navy Family Service Center's
Information School, individual ships/commands, Ombudsman's
groups, Navy wives organizations, schools, community groups and
others, providing information on the Navy Welcome Center,
Housing Referral Program and Equal Opportunity In Off-Base
Housing Program.  Also prepares and arranges training forums for
home ownership training.  Responds to questions concerning
leases, sales contracts, FHA/VA financing and service
eligibility, the "Virginia Residential Landlord and Tenant Act",
etc.  Also provides on site housing application capabilities at
remote sites for change of homeport.

3

FROM :NAVY       Case 1:07-cv-00103-JDB      Document 19-25      Filed 01/18/2008      Page 28 of 37
FAX NO. :12024332580                      Nov. 06 2007 03:59PM P6

FII 006

Attends and participates in a variety of community
organizations, such as F.A.C.E., Board of Realtors, Housing Task
Force, Helping Hands Committee, etc. as an advocate and to
support community involvement.

Reviews applications for priority to the waiting list. Counsels
applicants as to requirements, provides alternatives, interfaces
with command representatives, and submits completed packages to
the Priority Review Board for consideration. When the cases are
denied, individually works with clients to provide acceptable
options.

Interfaces with PSD to review records on persons in housing to
determine if the appropriate amount of BAH is being withheld,
verifies correct address, and duty stations. Verifies
information on upcoming PRD and EAOS dates and determines if
military member is in housing. If so noted, contacts the
military member to elicit if they have re-enlisted or been
extended in the area. If not, then advises member of procedures
to submit proper intent to vacate. Also notifies appropriate
housing area manager and other housing offices of pending
discharge from service or change of duty station.

When lease points are granted, contact owners/agents of
medium/large apartment complexes suitable for Government lease.
Performs habitability inspections prior to leasing to assure
conformance with guidelines. Recommends selection of apartment
complexes in a particular price range and location.

Composes a variety of correspondence required for the
administration of the coordinated referral program. Maintains
records and files. Submits required reports in a timely manner
which reflects the facilities and units surveyed and listed.
Maintains list of agents/landlords placed on restricted sanction
list. Monitors and reviews semi-annual/annual data on the
number of discrimination complaints investigated, and prepares
report of NAVFAC Headquarters. Consolidates data on housing
referral activity submitted by the housing offices and submits a
monthly report to the supervisor. Assists with the Family and
Unaccompanied Personnel Housing Requirement Survey Report.

**FACTOR 1. KNOWLEDGE REQUIRED BY POSITION   LEVEL:1-6 POINTS: 950**

Must have a comprehensive knowledge of DOD and Navy Department
housing policies, practices, and procedures related to the
Housing Program.

FROM : NAVY    FAX NO. : 13024332589    Nov. 06 2007 02:59PM P7
Case 1:07-cv-00103-JDB    Document 15-25    Filed 01/18/2008    Page 23 of 37

FH 006

Extensive knowledge of real estate properties, firms, and market conditions within the geographic commuting Washington Metropolitan area. Skill in communications to effectively solicit and gain support of the housing program.

Knowledge of investigative techniques, understanding of settlement negotiating techniques, procedures for accepting and investigating EOOBH complaints.

Skill in preparing and disseminating rental/sales listings sanctions list, EEO instruction sheets, etc.

A comprehensive knowledge of the Navy's Equal Opportunity in Off-Base Housing Program, policies and procedures.

Thorough and detailed knowledge of the legal rights and obligations of parties to the complaint and witnesses, and skill in counseling regarding these rights and obligations.

Knowledge of Landlord and Tenant Acts and ability to apply this law in resolving complaints.

Skill in investigating complaints, interviewing parties to the complaint, and witnesses; reviewing and analyzing evidence; and writing reports, memorandums and letters.

Knowledge of leases, sales contracts, FHA/VA conventional financing and in-service eligibility and skill in translating technical language into term's military members and dependents can understand.

Public speaking ability and knowledge of briefing and presentation procedures for detailed imparting of housing related material to various types of groups or organizations.

Skill in operating a government motor vehicle. Incumbent must have a valid driver's license.

A qualified typist is required.

**FACTOR 2. SUPERVISOR CONTROLS    LEVEL: 2-3    POINTS: 275**

Incumbent works under the supervision of the Supervisor, Customer Support Branch, Housing, GS-1173-12 who defines functional responsibility of the housing program and management objectives, priorities, and deadlines. The supervisor provides

advice, assistance and support in unusual controversial
situations.

Incumbent independently plans, sets priorities, and carries out
assignments to completion in accordance with Navy housing
procedures, local instructions and accepted practices deviating
as necessary to achieve settlement of complaints on a timely
basis.

The supervisor appraises performance by occasional review of
records and reports, results of NAVFAC on-site inspection and
comments offered by military members receiving assistance.

**FACTOR 3. GUIDELINES**                    **LEVEL: 3-2  POINTS: 125**

Guidelines include SECNAV, DOD, NAVCOM, OPNAV, LANTNAVFACENGCOM,
EOOBH instructions and regulations; Landlord and Tenant Acts;
and NAVSUPPACT Instructions, policies and procedures.  The
guidelines are generally applicable to the work but may lack
sufficient detail for specific decisions or actions.

The work requires judgment and initiative in selection,
interpretation and application of the guides to factual
situations.

Deviations and changes from established day-to-day procedures
are discussed and approved by the Supervisor, Customer Support
Branch.

**FACTOR 4.  COMPLEXITY**                   **LEVEL: 4-3    POINTS: 150**

Incumbent must maintain amicable relations with landlords,
property managers, real estate agents, commands and Government
agencies.

More complex problems, which could set a precedent, requiring
the establishment of a new policy or decision from higher
authority are analyzed, evaluated and referred to the supervisor
with recommendations.  The work includes continuing assignments
in housing referral and Equal Opportunity in Off-Base Housing.
The incumbent must apply the full range of functional activities
within the housing office.  The work involves the full range of
participation in planning, soliciting participation in the
programs, securing appropriate rental/sales listings,
investigation EOOBH complaints, and investigating and mediating
landlord/tenant complaints and administration of the programs.

Decisions regarding what needs to be done involves determining
sources of acquiring appropriate sales/rental listings in an
extremely tight housing market; determining ways of conducting
continuous surveys of densely populated commuting areas within
time allowed; determining means of coordinating of the data
gathered among the eight area housing offices; determining the
course of action in investigating complaints of EOOBH
discrimination; determining the parties to the complaint and
witnesses to be interviewed; determining the degree of depth and
extent of the investigation; analysis and evaluation of the
information gathered; and interpreting and applying the Landlord
and Tenant Acts in disputes.

**FACTOR 5.  SCOPE AND EFFECT**　　　　　**LEVEL: 5-3**　　　**POINTS: 150**

The work affects the adequacy of housing referral services
provided by the housing office and impacts on relations between
the Navy and the private community.

The purpose of the work is to serve as the functional manager
for the housing referral program services, for the investigation
of EOBH discrimination complaints, and settlement negotiations,
and for investigation and arbitration of landlord/tenant
disputes.

The incumbent is required to maintain an attitude of concern for
families seeking housing as the work affects the efficiency and
measurement of the Navy housing program.

Plans, schedules, and coordinates service to military personnel
and families.  Government quarters are to be assigned to meet
established Navy utilization guidelines.  Completed work
products or service in the form of records maintained, reports
prepared, documents processed, coordinates convenient moves and
schedules inspections for area managers which affects the
adequacy and responsiveness to residents of family housing.

**FACTOR 6. PERSONAL CONTACTS**　　　　**LEVEL:6-3**　　　**POINTS: 60**

Personal contacts include realtors, landlords, military
personnel and dependents, personnel of area housing offices,
employees of other Government agencies, judges, lawyers,
chaplains and local housing authorities.  Incumbent must be
sensitive but assertive and is subject to emotional stress
during peak workload periods, investigation of tenant/landlord
and discrimination complaints and resolution of complicated
problems where tact, diplomacy and self-control are mandatory.

**FACTOR 7. PURPOSE OF CONTACTS**        **LEVEL: 7-3**        **POINTS 120**

The purpose of contacts is to gain confidence in and support of,
Housing Referral Program and Equal Opportunity in Off-Base
Housing Program; to interview complaints, respondents and
witnesses who may be uncooperative and evasive; to negotiate
settlement of complaints and disputes.  In addition, to assure
coordination of personnel support functions to provide for even
work flow during peak workload periods; to ascertain that all
available rental listings possible are included for provision of
housing referral services; to locate vacant available units in
the local community not listed with housing referral; to ensure
that all assistance possible is provided to military members who
are relocating to the area in the movement of household effects
and saving in dollars; and to enhance the perception of the
military member that family housing personnel are interested in
the welfare and well-being of the military family.

**FACTOR 8.  PHYSICAL DEMANDS**        **LEVEL: 8-2**    **POINTS: 20**

The work does not involve any special physical demands other
than occasional walking and standing while visiting
realtors/landlords or interviewing complainants; respondents
witnesses.

**FACTOR 9.  WORK ENVIRONMENT**        **LEVEL: 9-1**    **POINTS: 5**

Work is performed in an office and outdoors in the community
traveling to and inspecting units, accompanies customers to
prospective available units in the civilian community, visiting
landlords, agents, etc. in realtors offices, in apartment
complexes or private residences.  There is occasional travel
involved when participating in team visits or major home port
changes.

**EXPLANATORY STATEMENT**

This is a non critical-sensitive position placing a significant
degree of trust in the incumbent.  A pre-appointment security
background investigation may be required.  Incumbent may be
required to private vehicle on a reimbursable basis.  A valid
state driver's license is required.

Work requires travel away from the normal duty station on a
regular basis.

**HOUSING MANAGER**
**GS-1173-09**

| FACTOR | LEVEL | POINTS |
|---|---|---|
| 1. KNOWLEDGE REQUIRED BY POSITION | 1-6 | 950 |
| 2. SUPERVISOR CONTROL | 2-3 | 275 |
| 3. GUIDELINES | 3-2 | 125 |
| 4. COMPLEXITY | 4-3 | 150 |
| 5. SCOPE AND EFFECT | 5-3 | 150 |
| 6. PERSONAL CONTACTS | 6-6 | 60 |
| 7. PURPOSE OF PERSONAL CONTACTS | 7-3 | 120 |
| 8. PHYSICAL DEMANDS | 8-1 | 20 |
| 9. WORK ENVIRONMENT | 9-1 | 5 |

Total   ~~1840/855~~

1855 = GS-1173-9                    (1605-1855)

9

# CREDITING PLAN

Announcement Number_____

Factor_____

Weight_____

## FACTOR (KSAP): KNOWLEDGE OF FAMILY HOUSING MANAGEMENT PRINCIPLES, PROCEDURES, POLICIES AND INSTRUCTIONS

Levels/points assigned applicants are based upon evaluation of experience, education, training, self-development, awards, and supervisory appraisals of performance potential.

**4 Points:**    Description: Held a position in which the applicant interpreted and implemented directives and regulations governing Family Housing management. Exhibits experience in handing Family Housing Assignments.

Example: OPNAVINST 11101.13J, NAVFAC P-930 Family Housing Management, DoD regulations for Management of Family Housing, or regulations from other military services.

**3 Points:**    Description: Has executed the family housing program in accordance with instructions or requested exceptions to policy. Has held a position in Family Housing Assignments before.

**2 Points:**    Description: Is familiar with and shows evidence of having work experience with various Housing regulations and directives.

**1 Point:**    Description: Has some understanding of Family Housing management.

# CREDITING PLAN

Announcement Number_____
                    Factor_____ 2 ___
                    Weight_____ 3 ___

## FACTOR (KSAP):  SKILL IN THE USE OF COMPUTERS AND VARIOUS TYPES OF SOFTWARE

Levels/points assigned applicants are based upon evaluation of experience, education, training, self-development, awards, and supervisory appraisals of performance potential.

| | |
|---|---|
| 4 Points: | Description:  Demonstrated experience using personal computers and various types of software to save data, produce reports, prepare spreadsheets and update information. |
| | Example:  Produced reports using Family Administrative Information Systems (FAMIS).  Other documents produced using Microsoft Word, Microsoft Access, Microsoft Excel. |
| 3 Points: | Description:  Knowledge and limited experience using personal computers and various types of software to save data, produce reports, prepare spreadsheets and update information. |
| | Example:  Applicant describes using Microsoft software to perform work. |
| 2 Points: | Description:  Held assignments using several software packages for automation requirements. Applicant must have the ability to determine what software package to use for various reports and documents. |
| | Example:  Applicant has inputted data into already established forms, etc. |
| 1 point: | Description:  Has completed formal training on Microsoft software but has little experience using it. |
| | Example:  Completed Microsoft Word training. |

# CREDITING PLAN

Announcement Number _____

Factor _____ 3

Weight _____ 2

## FACTOR (KSAP): ABILITY TO COMMUNICATE ORALLY

Levels/points assigned applicants are based upon evaluation of experience, education, training, self-development, awards, and supervisory appraisals of performance potential.

| | |
|---|---|
| 4 Points: | Description: Demonstrated experience in communicating orally in a pleasing manner. Demonstrated experience to speak before a group without faltering. Handles self well one-on-one in stressful situations. |
| 3 Points: | Description: Ability to communicate orally in a pleasing manner. Ability to speak before a group without faltering. Handles self well one-on-one in stressful situations. |
| 2 Points: | Description: Ability to communicate orally in a pleasing manner. Uncomfortable speaking before a group and may falter. Has some trouble handling self in stressful situations. |
| 1 Point: | Description: Ability to communicate orally in a pleasing manner. Unable to speak before a group. Cannot handle self in stressful situations. |

# CREDITING PLAN

**Announcement Number** _____

**Factor** _____ 4

**Weight** _____ 1

## FACTOR (KSAP):  ABILITY TO COMMUNICATE EFFECTIVELY IN WRITING

Levels/points assigned applicants are based upon evaluation of experience, education, training, self-development, awards, and supervisory appraisals of performance potential.

4 Points:    Description:    Demonstrated experience in writing letters, standards, procedures and memorandums free of grammatical and spelling errors.

3 Points:    Description:  Ability to write letters, standards, procedures and memorandums free of grammatical and spelling errors.

2 Points:    Description:  Ability to write letters, standards, procedures and memorandums with few grammatical and spelling errors.

1 Point:    Description:  Application/resume has numerous spelling and grammatical errors.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MICHAEL E. LIPSCOMB,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **C.A. No. 1:07CV00103 (JDB)** |
| | ) | |
| **DONALD C. WINTER,** | ) | |
| **Secretary of the Navy,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**<u>ORDER</u>**

Upon consideration of defendant's motion to dismiss or for summary judgment,

plaintiff's opposition, and defendant's reply, and after review of the entire record, it is this

_____ day of _____, 2008,

ORDERD, that said motion be, and hereby is, granted for the reasons set forth in

defendant's motion.

_____
**UNITED STATES DISTRICT JUDGE**