# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MICHAEL A. LIPSCOMB,

      Plaintiff,

      v.                               Civil Action No.  07-0103 (JDB)

DONALD C. WINTER,
Secretary of the Navy,

      Defendant.

## MEMORANDUM OPINION

Plaintiff Michael Lipscomb, a housing manager employed by the Department of the Navy, brings this action against the Secretary of the Navy ("Navy" or agency), alleging that the Navy has refused for years to approve a career ladder promotion from GS-9 to GS-11 and, in other respects, has treated him unfairly.   He brings this action pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., contending that he is the victim of race and gender discrimination and a hostile work environment.  Lipscomb and the Navy have submitted cross-motions for summary judgment on all claims.  Lipscomb also has submitted an affidavit pursuant to Fed. R. Civ. P. 56(f) contending that the Navy's motion should be denied because of his need for additional discovery on certain issues, and to that end, he has filed a second motion to compel discovery as well.  For the reasons explained below, the Court will grant summary judgment in favor of the Navy on all claims.

### BACKGROUND[1]

Lipscomb, an African American male, has served as a housing manager with the Navy since 1992, starting out as a GS-7 in a career ladder position with promotion potential to GS-11. Lipscomb Depo. at 14-15. He began his service at the Washington Navy Yard in 1995 as a housing manager in the Family Housing Department "Flag Housing" Division, where he was responsible for the maintenance, upkeep, and repair of the homes occupied by "flag officers" -- that is, top Navy and Marine Corps officials including admirals and generals. Id. at 18; ROI at 183, 186. By all accounts, he performed successfully during his first two years in Flag Housing. In June 1996, he received a noncompetitive promotion to GS-9. See Def.'s Ex. 8 & 9. His performance appraisals from 1996 and early 1997 rated him "Level 4/Exceeds Fully Successful" (the second highest of five ratings) and praised him as a "responsible, hard-working employee who always gets the job done." ROI at 175, 179, 183.

In October 1997, Lt. Brett Blanton -- Lipscomb's first-level supervisor -- gave him the highest rating available -- "Level 5/Outstanding" -- and recommended him for promotion to GS-11. ROI at 181. This time, however, the promotion was denied. Lipscomb Depo. at 39. Lipscomb's second-level supervisor, Lt. Commander Jim Wink, told Lipscomb soon thereafter

---

[1] The facts summarized in this section are not in dispute, except where noted. For ease of reference, the Court will refer to the Navy's memorandum in support of its motion for summary judgment as "Def.'s Mem.," and to Lipscomb's opposition and cross-motion as "Pl.'s Mem." The exhibits attached to the Navy's motion for summary judgment and Lipscomb's cross-motion will be referred to as "Def.'s Ex." and "Pl.'s Ex.," respectively, and the exhibits attached to Navy's reply brief as "Def.'s Reply Ex." However, considering that the deposition of Lipscomb, the Record of Investigation, and Lipscomb's memorandum in support of his Equal Employment Opportunity ("EEO") complaint are cited with great frequency by both parties -- each having submitted selected excerpts as well as duplicates of the full EEO complaint and memorandum -- the Court will simply cite those exhibits as "Lipscomb Depo.," "ROI," and "Pl.'s EEO Mem.," respectively. The pages of the ROI are indicated by handwritten page numbers at the bottom of each parties' exhibits.

that he did not have sufficient training to be promoted and also cited a complaint by a rear

admiral (Mobley) alleging that Lipscomb had made an error in a projected budget.  Id. at 38-43.

Lipscomb believed that he had obtained the necessary training and that he was not at fault for the

budget error,[2] but did not seek EEO counseling in the months thereafter.  Id. at 44-46.

In December 1997, Glenda Brown -- a Caucasian woman -- replaced Blanton as

Lipscomb's first-level supervisor.  Affidavit of Glenda Brown at 1 (Def.'s Ex. 11) ("Brown

Affidavit").   A month or two later, she submitted paperwork for Lipscomb's promotion to GS-11

but was informed that the rear admiral -- this time, Rear Admiral Ellis -- would not approve the

promotion because he considered Lipscomb "incompeten[t]" and had barred Lipscomb from his

quarters.  Id.

A few months later, in March 1998, Lipscomb's performance appraisal was due, and

Brown and the new second-level supervisor, Lieutenant Commander Andrew Trotta, gave him a

Level 4 rating of "Exceeds Fully Successful."  Def.'s Ex. 12.  She also "routinely resubmitted" the

GS-11 promotion paperwork that month.  Brown Affidavit at 2; Lipscomb Depo. at 67.

However, by August 1998, she observed that Lipscomb had begun falling behind in his work and

seemed inattentive, as reflected in a journal that she kept on employee performance.  Second

Brown Affidavit ¶¶ 5, 7 & ROI at 211 (Def.'s Reply Ex. A).[3]  When Lipscomb inquired about

---

[2]  In 1996 and 1997, Lipscomb obtained training in the following courses:  Contracting
Officers COR, Flag Quarters Management Team, Automated Fac Maint Plan Software, Flag
Quarters Management, Technical Writing English 2311, Introduction to Supervision, and
Advanced Supervision.  Pl.'s Mem. at 1-2 (citing ROI at 209).

[3]  The journal entry for August 19, 1998 states: "Employee seems pre-occupied, forgetful
and unattentive.  Work falling behind.  Critical work orders are not in place for year end close-
out.  Seems lost.  Have offered daily help checks and time saving tools to aid and assist.
Received call from FHMI coordinator.  Employee was observed dozing daily in class at PMI.  It
is believed this was from employee's medication."  ROI at 211.

his promotion in October 1998, he was told it had not been approved.  Id. ¶ 3.  In the months

thereafter, Brown noted that his timely completion of work continued to be a problem and

observed that poor planning was a contributing factor.  Id. ¶ 5 & ROI at 212.  She also noted that

a Flag Housing resident had complained that Lipscomb had entered the resident's home without

permission; in response, she cautioned Lipscomb not to enter a home without permission, though

noting that he had "the best intentions."  Id.   By December 1998, Brown had begun discussions

with her supervisor on whether Lipscomb should be downgraded to a GS-7 or transferred to a

different department because of her doubts about his ability to perform at the GS-9 level.  Id. ¶ 6.

Lipscomb's situation at work worsened in early 1999 due to a confluence of events -- a

disappointing performance review, a charge of sexual harassment, and an allegation of telephone

abuse, all within a period of a few weeks.  Brown gave him his annual performance review on

March 5, 1999, for the period running from April 1998 to February 1999.  Def.'s Ex. 14.

Lipscomb received a rating of "Acceptable" under a new two-tier system ("Acceptable" or

"Unacceptable"),[4] but accompanying written comments indicated that his performance was only

borderline acceptable:

> Mr. Lipscomb excels in areas of attitude, politeness, and internal working
> relations.  However, the employee has been generally distracted most of the rating
> cycle and is obviously struggling.  His performance is at the bare minimum level
> for acceptance.  A written complaint was received relative to the employee's
> performance from a customer.  Employee is failing to complete simple tasks in all
> elements.  Mr. Lipscomb's performance will be closely monitored over the next 60
> days and re-evaluated.

Id.  Brown's performance log and other documents indicate that the customer complaint at issue

concerned a complaint from Vice Admiral Fargo's residence that Lipscomb "was not inspecting

---

[4]  The five-level rating system, which provided for the previous ratings of "Outstanding"
and "Exceeds Fully Successful," was no longer in use.  See Def.'s Ex. 14.

the work he ordered and was making appointments with the resident and staff and then not

coming, not following through, etc."  Def.'s Ex. 13 at 1; Pl.'s EEO Mem. at 1-2.  In Mrs. Fargo's

words, Lipscomb "is not Flag Housing material" -- a label Lipscomb found highly demeaning.

Id.  In his view, Brown was quick to agree, even though the charges were unfounded.  Pl.'s EEO

Mem. at 2.  He explained to Brown that the problems cited by the customer were caused by

government and outside contractors who provide an unreliable window of time their services,

instead of a set time.  Id.  In response, Brown decided to subject him to a 60-day evaluation

period.  Id.

Within a few days of his performance appraisal, a potential sexual harassment charge

against Lipscomb came to light.  On or about March 4, 1999, Lipscomb had met with Denise

Arthur -- a mess steward responsible for the residence of Vice Admiral and Mrs. Nelson -- to

provide assistance with a washing machine problem at the Nelson residence.  See Pl.'s EEO

Mem. at 2; Def.'s Ex. 16, at 1.[5]  During the course of the meeting, the subject of their children

and family planning arose.  Pl.'s EEO Mem. at 2; Def.'s Ex. 16 at 1.  Their accounts of the

conversation differ significantly.  According to Arthur, Lipscomb raised the subject of his

vasectomy, stating that "it did not work" and "some young women told him to go and have lots of

sex to get the sperm out." Def.'s Ex. 16, at 1.  He also asked her what form of birth control she

used and asked her for information about other birth control methods.  Id.  She avoided speaking

but, at some point in the conversation, told him to talk to his wife, doctor, or Planned Parenthood

and that she could not help him.  Id.  She tried to stop the conversation and lead him to the door,

---

[5]  Other documents identify the date as "mid-February" or "February or March 1999."
Def.'s Ex. 16; Def.'s Reply Ex. B.  The exact date is not material to this case, but as both parties
now refer to the date as March 4, 1999, the Court also will do so.

but did not voice her discomfort.  Id. at 2.

According to Lipscomb, it was Denise Arthur who raised the subject of birth control in response to his comment that having children was expensive.  Pl.'s EEO Mem. at 2.  Arthur also was the one who suggested a vasectomy as a method he should consider.  Id.  Furthermore, she never told him that she was uncomfortable with the conversation.  Id.

The incident soon came to the attention of Trotta, Lipscomb's second-level supervisor.[6] Pl.'s EEO Mem. at 2.  Trotta called Lipscomb into his office on March 19, 1999 to discuss a potential sexual harassment charge after he had interviewed Arthur earlier that day.  Id.  Trotta asked Lipscomb to provide a written statement describing the substance of his conversation with Arthur; Lipscomb did not initially do so because of concern about what his rights were, but subsequently provided a statement dated April 1, 1999.  Id.; Def.'s Ex. 17.  While the investigation was pending, Lipscomb was ordered to have no contact with customers, primarily because Nelson was a direct customer.  Brown Affidavit at 3.  Ultimately, Lipscomb was not disciplined, although Brown and Trotta believed he should have been.  Id. at 4 ("I do not know why [Lipscomb] was not disciplined . . . (I did participate in meetings with personnel concerning disciplining [him]); subsequently, LCDR Trotta told me that [Lipscomb] was 'the luckiest guy in the world.'").  At a meeting held on March 29, 1999, attended by Trotta, Brown, and Lipscomb, Trotta informed Lipscomb that he would be reassigned within the Family Housing Office, from Flag Housing to Customer Referral; Teasha Thompson from Customer Referral, in turn, would

---

[6] Arthur informed Mrs. Nelson of the incident the next day, when Mrs. Nelson asked her if Lipscomb had stopped by the residence.  Def.'s Ex. 16, at 2.  She, in turn, told her husband, who then told Trotta.  Id.  Both parties agree that the issue of sexual harassment was not before Trotta and Brown at the time of his March 5th performance evaluation.  Lipscomb Depo. at 96.

be switched to Flag Housing to cover Lipscomb's duties.  Def.'s Ex. 17; Brown Affidavit at 3;[7]

Lipscomb Depo. at 53-54.  According to Brown's performance log, the reassignment was

considered necessary because Lipscomb's "relationship with the customer [Vice Admiral Nelson]

has deteriorated to the point he is ineffective in his current position."  Def.'s Ex. 13 at 4.

Around the same time, an office-wide internal audit revealed that several employees in

Flag Housing, including Lipscomb, Trotta, and three other persons, had made excessive use of

their government phones for personal calls.  See Brown Affidavit at 2; see also Def.'s Ex. 15

(noting that the audit was conducted by the Navy Audit Service and Navy Criminal Investigative

Service).  On March 16, 1999, Brown notified Lipscomb that the office considered his use of the

office landline and cell phones excessive, noting in particular that he had made 307 landline calls

in 20 working days, which was beyond the amount of all other employees in Flag Housing and

far beyond the number of calls necessary to do his job.[8]  Pl.'s EEO Mem. at 1.  By Lipscomb's

own account, "there were perhaps more calls than there needed to be," including calls to and

from his prayer group on a regular basis that typically lasted 10 to 15 minutes each; thus, he did

not object to repaying for any personal use.  Lipscomb Depo. at 93, 133-35.  But he felt that "how

they came at [him]" with the telephone abuse charge was discriminatory.  Id. at 94.

On March 31, 1999, Lipscomb contacted EEO counselor Loretta Johnson.  See Def.'s

---

[7]  The Brown affidavit refers to the date of the meeting as March 29, 2000; however, it is
apparent from Lipscomb's memorandum dated April 1, 1999 acknowledging the meeting and
reassignment that the correct date is March 29, 1999.  See Def.'s Ex. 17.

[8]  Brown's performance journal provides a more detailed description of why she
considered the level of calls excessive: "This number of calls is well over 100% more of the
average of all other members of the Housing Department.  Management concerns are that with
having only 12 customers it is nearly impossible to make an average of 15 calls from the desk
phone per day when approximately 80% of the job responsibilities lie out side of the office."
Def.'s Ex. 13 at 1.

Ex. 1.  In a memorandum to Johnson dated April 21, 1999, he alleged that "since October 1997, I have been subjected to a pattern of continuous and on-going disparate treatment" on the basis of race and gender,[9] and enumerated the following claims:

    A.  Abusing Telephone Usage
    B.  Labeled As Being Inadequate for My Job
    C.  Alleged Matter that Occurred on or About March 4, 1999
    D.  Denial of Promotion

Pl.'s EEO Mem. at 1-3.  Lipscomb provided a detailed factual summary in support of each claim that largely reflects the foregoing account of events involving the sexual harassment charge, his telephone abuse charge, the criticisms of his performance, and the events surrounding his nonpromotion "in October 1997 and October 1998." Id.  He concluded with a request for relief that he be promoted to GS-11 with back pay "from October 1997 to present," and reassignment out of the "Family Housing Department Series" of positions.  Id. at 3-4.  He filed his formal EEO complaint on June 22, 1999, which in turn relied entirely on his April 21, 1999 memorandum to Johnson as setting forth the EEO claims.  Def.'s Ex. 3.  The Navy issued a "notice of acceptance" of complaint on December 13, 1999, identifying the accepted claims as "continuous and ongoing harassment by management officials beginning March 4, 1999," and discriminatory nonpromotion, but erroneously referring to the date of the nonpromotion as the date of Lipscomb's EEO memorandum -- April 21, 1999.  See Def.'s Ex. 20.

While the EEO complaint was pending, Brown proceeded in November 1999 to authorize a temporary 90-day "career ladder" promotion for Lipscomb to the GS-11 level.  See Brown Affidavit at 2.  However, Pamela Curry, an African-American female who supervised him during

---

[9]  Lipscomb's EEO complaint also alleged disparate treatment based on religion and disability, but he has since abandoned those claims.  See Compl. at 1 n.1 (noting that plaintiff has "abandoned his disability and religion claims").

that period, rated his performance as "unacceptable," and he was returned to the GS-9 level.

Def.'s Ex. 6 at 4-5.  Curry provided the following written comments in the performance appraisal

covering that period:

> Michael was not meeting most of his work assignments in a timely manner and he
> was not requesting for additional time.  Michael was not briefing me on status or
> problems.  Michael is very unorganized which was making him unable to
> accomplish his work assignments.  I informed Michael I would be working
> closely (micro-managing) him to ensure that the taskings were getting
> accomplished.  I also explained to him he needed to work on his organization and
> management skills.  I did explain to Michael I was disappointed in his
> performance since the temporary promotion to the GS-11 level.  Michael has a lot
> of work to accomplish in order to develop his management, organization and
> leadership skills at the GS-11 level.  Michael needs to accomplish working more
> independently without so much supervision.  His leadership skill need[s] to
> increase so the lower grades will feel confident in requesting his assistance and
> ensure their confidence when he is left in the leadership role.

Def.'s Ex. 6. at 4-5.

Four other people in the Housing office were promoted to GS-11 positions in this general

timeframe -- 1997 to 2000 -- each through a competitive merit promotion process (in contrast to

career ladder promotions).   See Def.'s Second Supplemental Response to Pl.'s Interrogatories at

2-4.  All were women; two of the four were Caucasian (Floramae "Teasha" Thompson, Kelly

Sieber), and two were African American (Cheryl Thompson and Pamela Driggers).  Id. Lipscomb

focused on the promotion of Teasha Thompson as the most troubling because, in his view, he had

been responsible for training her, yet she was eventually promoted above him to do the same job

he had once performed.  Lipscomb Depo. at 195, 238; ROI at 153.  She was selected over three

other candidates in a competitive process effective July 16, 2000; Lipscomb was not one of the

applicants.  See Def.'s Second Supplemental Response to Pl.'s Interrogatories at 2; ROI at 153

(identifying the other three candidates as Leroy Ferguson, Kelly Sieber, and Cheryl Thompson).

Lipscomb's 1999 EEO complaint ultimately was unsuccessful.  In 2005, an EEOC

administrative judge entered summary judgment for the Navy, holding that Lipscomb had failed to rebut the Navy's articulated non-discriminatory reasons for its actions.  <u>See</u> Compl., Ex. A. That decision was affirmed by the EEOC Office of Federal Operations on October 17, 2007.  <u>Id.</u>, Ex. C.

Lipscomb then filed this lawsuit seeking promotion to GS-11, backpay starting from October 1997, and $300,000 in compensatory damages.  Complaint ¶¶ 15, 20, 26.  Count One alleges race discrimination in violation of Title VII, and lists four actions as being discriminatory: (1) the criticisms of his telephone usage, (2) his nonpromotion, including the criticisms of his performance that reportedly justified nonpromotion; (3) the sexual harassment investigation and accompanying reassignment, and (4) the promotion of "a female he trained" -- elsewhere identified as Teasha Thompson -- to a GS-11 position instead of himself.  Compl. ¶¶ 11-15.  Count Two alleges gender discrimination in violation of Title VII, and appears to focus on three actions as being discriminatory: (1) the customer criticism of him as "not Flag Housing material"; (2)  the sexual harassment investigation and accompanying reassignment; and (3) the failure to promote him to GS-11.  <u>Id.</u> ¶¶ 16-20.  Count Three alleges a hostile work environment based on the sexual harassment investigation, the series of criticisms of his performance and telephone usage, and his nonpromotion.  <u>Id.</u> ¶¶ 21-25.

## <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  The moving party may successfully support its

motion by identifying those portions of "the pleadings, the discovery and disclosure materials on file, and any affidavits" which it believes demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c); see Celotex, 477 U.S. at 323.

In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position. Id. at 252. By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment. Celotex, 477 U.S. at 322. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted). Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." Id. at 252.

## DISCUSSION

### I.   Discovery

Lipscomb has a pending motion to compel discovery with respect to Requests for Production of Documents Nos. 6 and 7 and Interrogatories 6, 7, 13, and 14. See Pl.'s Second Mot. to Compel at 2-7; Pl.'s Supplemental Discovery Mem. at 1-4.[10] He also contends that the

---

[10] Lipscomb's first motion to compel discovery was denied without prejudice in light of a status report from the parties indicating supplemental responses were being produced. See Order filed Dec. 21, 2007. To clarify the briefs referenced in this part of the opinion, the Court notes that Lipscomb's second motion to compel discovery and his supplemental memorandum are ECF Documents No. 18 and 27. The Navy's response thereto is ECF Doc. No. 28 (hereinafter, "Def.'s Discovery Mem."). The original motion to compel discovery, which attaches the discovery requests at issue, is ECF Doc. No. 7.

Navy's motion for summary judgment should be denied pursuant to Fed. R. Civ. P. 56(f) because, in the absence of the requested information, he is "handcuffed" in submitting evidence that would support an inference of discrimination -- that is, that similarly situated individuals were treated more favorably than him and that criticisms of him had no legitimacy.  See Affidavit of Rickey Nelson Jones ¶¶ 7, 11, 16, 22, 29-31 (Pl.'s Ex. D).  The Navy responds that an order compelling further discovery is unwarranted because defendant has provided all responsive information.  See Def.'s Discovery Mem. at 2-8.  It further contends that the discovery motion is grounded in a dispute as to whether certain facts have been proven by either side -- a dispute that bears on whether there is a genuine issue of material fact, rather than whether further discovery is warranted.  Id. at 4-5.

    The Court has reviewed each of the discovery requests and the Navy's initial and supplemental responses, and concluded that the Navy has provided adequate responses.  In Document Request No. 6, Lipscomb requests "[a]ll documents . . . or information of any kind whatsoever which show Plaintiff failing to do his job within the parameter of the Performance Appraisal System."  The Navy identified the EEO Report of Investigation (previously disclosed) at "pages 5-7, 10-13, 33-36, 38, 40, 165-71, 192-97, 202-03, 211-13, 231-32, 235-42."  See Def.'s Discovery Mem. at 3 & Attachment 3.  The Court has reviewed those pages of the ROI that have been filed on the record, and it is readily apparent that the documents identified are responsive.  See, e.g., ROI at 5-7 (summary of accusations as described by Lipscomb, including sexual harassment and error in budget projection); ROI at 211-13 ("Employee seems pre-occupied, forgetful and unattentive.").

    In Document Request No. 7, Lipscomb seeks "[a]ll documents . . . or information of any kind whatsoever which show Plaintiff making any statements about vasectomy and/or sperm

count."  In response, the Navy cited pages 6-7, 10-13, 35-36, 42-44, 145-51, and 228 of the ROI.

See Def.'s Discovery Mem., Attachment 3, at 3.  Again, those pages contain responsive

information.  See, e.g., ROI at 35-36 ("[He] was very forthcoming about his vasectomy . . . that

his sperm count was still too high after the vasectomy.").

The Court also has reviewed each of the interrogatories and the Navy's initial and

supplemental responses, and finds them to be sufficient.  There is no need to discuss each

interrogatory in detail because the sufficiency is readily apparent from the responses quoted in

full in defendant's responsive brief. See Def.'s Discovery Mem. at 5-9.[11]  The Court observes that

much of Lipscomb's dissatisfaction with the Navy's discovery responses stems from his

frustration at getting the Navy to admit facts that Lipscomb believes to be true.  Indeed, for each

of the interrogatories at issue, Lipscomb sets forth the "response plaintiff desires" as follows:

- Interrogatory No. 6: "How many Caucasians, in Plaintiff's office, have the same
  number of years and experience as Plaintiff, but have been deprived of a
  recommended promotion?"

  "None of the Caucasians in Plaintiff's offices have been deprived of a
  recommended promotion with the same number of years and experience as
  Plaintiff."

- Interrogatory No. 7: "How many Caucasians, in Plaintiff's Office, have trained

---

[11]  For example, Interrogatory No. 6 asks "[h]ow many Caucasians, in Plaintiff's office, have the same number of  years and experience as Plaintiff, but have been deprived of a recommended promotion?"  The Navy's response was, in essence, that no one in the office, of any race, has been "deprived" of a promotion.  See Def.'s Discovery Mem. at 5 & Attachment 7. Lipscomb clearly disagrees with that response, as a factual matter, but there is nothing incomplete about the response.  See id., Attachment 7 (stating in defendant's response to Interrogatory No. 6, that "[p]romotion, non-competitive or otherwise, is not a right and therefore it was not possible to 'deprive ' an employee of a recommended promotion.  See HROWASHDC MERIT PROMOTION INSTRUCTION 12335.IF at 6, ROI at 259 . . . . Additionally, this interrogatory calls for Defendant to accept specific, unsupported assumptions contained within the Interrogatory itself in order to respond, including the assumption that Plaintiff was deprived of a recommended promotion.").

people formally or informally, and the very ones trained have been promoted to a higher grade, in the same office, than the Caucasians who trained them?"

"No Caucasians in Plaintiff's offices have trained people and the ones trained have been promoted to a higher grade in the same office over the Caucasians who trained them."

• Interrogatory No. 13: "How did Plaintiff make excessive phone calls when no official limitation was placed on number of calls?"

"Plaintiff did not make excessive telephone calls because there are no limit on number of calls in the office."

• Interrogatory No. 14: "Why did the Defendant promote someone trained and/or taught by Plaintiff over him?"

"Caucasians were promoted over Plaintiff after he trained them, and there was no non-discriminatory reason for such."

See Pl.'s Interrogatories to Defendant at 2-3 and Pl.'s Second Mot. to Compel at 6-7.  Of course, this is not how interrogatories work.  A party is entitled to respond to discovery with answers that it believes to be factually correct, even if the adversary disagrees with its version of the facts. Furthermore, a party is entitled to dispute the factual presumptions underlying an interrogatory (e.g., whether Lipscomb was deprived of a promotion), as the Navy has done in this case. Lipscomb is frustrated that he has not obtained admissions from the Navy through the interrogatory responses.  But, as the Navy points out, if Lipscomb sought admissions, the onus was on him to file a request for admission, which he did not do.  The principal problem with the interrogatories lies in the framing by Lipscomb and his counsel, not in the Navy's responses.

It bears noting that Lipscomb's discovery requests had the apparent purpose of obtaining information that would potentially establish an inference of discrimination by showing that Caucasian females were treated more favorably in the promotion process than similarly situated African American males.  See Nelson Aff. ¶¶ 7, 11, 22.  Other interrogatories also targeted this

14

information, most notably, Interrogatories No. 1 and 2, which asked the Navy to "identify all persons promoted to a GS-11 in Plaintiff's office since 1997," and provide ethnicity/skin color, years of service, education, reason for promotion, and related information. The Navy provided the requested information concerning all such individuals in its second supplemental responses.[12] See Def.'s Discovery Mem., Attachment 5, at 1-5. Thus, the Court concludes that Lipscomb has not been hindered in obtaining evidence that potentially may show that similarly situated Caucasians were treated more favorably.

## II.    Exhaustion of Administrative Remedies

Lipscomb's judicial complaint describes a broad array of allegedly discriminatory acts, including criticisms of his performance, the sexual harassment investigation, and the excessive telephone usage, but the crux of his complaint is that the Navy acted with a discriminatory motive -- either race, gender, or both -- in refusing to grant him a career ladder promotion to the GS-11 level. See Compl. ¶¶ 11-20 (referring throughout complaint to nonpromotion and requesting promotion to GS-11 as relief). The formal EEO complaint that he filed on June 22, 1999, following his meeting with an EEO counselor on March 31, 1999, also shows this to be the case. See Def.'s Ex. 3 and Attachment. The Navy raises the threshold issue whether Lipscomb's claims of nonpromotion must be dismissed for failure to exhaust administrative remedies because he allegedly failed to initiate contact with an EEO counselor within 45 days of the nonpromotion incidents. See Def.'s Mem. at 17-20. The Navy contends that his first contact with an EEO counselor -- on March 31, 1999 -- came too late to satisfy the exhaustion

---

[12]   The Navy initially objected to Interrogatories No. 1 and 2 on the ground that information post-dating the alleged discriminatory nonpromotion was irrelevant. See Def.'s Discovery Mem., Attachment No. 7, at 1-3. However, it provided full responses in its second supplemental response.

requirement as to the nonpromotion decisions in October 1997 and October 1998, and that no other nonpromotion actions were described in his EEO meeting or complaint.  Id.  Lipscomb responds that the 45-day time limit should not be applied in this case because the failure to promote him constituted a "continuing" violation and that, in any event, Brown led him to believe he would eventually receive the GS-11 promotion.  Pl.'s Mem. at 3-4; Pl.'s Reply at 3-5. He further submits that his formal EEO complaint shows that he sought redress for the denial of a promotion in March 1999, as well as on the earlier occasions. Pl.s' Reply at 4.

Pursuant to 29 C.F.R. § 1614.105(a)(1), an employee alleging discrimination must contact an EEO counselor in order to try to informally resolve the matter, and must do so "within 45 days of the date of the matter alleged to be discriminatory, or in the case of a personnel action, within 45 days of the action."  He then must file an administrative complaint with the agency that allegedly discriminated against him.  Id. § 1614.106(a).  A party must exhaust his administrative remedies within the Title VII limitations period for each discrete act of discrimination alleged or lose the ability to recover for it.  National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114-15 (2002).  However, exhaustion of administrative remedies, "like a statute of limitations, is subject to waiver, estoppel, and equitable tolling."  Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982); Brown v. Marsh, 777 F.2d 8, 14 (D.C. Cir. 1985).  Under the doctrine of equitable estoppel, a defendant cannot assert untimeliness where the defendant has taken active steps to prevent the plaintiff from litigating in time.  Smith-Haynie v. Dist. of Columbia, 155 F.3d 575, 580 (D.C. Cir. 1998).  Hence, a case will not be dismissed for failure to exhaust administrative remedies where "affirmative misconduct on the part of a defendant lulled the plaintiff into inaction."  Baldwin County Welcome Center v. Brown, 466 U.S. 147, 151 (1984).

It is undisputed that Lipscomb made his initial contact with an EEO counselor on March

31, 1999.  Two questions then arise: first, what were the nonpromotion claims covered by that initial contact and his subsequent EEO complaint; and second, was his initial contact with the EEO counselor timely for any of those nonpromotion claims.  As to the first issue, the Navy says Lipscomb described only nonpromotions that occurred in October 1997 and October 1998; Lipscomb contends he complained of a nonpromotion in March 1999 and also refers to being passed over for promotion in 2000 when Teasha Thompson was instead promoted.  See Def.'s Mem. at 17; Pl.'s Reply Mem. at 4, 12-13.  The Court need only look to the EEO complaint to answer this question.  Lipscomb's memorandum attached to the complaint is styled as setting forth the claims, and it states, under the heading "Denial of Promotion":

> I was denied my promotion from GS-1173-09 to GS-1173-11.
>
> In October 1997, after receiving an outstanding performance appraisal, it was recommended by my immediate supervisor, Lt. Brett Blanton[,] that I be promoted immediately.  Lt. Blanton presented his recommendation to LCDR Jim M. Wink.  LCDR Wink stated that I had not received enough training to promote me.  He also stated that he received a verbal complaint from RADM Mobley that I was at fault in projecting their budget.  It was LCDR Wink and Ms. Barbara Beeler's responsibility to brief RADM Mobley of his projected budget.  LCDR Wink also stated that the Commandant of the Washington Navy Yard would put a stop to my promotion.
>
> I have attended all of the recommended courses that I was told I had to take to receive my promotion.  I never received anything in writing of this verbal complaint made against me, only hearsay.  I have since then inquired about my promotion in October 1997 and October 1998.

Pl.'s EEO Mem. at 3-4.  No reference is made to a nonpromotion in or around March 1999.  Nor is any reference to a March 1999 nonpromotion indicated in the EEO counselor report dated August 10, 1999.[13]  Def.'s Ex. 1.  Lipscomb has produced no other evidence indicating that he

---

[13]  The only supplemental factual information in the EEO counselor report concerning Lipscomb's nonpromotion claim is an undated reference to a Commander Arrowood at the

(continued...)

sought EEO counseling or filed an EEO complaint for any nonpromotion that occurred in March 1999.[14]

Nor has Lipscomb produced any evidence that he sought EEO counseling or amended his pending June 1999 EEO complaint for actions post-dating his EEO complaint -- that is, when his temporary promotion in late 1999 expired or when Thompson (or others) received a GS-11 promotion in 2000. In fact, Lipscomb stated at his deposition that he understood the issues to be investigated at the administrative level were those identified in the Navy's Notice of Acceptance dated December 13, 1999, and furthermore, that he had not expanded his claims thereafter. Lipscomb Depo. at 109-11. This is most clearly reflected in the following exchange with counsel:

---

[13](...continued)
Washington Navy Yard as another person involved in denying his promotion. Def.'s Ex. 1 at 4. However, the record is undisputed that Arrowood left the Washington Navy Yard in September 1998. Affidavit of John J. Imparato ¶¶ 3-4 (Def.'s Reply Ex. B). Therefore, the only reasonable inference is that disapproval of the promotion by Arrowood occurred in 1998 or earlier, consistent with the claims presented in the EEO complaint.

[14] The parties dispute, in the first instance, whether Lipscomb was even considered for a promotion in March 1999. Lipscomb's sole evidentiary support for his allegation that the Navy was considering him for a promotion then is a journal entry by Brown on March 4, 1999, stating "[e]mployee is told his pending promotion is not forthcoming." Pl.'s Mem. at 3-4 (citing ROI at 203). The Navy has produced a supplemental affidavit from Brown which states that a promotion request was not pending in March 1999, and explains that the quoted journal entry represented a rough "summary of [their] conversation," where she had explained to Lipscomb that "if he was unable to accomplish his job duties effectively at the GS-09 level, he had no reason to believe I would resubmit his name for promotion." Second Brown Affidavit ¶¶ 8-9. Lipscomb has produced no evidence that suggests Brown or some other supervisor had submitted a promotion request after October 1998; indeed, all evidence is to the contrary. See Lipscomb Depo. at 44 (answering question about promotions in 1998, with "I wasn't put in no more after that timeframe, I was not put in. I got stopped right there."); see also id. at 146 (answering the question "[d]id you ask her to put it [the promotion] in again between March and April?" with "[n]o, I did not,"). However, for purposes of resolving the exhaustion issue, it is sufficient to say that, even if Lipscomb had a mistaken belief that his supervisors had wrongfully denied him a promotion in 1999, he did not raise that claim to the EEO counselor or in the EEO complaint.

Q: . . . [I]f you wanted something else to be investigated, you had to tell them --
you had to make -- you had to pursue having the scope of the investigation
expanded; you understood that?

A: Yes.

Q: And you did not?

A: Correct, yes.

Id. at 111.  Lipscomb apparently believes that the contact he initiated with the EEO counselor on

March 31, 1999 and his subsequent June 22, 1999 EEO complaint covers these later events

because "the discrimination he was subjected to was ongoing since March 1999."  See Pl.'s Mem.

at 13.  But as discussed in more detail below, his continuing violation theory does not excuse him

from the requirement to exhaust administrative remedies for each discrete discriminatory event.

Thus, the EEO counselor's report, the EEO complaint, and Lipscomb's deposition all

point to only one conclusion -- the only nonpromotion claims covered by his initial contact with

the EEO counselor and his EEO complaint are the October 1997 and October 1998

nonpromotion claims.  The issue, then, is whether Lipscomb's initial contact on March 31, 1999

was timely as to those claims.  As discussed earlier, an employee must initiate contact with an

EEO counselor within 45 days of the alleged discriminatory event.  This means that any claims

based on discrete acts of discrimination occurring more than 45 days before that date -- that is,

before February 12, 1999 -- are time-barred unless Lipscomb can succeed on his contention that a

"continuing violation" theory or equitable tolling applies.

Lipscomb's continuing violation theory provides him no recourse.  As the Supreme Court

emphasized in Morgan, an assertion that discrete acts constitute a "continuing violation" or a

series of related violations will not save a claim that falls outside of the limitations period.  536

U.S. at 115 .  Indeed, Morgan identified nonpromotion as a discrete act subject to the limitations

19

period, explaining that "[d]iscrete acts such as termination, <u>failure to promote</u>, denial of transfer, or refusal to hire are easy to identify," and "[e]ach incident . . . constitutes a <u>separate</u> actionable 'unlawful employment practice.'" <u>Id.</u> at 115 (emphasis added).  An employee "can only file a charge to cover discrete acts that 'occurred' within the appropriate time."  <u>Id.</u>  Thus, the Court rejects Lipscomb's contention that the older nonpromotion claims are timely because they "continued" from October 1997 and October 1998 through March 1999.

Lipscomb also asks the Court to consider his reliance on Brown's statements allegedly creating an expectation that he would eventually receive the GS-11 promotion -- in effect, making an argument of equitable estoppel.  Pl.'s Mem. at 3-4; Pl.'s Reply at 3-5.  Estoppel based on a defendant's conduct is applicable, however, only if the defendant engaged in "affirmative misconduct" to lull a plaintiff into inaction.  <u>See</u> <u>Washington v. Washington Metro. Area Transit Auth.</u>, 160 F.3d 750, 753 (D.C. Cir. 1998).  But in Lipscomb's own words, he simply had an "expectation of getting the promotion because Ms. Brown routinely resubmitted his documents for such," citing her resubmission in March 1998 and her statement in March 2000 that "she will always consider him when [she] ha[s] a GS-11 vacancy."  Pl.'s Mem. at 3.  Nothing on the face of the cited statements suggests a promise to grant the promotion -- they indicate, at most, that he will be "considered" for promotions in the future.  Since no approval of a promotion was promised, those statements cannot be considered "affirmative misconduct" that would lull a person into inaction.  Furthermore, even if his supervisors' assurance could somehow be construed as a commitment to redress his grievance, an employer's attempt to resolve a dispute raised by an employee does not rise to the level of "affirmative misconduct."  <u>See</u>, <u>e.g.</u>, <u>Cristwell v. Veneman</u>, 224 F. Supp. 2d 54, 60 (D.D.C. 2002) (holding that "participation in [a] settlement process" cannot by itself constitute "affirmative misconduct").

20

Accordingly, the Court holds that Lipscomb's claim of discriminatory nonpromotions in 1997 and 1998 is time-barred.  The Court also holds that he failed to exhaust his administrative remedies as to any alleged nonpromotion in 1999, as to the expiration of his temporary 90-day promotion thereafter, and as to the subsequent promotion of Teasha Thompson and others ahead of him in 2000.  The Court now turns to the Navy's arguments for summary judgment on the remaining claims.

## III.    The Merits of the Remaining Claims

Lipscomb's remaining claims relate to his challenge to the Navy's actions against him for his excessive telephone usage, the sexual harassment investigation and accompanying reassignment, the criticisms of his performance, and the hostile work environment claim.  The complaint arguably can be construed as alleging that gender and race were factors in all of these Navy actions, and Lipscomb's briefs do not consistently distinguish between the type of animus at issue for each action. Therefore, the Court will consider race and gender discrimination as to each claim.

### A.      The McDonnell Douglas Framework

The framework for establishing a prima facie case of discrimination was introduced for Title VII claims in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  The first step in the analysis requires a plaintiff to carry the burden of establishing a prima facie case by a preponderance of the evidence.  Id.; Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).  In order to make out a prima facie case of discrimination, a plaintiff must show that "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." Stella v. Mineta, 284 F.3d 135, 145 (D.C. Cir. 2002) (citing Brown v. Brody, 199 F.3d 446, 452 (D.C. Cir. 1999)).  An

21

adverse employment action requires that there be "materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." Forkkio v. Powell, 306 F.3d 1127, 1131 (D.C. Cir. 2002) (citing Brown, 199 F.3d at 457).

Once the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. McDonnell Douglas, 411 U.S. at 802. The employer's burden, however, is merely one of production. Burdine, 450 U.S. at 254-55. The employer "need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." Id.

Where assessment of the employer's legitimate, non-discriminatory reason becomes necessary, a prolonged evaluation of the sufficiency of the plaintiff's prima facie case is unnecessary, for the central inquiry then becomes "whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis." See Adeyemi v. Dist. of Columbia, 525 F.3d 1222, 1226 (D.C. Cir. 2008); see also Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507-08, 511 (1993), and U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 714-16 (1983)). "Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors . . . includ[ing] the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." Reeves v. Sanderson Plumbing Prods.,

Inc., 530 U.S. 133, 148-49 (2000); accord Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1289

(D.C. Cir. 1998) (en banc); see also Waterhouse v. Dist. of Columbia, 298 F.3d 989, 992-93

(D.C. Cir. 2002).

      In other words, the McDonnell Douglas shifting burdens framework effectively

evaporates -- the sole remaining issue is discrimination vel non, and "to survive summary

judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence

that the adverse employment decision was made for a discriminatory reason." Lathram v. Snow,

336 F.3d 1085, 1088 (D.C. Cir. 2003); see Reeves, 530 U.S. at 142-43.  Examination of that

issue in this setting therefore requires consideration of all the relevant circumstances in evidence,

including the strength of the prima facie case, any direct evidence of discrimination, any

circumstantial evidence that defendant's proffered explanation is false (which may be enough

with the prima facie case to infer unlawful discrimination), and any properly considered evidence

supporting the employer's case.  Reeves, 530 U.S. at 147-48; see also Adeyemi, 525 F.3d at

1226; Teneyck v. Omni Shoreham Hotel, 365 F.3d 1139, 1151 (D.C. Cir. 2004); Lathram, 336

F.3d at 1089; Waterhouse, 298 F.3d at 993; Aka, 156 F.3d at 1290.

    **B.**    **Telephone Abuse Charge**

      Lipscomb alleges that the telephone abuse charge made against him was discriminatory.

He acknowledges that he made "a high number of telephone calls from his desk," and does not

dispute the particular figures offered by the Navy -- 307 landline calls in 20 working days, which

was beyond the amount of all other employees in Flag Housing and was of concern to

management because most of his job responsibilities were outside the office.  Compl. ¶ 12; Def.'s

Ex. 13 at 1.  The Navy contends that the criticism was not an adverse employment action and,

submits that, in any event, it had a legitimate non-discriminatory reason for its criticism -- all

employees making excessive personal telephone calls were warned about their usage and required to reimburse the Navy.  See Def.'s Mem. at 26-27; Def.'s Reply Mem. at 9-10.

The Court will assume that the telephone abuse criticism constitutes an adverse employment action because Lipscomb was required to repay telephone usage charges and thus suffered objectively tangible harm.  But even so, the Navy is entitled to summary judgment. Lipscomb admits that his telephone usage was excessive (Lipscomb Depo. at 94, 133-35), and Brown's affidavit further explains why his numbers were of concern --  "with having only 12 customers it is nearly impossible to make an average of 15 calls from the desk phone per day when approximately 80% of the job responsibilities lie out side of the office."  Def.'s Ex. 13 at 1. Furthermore, Lipscomb has not identified any facts implying that the telephone charges were motivated by his race or gender.  Indeed, at one point, he stated at his deposition that he did not believe the criticism over his telephone usage was discrimination, then later changed his mind, but offered as an explanation only that "[i]t is just how they came at me."  Lipscomb Depo. at 93-94.

The Navy provided a legitimate non-discriminatory reason for the action against Lipscomb -- indeed, all employees regardless of race or gender were subject to an officewide audit of telephone usage and many employees had to reimburse the Navy for personal calls.  See Brown Affidavit at 2; Def.'s Ex. 15 at 1 (describing office-wide audit by the Navy Audit Service and NCIS).  Those employees included Cheryl Thompson, Brenda Smith, Lieutenant Commander Trotta, and Ken Ridgeway.  See Brown Affidavit at 2.  Of these, two are women (Thompson and Smith) and the record suggests that Trotta is white.  See Def.'s Second Supplemental Response to Pl.'s Interrogatories at 2; Pl.'s Mem. at 16.  The Navy has met its burden of coming forward with a legitimate non-discriminatory reason for cautioning Lipscomb

24

about this excessive use of the telephone for personal calls.

Lipscomb attempts to create an inference of discrimination by asserting that there was no policy limiting use of the telephones for personal calls.  See Pl.'s Mem. at 4; Pl.'s Second Mot. to Compel at 13.  But that bald assertion of no policy is belied by the record.  The Navy has submitted the Department of Defense policy on use of federal government resources which imposes a general reasonableness standard for personal telephone calls.  See Def.'s Ex. 23 (authorizing "personal communications . . . that are most reasonably made while at the work place" subject to certain restrictions).  Under this standard, personal calls are authorized if, among other things, they:

> (a) [d]o not adversely affect the performance of official duties by the DoD employee or the DoD employee's organization;
>
> (b) [a]re of reasonable duration and frequency, and whenever possible, made during the DoD employee's personal time such as after duty hours or lunch periods;
>
> (c) [s]erve a legitimate public interest . . .; [and]
>
> (d) [d]o not overburden the communication system . . . .

Id.  The criticism of Lipscomb's excessive telephone usage is consistent with the standards in that guidance.  Indeed, after the audit, a memorandum was issued to all employees of the Family Housing Department cautioning them to keep calls to home brief and to otherwise refrain from personal calls.  See Def.'s Ex. 15.  Considering the office-wide nature of the audit, Lipscomb's deposition, Brown's affidavit, and the unrebutted Department of Defense guidance, the Court concludes that no reasonable trier of fact could find that the Navy discriminated against Lipscomb in taking action with respect to his excessive telephone usage.

## C.      Sexual Harassment Charge and the Reassignment

Lipscomb alleges that the sexual harassment investigation arising from the Denise Arthur

incident in March 1999 was discriminatory.   The Navy contends that summary judgment is appropriate because no adverse employment action resulted from the investigation and, in any event, the evidence shows the Navy had a legitimate non-discriminatory reason for the investigation.  See Def.'s Mem. at 24-25; Def.'s Reply Mem. at 11.  Lipscomb contends that the investigation was an adverse action because it undermined his chance for a promotion and he was reassigned to desk duty as a result.  See Pl.'s Mem. at 5.  He further contends that there was "no reliable evidence" to support an investigation, and avers that he was singled out for investigation solely because he is African American.  See Pl.'s Mem. at 5, 15-16.

As a threshold matter, neither the investigation nor reassignment can be considered an adverse action on this record.  "The mere initiation of an investigation into a plaintiff's conduct is not an adverse employment action when it has no effect on the plaintiff's employment."  Ginger v. Dist. of Columbia, 477 F. Supp. 2d 41, 53 (D.D.C. 2007).  The only impact that Lipscomb has shown is the reassignment away from Flag Housing to the Housing Referral office.  But Lipscomb does not contend that he suffered a dimunition in pay or benefits from the reassignment, and the record reveals none.  Lipscomb suggests that the real impact is that the investigation damaged his chances of receiving a career ladder promotion to GS-11.  But he provides no evidentiary support for this assertion.  Indeed, the record shows that he was granted a temporary career ladder promotion to GS-11 about seven months after the investigation, which indicates that Lipscomb's ability to receive a career ladder promotion was not damaged by the investigation.[15]  See Def.'s Ex. 8; Def.'s Ex. 6 at 4.

_____

[15]  Lipscomb ultimately was not retained at the GS-11 level.  Supra at 8-9.  But as discussed below, the Navy has proffered non-discriminatory reasons for that separate decision -- that is, problems with his performance -- and Lipscomb has proffered no evidence suggesting that the true reason he was not retained at GS-11 was the sexual harassment investigation.

Assuming <u>arguendo</u> that the investigation or reassignment constitutes an adverse action, the Navy is entitled to summary judgment because Lipscomb has failed to create a genuine issue of material fact over the Navy's proffered legitimate non-discriminatory reason for the investigation.  The Navy contends that it has an affirmative duty to investigate all charges of sexual harassment.  <u>See</u> Def.'s Mem. at 24.  Such a duty is well-established in the law.  As the Second Circuit has explained, "an employer's investigation of a sexual harassment complaint is not a gratuitous or optional undertaking; under federal law, an employer's failure to investigate may allow a jury to impose liability on the employer."  <u>Malik v. Carrier Corp.</u>, 202 F.3d 97, 105 (2d Cir. 2000); <u>see also</u> <u>Flanagan v. Ashcroft</u>, 316 F.3d 728, 730 (7th Cir. 2003) (affirming dismissal of discrimination claim that was based solely on employer's decision to investigate employee for harassment because employer was obligated to do so)

In response, Lipscomb contends that there was no reliable evidence to support an investigation, as indicated by the absence of a declaration from Denise Arthur.  <u>See</u> Pl.'s Mem. at 15-17 & ROI 326 (statement by EEO investigator indicating that Arthur was not interested in participating in an interview).  As a factual matter, Lipscomb's characterization of the record is incomplete and misleading.  Arthur was interviewed by Trotta on March 19, 1999; she later reviewed and corrected a typed summary of the interview, and then signed it, attesting that it was "true and correct to the best of [her] knowledge."  <u>See</u> Def.'s Ex. 16; Def.'s Reply Ex. E.  The exact form of Arthur's sexual harassment allegations -- an affidavit or a summary of an interview signed by her -- is irrelevant.  Indeed, even a desire by Arthur not to pursue any charges would not negate the Navy's need to investigate.  <u>See</u> <u>Malik</u>, 202 F.3d at 106 (explaining that an employer's duty to investigate cannot be "subordinated to the victim's desire to let the matter drop").  Nor does Lipscomb's asserted actual innocence bear on the legitimacy of the

investigation, for an employer's obligation to investigate "do[es] not cease because the alleged harasser denies inappropriate conduct." Id.; see also Flanagan, 316 F.3d at 730 (holding that an employer is "entitled to investigate a sexual harassment complaint" even where an employee claims "any investigation . . . [is] unwarranted" by the factual record) (emphasis in original).

Lipscomb contends that the discriminatory nature of the investigation is evidenced by "male-condemning statements" by Brown, such as "he was very forthcoming about his vasectomy," and her reference to his brother as a convicted rapist. Compl. ¶¶ 19-20. However, the record amply establishes that the investigation was initiated based on the Arthur interview, rather than any statements by Brown. Moreover, Brown's statement about Lipscomb's vasectomy was made in the context of assessing the credibility of Arthur's allegation that Lipscomb initiated a conversation about the vasectomy. See Brown Affidavit at 3. The brother's conviction was an issue for Flag Housing because Lipscomb was involved in having a contractor hire his brother as a groundskeeper for Flag Housing, which Brown determined was inappropriate in light of the brother's rape conviction.[16] Id.; Lipscomb Depo. at 14. Nothing in the record indicates that this information affected the course of the sexual harassment investigation.

Lastly, it bears noting that, even by Lipscomb's account of events, the scope of the investigation was not excessive. It consisted of an interview of Arthur and of Lipscomb, a request for a written statement, and two meetings between Lipscomb, Brown and/or Trotta -- his first and second-line supervisors. See Def.'s Ex. 11, 16, 17. Additionally, the reassignment that followed was not taken as a form of discipline; rather, Brown was concerned over Lipscomb's ability to conduct his duties with respect to the Nelson residence, where the Arthur incident had

---

[16] The conviction was revealed through a standard background investigation. Brown Affdidavit at 3.

occurred.  See Def.'s Ex. 13 at 4 (observing that Lipscomb's "relationship with the customer

[Vice Admiral Nelson] has deteriorated to the point he is ineffective in his current position").

Construing the evidence in the light most favorable to Lipscomb, no reasonable trier of fact could

conclude that the sexual harassment investigation or accompanying reassignment was motivated

by race or gender discrimination.

> **D.     Performance Evaluations and Criticisms of Performance**

Lipscomb also contends that, in his performance evaluations, Brown and others

discriminated against him by giving him negative reviews, and he challenges Brown's acceptance

of customer criticisms of his performance.  See Compl. ¶¶ 13, 15, 17.  As a threshold matter, the

EEO complaint does not indicate that Lipscomb challenged any negative performance

evaluations.  Under the heading, "Labeled As Being Inadequate For My Job," he lists two

customer complaints against him that he believed Brown unfairly accepted as valid.  These are:

(1) the complaint by Vice Admiral Fargo's wife that Lipscomb had not inspected the work he

ordered, did not keep appointments, and thus was "not Flag Housing material"; and (2) a separate

complaint concerning a failure to keep an appointment that fell under the supervision of a co-

worker.  See Pl.'s EEO Compl. at 1-2.  The Court considers these criticisms first.

As a threshold matter, the criticisms do not constitute adverse employment actions.

Brown, 199 F.3d at 458 ("[a] thick body of precedent . . . refutes the notion that formal criticism

or poor performance evaluations are necessarily adverse actions");  Taylor v. Small, 350 F.3d

1286, 1293 (D.C. Cir. 2003) ("formal criticism or poor performance evaluations are [not]

necessarily adverse actions" where "they d[o] not affect the employee's grade or salary").

Lipscomb complains that he was subjected to a 60-day evaluation period after the residents'

criticisms, but he has identified no objectively tangible harm that resulted from Brown's apparent

agreement with those criticisms.

In any event, the Navy has proffered a legitimate non-discriminatory reason for making the criticisms.  Brown did not accept Lipscomb's explanation that unkept appointments were the fault of the contractor (rather than his own fault) because under Flag Housing procedure, the contractor must meet the schedule of the resident customer and, if it cannot comply, another contractor should be engaged.  Brown Affidavit at 3.  Lipscomb disagrees with Brown's assessment of the contractor situation (see Lipscomb Depo. at 96-97), but has offered no evidence to indicate that Brown's explanation is a pretext for discrimination.

Lipscomb's primary concern is less with the particular criticisms and more with his performance evaluations, as they were the apparent obstacles to obtaining a career ladder promotion to GS-11.  But he did not pursue his administrative remedies with respect to any performance evaluations.  See Pl.'s EEO Compl. at  1-3.  Assuming arguendo that the Court could nonetheless consider them, he has failed to offer any evidence rebutting the substance of the evaluations.  Lipscomb first focuses on the overall rating of "Acceptable" by Brown in the March 1999 performance evaluation, which he contrasts with his prior ratings of "Outstanding" and "Exceeds Fully Successful."  Compl. ¶¶ 11, 13; Pl.'s Mem. at 2.  The Navy has explained that, under a revised rating system, only two ratings were available in 1999 -- Acceptable and Unacceptable.  See Def.'s Ex. 14.  Hence, an evaluation of "Acceptable" does not, by itself, represent a negative evaluation.

To be sure, the written comments accompanying the 1999 rating were critical, but the Navy contends that the written comments represent legitimate non-discriminatory criticisms of Lipscomb's performance.  The comments stated that Lipscomb was "distracted," "struggling," "at the bare minimum level for acceptance," and the subject of a customer complaint (the Fargo

complaint).  The Navy has submitted evidence demonstrating that Lipscomb's co-workers over

that period had similar comments about him.  See Def.'s Reply Ex. C (affidavit of George

Coffman, stating that residents asked him "to take complaints back to the office" concerning "Mr.

Lipscomb not getting work accomplished, not keeping appointments, not making appointments

before arriving and a lack of professionalism" ); Def.'s Reply Ex. D (affidavit of Ken Ridgeway,

stating that Lipscomb was unable to track the status of his work and "has not had the ability to

manage more than one issue at a time" and "therefore, can't coordinate any multiple tasks, such

as two changes of occupancies occurring at the same time").  Even when Lipscomb eventually

came under the supervision of another first-line supervisor -- Pam Curry, an African American --

similar evaluations of his performance were made regarding his inability to meet deadlines and

organize his tasks.  See Def.'s Ex. 6 at 4-5 ("Michael was not meeting most of his work

assignments in a timely manner and he was not requesting . . . additional time.  Michael was not

briefing me on status or problems.  Michael is very unorganized which was making him unable

to accomplish his work assignments.")  Lipscomb has failed to come forward with any evidence

that creates a genuine issue of material fact as to the legitimacy of the criticisms or that the

criticisms were a pretext for discrimination.[17]  Indeed, he does not deny that he has missed

appointments and residents have complained about him; he only has submitted that he had

excuses for those situations.  See Lipscomb Depo. at 96-98, 139.

Lipscomb suggests that his involvement in training another Caucasian employee who was

---

[17]  The Court observes that, even had Lipscomb overcome the exhaustion requirement as
to his 1999 or 2000 nonpromotion claims, the Navy would have prevailed on summary judgment
because, looking at the issue of discrimination vel non, the performance evaluations demonstrate
that there were legitimate non-discriminatory reasons for the Navy's refusal to grant Lipscomb a
career ladder promotion to GS-11.  No reasonable trier of fact could conclude on this record that
discrimination was the actual motive for the nonpromotions at issue.

promoted to GS-11 -- Teasha Thompson -- demonstrates that  he was amply qualified to do his

job and, by implication, that the criticisms were unfounded.  See Pl.'s Mem. at 6, 13-14.  But

Lipscomb's own deposition testimony explains that his "training" of Thompson occurred as a

result of a "switch" or "trade" in their positions following the sexual harassment incident in

March 1999, in contrast to training to promote another person.  See Lipscomb Depo. at 53-55.[18]

Lipscomb has noted that Thompson got promoted to GS-11 at a later time, "not in that temporary

transition."  Id. at 215.  This is confirmed by the Navy's records showing that Thompson, in fact,

received a permanent promotion the next year, July 2000, as part of a competitive process.[19]  See

Def.'s Ex. 22; Def.'s Second Supplemental Response to Pl.'s Interrogatories at 2.  Thus, the mere

_____

[18]      Lipscomb described the circumstances of the training as follows:

A:  They put [Teasha Thompson] into the position I was in when they took me out my
position after that complaint . . .

Q.: There was like a switch?

A: Right.

Q: She left customer services and you had a trade?

A: Right.

Q: Did she ever work with you in Flag Housing?

A: I had to -- I was directed by my supervisor, [Glenda] Brown, to give her all the
knowledge I knew on what I do before they took me out of it.

Lipscomb Depo. at 53-55.  See also Pl.'s Mem. at 13 ("Since Plaintiff was the only person in Flag
Housing who did the specific work he did, Ms. Brown directed Plaintiff to teach Ms.
Thompson.") (citing Lipscomb Depo. at 219).

[19]  Lipscomb does not allege that he applied for that competitive promotion, and the few
documents in the record pertaining to that selection process indicate that he did not.  See ROI at
153 (identifying the other three candidates as Leroy Ferguson, Kelly Sieber, and Cheryl
Thompson).

fact that Lipscomb was involved in training Thompson is not a measure of his performance;

rather, the training was necessitated by the "trade" in jobs that occurred as part of Lipscomb's

reassignment out of Flag Housing following the sexual harassment incident.  Hence, the Navy's

legitimate non-discriminatory justification for the criticisms of Lipscomb's performance is not

undercut.

  **E.**  **Hostile Work Environment**

  To establish a prima facie case of hostile work environment, plaintiff must demonstrate

that: (1) he is a member of a protected class; (2) he was subject to unwelcome harassment; (3) the

harassment occurred because of his race or disability; (4) the harassment affected a term,

condition or privilege of employment; and (5) the employer knew or should have known of the

harassment, but failed to take any action to prevent it.  See Kilby-Robb v. Spellings, 522 F. Supp.

2d 148, 162-63 (D.D.C. 2007) (citing Jones v. Billington, 12 F. Supp. 2d 1, 11 (D.D.C. 1997),

aff'd, 1998 WL 389101 (D.C. Cir. June 30, 1998)).  The workplace environment becomes

"hostile" for purposes of Title VII and legal relief only when the offensive conduct "permeate[s]

[the workplace] with discriminatory intimidation, ridicule, and insult that is sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an abusive working

environment."  Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998); accord Harris

v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993); see also Clark County Sch. Dist. v. Breeden,

532 U.S. 268, 270-271 (2001); Holbrook v. Reno, 196 F.3d 255, 262 (D.C. Cir. 1999).

  The key terms, then, are "severe," "pervasive," and "abusive," as not just any offensive or

discriminatory conduct rises to an actionable hostile work environment.  Under Faragher v. City

of Boca Raton, 524 U.S. 775, 787-88 (1998), in order to determine whether a work environment

is sufficiently hostile to be actionable under Title VII, a court should consider: (1) the frequency

of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or merely offensive; and (4) whether the conduct reasonably interferes with the employee's performance.

These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a "general civility code."  See Oncale, 523 U.S. at 80 (explaining that Title VII "does not prohibit all verbal or physical harassment in the workplace," only discriminatory harassment that satisfies the requirements of the statute).  Properly applied, this will filter out complaints attacking "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing."  Faragher, 524 U.S. at 787 (citations omitted); see also Breeden, 532 U.S. at 271 ("simple teasing, offhand comments, and isolated incidents (unless extremely serious)" are insufficient).

Moreover, it must be clear that the hostile work environment was the result of discrimination based on a protected status. As the Second Circuit has explained:

> Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals.

Alfano v. Costello, 294 F.3d 365, 377 (2d Cir. 2002).  To sustain his hostile work environment claim, then, Lipscomb must produce evidence that he was discriminated against because of his race or gender.  See, e.g., Hardin v. S.C. Johnson & Son, Inc., 167 F.3d 340, 345-46 (7th Cir. 1999) (hostile work environment claim failed where there was insufficient evidence that the alleged harassing behavior was motivated by discrimination); Jones, 12 F. Supp. 2d at 12 (hostile work environment claim failed where plaintiff had "not demonstrated that any of the conduct of

which he complain[ed] was related to his race, or that his workplace was permeated with racially discriminatory behavior").

Lipscomb bases his claim of hostile work environment on the aggregation of individual events that he has challenged as discriminatory -- the criticisms of his telephone usage, the criticism and monitoring that arose from resident complaints, criticisms that allegedly were inconsistent with his overall performance evaluations, the sexual harassment investigation, and the performance evaluation by Curry that allegedly blocked his permanent promotion to GS-11. As discussed above, however, the Court has found no inference of discrimination with respect to any of those events. Lipscomb's reliance on these events, therefore, falls far short of the showing he must make for a discriminatory hostile work environment claim. See Childs-Pierce v. Util. Workers Union of Am., 383 F. Supp. 2d 60, 79 (D.D.C. 2005) (explaining that the plaintiff could not "show a pervasive, severe and discriminatory hostile work environment, because the Court [had] already found the acts to be non-discriminatory"), aff'd, 187 Fed. Appx. 1 (D.C. Cir. June 27, 2006).

Moreover, alleged acts of disparate treatment cannot be transformed, without more, into a hostile work environment claim. See, e.g., Lester v. Natsios, 290 F. Supp. 2d 11, 33 (D.D.C. 2003) ("Discrete acts constituting discrimination or retaliation claims . . . are different in kind from a hostile work environment claim that must be based on severe and pervasive discriminatory intimidation or insult."); Parker v. State of Delaware Dep't of Public Safety, 11 F. Supp. 2d 467, 475 (D. Del. 1998) (stating that "the dangers of allowing standard disparate treatment claims to be converted into a contemporaneous hostile work environment claim are apparent.  Such an action would significantly blur the distinctions between both the elements that underpin each cause of action and the kinds of harm each cause of action was designed to

address.").  But even if a hostile work environment claim could be based on the aggregation of a

plaintiff's individual claims, Lipscomb's hostile work environment claim would fail here.

Assuming the truth of the alleged events and considering them in their totality, Lipscomb has

fallen far short of alleging conduct that, under <u>Harris</u> and <u>Oncale</u>, amounts to "intimidation,

ridicule and insult, that is sufficiently severe or pervasive to alter the conditions of . . .

employment and create an abusive working environment."  Accordingly, the Court will grant the

Navy's motion for summary judgment on Lipscomb's claim of hostile work environment in Count

Three.

<b><u>CONCLUSION</u></b>

To be sure, Lipscomb faced an unusually trying time in March 1999, with the onset of the

sexual harassment investigation, coming on the heels of declining performance reviews from

management and amidst an office-wide telephone audit.  But that is not enough to establish a

Title VII violation absent any evidence that would tend to suggest discrimination on the basis of

unlawful criteria.  Ultimately, Lipscomb has produced no evidence -- direct, circumstantial, or

otherwise -- that would permit a reasonable jury to find that any of the Navy's alleged actions

were motivated by discriminatory animus. For the foregoing reasons, the Court will grant the

Navy's motion for summary judgment on all claims and deny Lipscomb's cross-motion for

summary judgment.  The Court will also deny Lipscomb's second motion to compel discovery

and request for discovery sanctions, as well as Lipscomb's motion to strike the Navy's reply brief.

A separate order will be issued herewith.



/s/<br>
JOHN D.  BATES<br>
United States District Judge

Date:   September 18, 2008